## Page 1

```
 1                    CAUSE NO. 2020-01418
 2   KME HOLDINGS, LLC,      )  IN THE DISTRICT COURT OF
                             )
 3           Plaintiffs,     )
                             )
 4   VS.                     )  HARRIS COUNTY, TEXAS
                             )
 5   1960 FAMILY PRACTICE,   )
     P.A., PHYSICIANS ALLIANCE )
 6   OF RED OAK, L.P., UNITED )
     MEMORIAL MEDICAL CENTER, )
 7   LLC, HUONG LE NGUYEN,   )
     QUOC D. LE, AND ALEX L. )
 8   NGUYEN,                 )  189TH JUDICIAL DISTRICT
                             )
 9           Defendants.     )
10
11   *********************************************************
12           ORAL DEPOSITION OF HUONG LE NGUYEN
                   MAY 19, 2022
13
     *********************************************************
14
15       ORAL DEPOSITION OF HUONG LE NGUYEN, produced as
16   a witness at the instance of the Plaintiff and duly sworn,
17   was taken in the above styled and numbered cause on
18   Thursday, May 19, 2022, from 10:08 a.m. to 4:04 p.m.,
19   before SARA BIELAMOWICZ, CSR, RPR, in and for the State of
20   Texas, reported by computerized stenotype machine, at the
21   offices of Porter Hedges, 1000 Main Street, 36th Floor,
22   Houston, Texas, pursuant to the Texas Rules of Civil
23   Procedure and the provisions stated on the record herein.
24
25
```

## Page 2

```
 1              A P P E A R A N C E S
 2
     FOR THE PLAINTIFF:
 3       Ms. Robin M. Ziek
         ROBIN M. ZIEK - ATTORNEY AT LAW
 4       24 Greenway Plaza, Suite 2050
         Houston, Texas  77046
 5       713.222.8030
         Rziek@sbcglobal.net
 6
 7   FOR THE DEFENDANT, HUONG LE NGUYEN:
         Ms. Amy C. Falcon
 8       PORTER HEDGES, LLP
         1000 Main Street, 36th Floor
 9       Houston, Texas  77002
         713.226.6681
10       Afalcon@porterhedges.com
11
     FOR THE DEFENDANT, UNITED MEMORIAL MEDICAL CENTER:
12       Ms. Sharlene A. Poyser
         THE POYSER LAW FIRM
13       1001 Texas Avenue, Suite 400
         Houston, Texas  77002
14       832.498.5434
         sharlene@thepoyserlawfirm.com
15
16   FOR THE DEFENDANT, ALEX L. NGUYEN:
         Mr. Jeff Matthews
17       ATTORNEY AT LAW
         P.O. Box 982
18       Katy, Texas  77492
         281.772.0772
19       Jeff.superdocs@gmail.com
20
     ALSO PRESENT:
21       ALEX L. NGUYEN
22       ALEXANDRA SMOOTS
23
24
25
```

## Page 3

```
 1                    I N D E X
 2
                                            PAGE
 3
 4   APPEARANCES..............................    2
 5      HUONG LE NGUYEN
 6   EXAMINATION
        BY MS. ZIEK..........................    5
 7
 8   CORRECTIONS AND SIGNATURE................  183
 9   REPORTER'S CERTIFICATION................  185
10
11
12               E X H I B I T S
13   NO.        DESCRIPTION              PAGE
        Exhibit 21   Second Amended Notice of
14                   Intention to take the Oral
                     Deposition of Huong Le
15                   Nguyen                      8
        Exhibit 22   Tenant and Guarantor
16                   Estoppel Certificate,
                     3/27/18, 837 FM 1960 Road
17                   West, Houston, Texas       50
        Exhibit 23   Tenant and Guarantor
18                   Estoppel Certificate,
                     3/27/18, 845 FM 1960 Road
19                   West, Houston, Texas       50
        Exhibit 24   Asset Purchase Agreement   60
20      Exhibit 25   Sublease Agreement,
                     LE-KME000217-LE-KME000251  72
21      Exhibit 26   Consent to Sublease,
                     LE-KME000376-LE-KME000380  73
22      Exhibit 27   Sublease Agreement (Bld 3
                     - 847 Cypress Creek
23                   Parkway),
                     LE-KME000095-LE-KME000108  74
24
25
```

APPEARANCES — 2
EXAMINATION BY MS. ZIEK — 5
CORRECTIONS AND SIGNATURE — 183
REPORTER'S CERTIFICATION — 185
Exhibit 21 — 8
Exhibit 22 — 50
Exhibit 23 — 50
Exhibit 24 — 60
Exhibit 25 — 72
Exhibit 26 — 73
Exhibit 27 — 74

## Page 4

```
 1              INDEX (Cont.)
 2   Exhibit 28   Managed Access and Service
                  Agreement                    102
 3   Exhibit 29   Notice of Default from KME
                  Holdings, LLC                109
 4   Exhibit 30   Defendant Huong Le
                  Nguyen's Second Amended
 5                Answer, Counterclaim and
                  Cross-Claim                  111
 6   Exhibit 31   Invoice AR History,
                  LE-KME000011                 137
 7   Exhibit 32   Email String, Subject:
                  Fw: December Rent and CAM
 8                Invoice, 12/20/19,
                  LE-KME000018                 144
 9   Exhibit 33   Defendant Huong Le
                  Nguyen's Objections and
10                Responses to Subpoena
                  Duces Tecum                  156
11   Exhibit 34   Text Messages,
                  LE-KME000195                 163
12   Exhibit 35   Exhibit A/B #11b, UMC
                  Receivable Detail            174
13
14
15   REPORTER'S NOTE:
16   All quotations from exhibits are reflected in the manner
17   in which they were read into the record and do not
18   necessarily denote an exact quote from the document.
19
20
21
22
23
24
25
```

Exhibit 28 — 102
Exhibit 29 — 109
Exhibit 30 — 111
Exhibit 31 — 137
Exhibit 32 — 144
Exhibit 33 — 156
Exhibit 34 — 163
Exhibit 35 — 174

TRUSTEE1960-051925
Huong Le Nguyen

Page 5

1    HUONG LE NGUYEN,
2  HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:
3    EXAMINATION
4  BY MS. ZIEK:
5    Q. Dr. Le, my name is Robin Ziek, and I represent
6  KME Holdings, LLC. Do you understand, that ma'am?
7    **A. That you are represent, yes.**
8    Q. Okay. That I am the attorney for them?
9    **A. Yes.**
10   Q. Okay. Dr. Le, I'm going to ask you -- or I'm
11  going to go through a series of admonishments with you.
12  Have you ever had your deposition taken before?
13   **A. Yes.**
14   Q. Okay. So do you recall the admonishments they
15  gave you, that you must give a verbal answer to my
16  questions so that the court reporter can take it down?
17  Correct?
18   **A. Yes.**
19   Q. Okay. Would you also agree with me that if you
20  don't understand a question that I'm asking, that you will
21  ask me to rephrase it or to ask it again until you
22  understand the question so that you give a truthful answer
23  to that? Can we have that agreement?
24   **A. Yes.**
25   Q. Can we also have the agreement that if you want

Page 6

1  to take a break at any point in time to talk to your
2  lawyer, to go to the restroom, or just to take a break
3  from the questioning, that if there is a question that has
4  been asked, that you will answer that question before you
5  ask to take a break? Can we have that agreement?
6    **A. Yes.**
7    Q. Okay. Can we also have the agreement that you
8  will allow me to finish my questions before you begin your
9  answer so that the court reporter takes it down in a clear
10  manner?
11   **A. Yes.**
12   Q. Can I have that agreement?
13   **A. Yes.**
14   Q. Okay. Could you state your full name for the
15  record, ma'am?
16   **A. Dr. Huong, H-U-O-N-G, Le, L-E, Nguyen,**
17  **N-G-U-Y-E-N.**
18   Q. Okay. Do you normally go by Dr. Le?
19   **A. Yes.**
20   Q. Would it be okay if I call you Dr. Le today?
21   **A. Yes.**
22   Q. Okay. Dr. Le, are you related to any of the
23  other guarantors in this suit, the other defendants?
24   **A. What do you mean by "related"?**
25   Q. Okay. Are any of them your children?

Page 7

1    **A. I don't know what the defendant -- I know myself**
2  **is.**
3    Q. Okay. Are you married, ma'am?
4    **A. Yes.**
5    Q. Who are you married to?
6    **A. Minh Nguyen, M-I-N-H N-G-U-Y-E-N.**
7    Q. Okay. Do you have any children, ma'am?
8    **A. Yes.**
9    Q. How many?
10   **A. Two.**
11   Q. And what are their names?
12   **A. Michael, M-I-C-H-A-E-L, Nguyen. Same last name.**
13   Q. Okay. And your daughter's name?
14   **A. Michelle, M-I-C-H-E-L-L-E, Nguyen, N-G-U-Y-E-N.**
15   Q. Okay. Are either --
16     MS. FALCON: Do you need her to speak up?
17     (Discussion off the record.)
18   Q. (BY MS. ZIEK) Dr. Le, is Michael Nguyen married?
19   **A. Who? My son?**
20   Q. Yes, ma'am.
21   **A. No.**
22   Q. He's not married. Is he a doctor?
23   **A. No.**
24   Q. Michelle Nguyen, is she married?
25   **A. No.**

Page 8

1    Q. Is she a doctor?
2    **A. No.**
3    Q. Is your husband a doctor?
4    **A. Yes.**
5    Q. Where do you and Mr. Nguyen -- Dr. Nguyen reside?
6    **A. 50 Palmer Crest Drive, The Woodlands 77381.**
7    Q. Are you the only two parties that live in that
8  residence?
9    **A. Yes.**
10     (Exhibit 21 marked.)
11   Q. (BY MS. ZIEK) Dr. Le, it's my understanding that
12  you are here today in accordance with Exhibit 21. Let me
13  show you. And it's the only copy I have, unfortunately.
14  The other copies are for an earlier date.
15     Prior to coming here, Dr. Le, have you seen
16  that document?
17   **A. Yes. I -- I'm...**
18     MS. FALCON: Yes.
19   **THE WITNESS: Yes.**
20     MS. FALCON: Sorry.
21   **A. Yes. Yes.**
22   Q. (BY MS. ZIEK) Okay. And, Dr. Le, on the very
23  back, attached to it, is the subpoena duces tecum. And
24  your counsel was nice enough to provide me those documents
25  early on with a response. Do you recall providing

TRUSTEE1960-051925

LEXITAS

TRUSTEE1960-051926

Huong Le Nguyen

Page 9

1 documents pursuant to that subpoena duces tecum?

2    **A. I don't think I've seen this.**

3    Q. Okay. We'll go through it in a minute, but let's

4 go back to your background a little bit and then we'll go

5 through the listing on the back of the notice of

6 deposition.

7      Are you originally from the United States?

8    **A. No.**

9    Q. Where were you born, ma'am?

10    **A. Vietnam.**

11    Q. And when did you come to the United States?

12    **A. 1975.**

13    Q. Okay. And how old would you have been in 1975?

14    **A. 13.**

15    Q. Where did you go to college, ma'am?

16    **A. Rice University.**

17    Q. And what year did you graduate?

18    **A. 1981.**

19    Q. And what degree did you have in 1981 from Rice

20 University?

21    **A. Bachelor of Arts.**

22    Q. Okay. Did you subsequently go to medical school?

23    **A. Yes.**

24    Q. Okay. What medical school did you attend?

25    **A. Baylor College of Medicine.**

Page 10

1    Q. And what years did you go to Baylor College of

2 Medicine?

3    **A. I graduate in 1985.**

4    Q. Okay. And in 1985 when you graduated, did you

5 then do a residency in any specialty?

6    **A. Yes.**

7    Q. What residency did you do?

8    **A. Family practice.**

9    Q. Okay. Did you subsequently do any fellowships?

10    **A. No.**

11    Q. Once you completed your residency -- was your

12 residency also done at Baylor College of Medicine?

13    **A. No.**

14    Q. Where was your residency done?

15    **A. Montgomery County Foundation in Conroe, Texas.**

16    Q. And when did your residency end?

17    **A. 19 -- I'd say 1992. Oh, I take it back. I think**

18 **all my dates are mixed up.**

19     **I graduate from Rice in 1985. I graduate**

20 **from Baylor in 1989. And I finished my residency in 1992.**

21    Q. Okay. And when you finished your residency, did

22 you then go to work for a doctor or did you go to work for

23 a hospital?

24    **A. I went to work for a group of doctors.**

25    Q. Okay. And what was your primary practice?

Page 11

1    **A. Family practice.**

2    Q. Are you boarded in family practice?

3    **A. I was until I retire.**

4    Q. Okay. And when did you retire, Dr. Le?

5    **A. I think 1998. And then I went back to reinstate**

6 **during COVID time.**

7    Q. So approximately 2019 or 2020 --

8    **A. I'm sorry. 2018 or 2019 -- I cannot remember --**

9 **I retire. And then COVID hits and then I went back to**

10 **reinstate to help out with COVID.**

11    Q. Okay. So you didn't retire in 1998?

12    **A. No, no, I'm sorry 20 -- I'm sorry, not 1998.**

13 **2018 or 2019, I cannot remember.**

14    Q. Okay. And when you retired, when you said you

15 gave up your license, did you just put it in an inactive

16 status?

17    **A. Correct.**

18    Q. When did you marry your husband?

19    **A. I don't remember. I remember April 2nd was our**

20 **anniversary, 19, oh I was in -- 1989 or '88, one of those**

21 **years.**

22    Q. So pretty close to when you finished your

23 residency?

24    **A. No, medical school.**

25    Q. Medical school, okay.

Page 12

1     Is your husband boarded in anything?

2    **A. I don't know. You'd have to ask him. I know**

3 **he's a radiologist.**

4    Q. Have you and your husband ever worked together in

5 the same group of doctors before?

6    **A. We have our own separate practices.**

7    Q. Okay. What was the name of the group that you

8 originally worked for when you got through with your

9 residency in '92?

10    **A. Red Oak Family Practice.**

11    Q. And who owned Red Oak Family Practice?

12    **A. It was a group of doctors. I don't know who**

13 **owned it back then.**

14    Q. Okay. Did you subsequently buy into Red Oak

15 Family Practice?

16    **A. There was a physician who retired, Dr. Lewis**

17 **Foxhall, and I did buy in, yes.**

18    Q. And how long were you with Red Oak Family

19 Practice?

20    **A. From 1992 to -- I don't remember. It's been so**

21 **long.**

22    Q. Okay, ma'am. When -- after you left Red Oak

23 Family Practice, did you sell your portion to another

24 doctor?

25    **A. I don't know. I think Red Oak Family Practice**

TRUSTEE1960-051926

LEXITAS

Page 13

1 become 1960 Family Practice.

2    Q. Did you buy out the other physicians?

3    **A. Yes.**

4    Q. So when it became 1960 Family Practice, how many

5 owners were there?

6    **A. It was myself, originally.**

7    Q. Did the ownership subsequently change?

8    **A. Yes.**

9    Q. When did it change, ma'am?

10    **A. I don't remember.**

11    Q. Okay. Who else was an owner of 1960 Family

12 Practice?

13    **A. Quoc Le.**

14    Q. And that's spelled, for the court reporter,

15 Q-U-O-C -- and what was his last name?

16    **A. Le, L-E.**

17    Q. Okay. Was that person any relationship to you?

18    **A. No.**

19    Q. And how much of 1960 Family Practice did the

20 other Dr. Le own?

21    **A. I don't remember.**

22    Q. Was it more than 50 percent, ma'am?

23    **A. No.**

24    Q. Did Quoc Le subsequently leave 1960 Family

25 Practice?

Page 14

1    **A. Yes.**

2    Q. Do you recall when Dr. Quoc Le left?

3    **A. I don't remember when.**

4    Q. Was it before 2018, ma'am?

5    **A. Yes.**

6    Q. Did you buy his portion of the practice back,

7 ma'am?

8    **A. Yes.**

9    Q. And so after Dr. Quoc Le left, you were then a

10 hundred percent owner of 1960 Family Practice again,

11 correct?

12    **A. No.**

13    Q. Okay, ma'am. Who else was an owner?

14    **A. Alex Nguyen.**

15    Q. Okay. Did Dr. Nguyen, Dr. Alex Nguyen -- let me

16 just use first and last names. Did Dr. Alex Nguyen buy

17 into the practice?

18    **A. Yes.**

19    Q. Do you recall when?

20    **A. I don't remember.**

21    Q. Okay. Was there a time that you, Dr. Quoc Le,

22 and Alex Nguyen owned 1960 Family Practice?

23    **A. Yes.**

24    Q. At any of those times did either Dr. Quoc Le or

25 Dr. Alex Nguyen own more than 50 percent of 1960 Family

Page 15

1 Practice?

2    **A. No.**

3    Q. At any point in time did Dr. Quoc Le and Alex

4 Nguyen together own 50 percent of 1960 Family Practice?

5    **A. No.**

6    Q. So at all points in time you were the majority

7 shareholder in 1960 Family Practice. Is that a correct

8 statement?

9    **A. Yes.**

10    Q. Okay. Did Dr. Alex Nguyen subsequently leave

11 1960 Family Practice?

12    **A. Yes.**

13    Q. Do you recall what date?

14    **A. I don't remember -- 2018 to 2019. I don't**

15 **remember exact date.**

16    Q. Okay. Did you buy out Dr. Nguyen's portion of

17 the practice?

18    **A. No.**

19    Q. So what happened to Dr. Nguyen's shares of stock

20 in 1960 when he left?

21    **A. They were still there.**

22    Q. Setting aside the issue of the bankruptcy right

23 now, is it your statement that if -- if 1960 Family

24 Practice was not in bankruptcy, that Dr. Alex Nguyen would

25 still own shares of stock in it?

Page 16

1    **A. Yes.**

2    Q. Would the statement still be true as far as

3 Dr. Quoc Le?

4    **A. No, Dr. Quoc Le was bought out.**

5    Q. Okay. And he was bought out by you and Dr. Alex

6 Nguyen?

7    **A. And Dr. Annie Hoang. Dr. Annie Hoang came to**

8 **replace Dr. Quoc Le.**

9    Q. So did Dr. Annie Hoang, when she replaced

10 Dr. Quoc Le, did she buy his stock or did the company buy

11 the stock back and reissue stock to her?

12    **A. The company bought the stock back and reissue to**

13 **her.**

14    Q. Was she reissued the same amount of stock that

15 Dr. Quoc Le had?

16    **A. No.**

17    Q. Was it more or less?

18    **A. Less.**

19    Q. Again, setting aside the bankruptcy proceeding,

20 if 1960 Family Practice was no longer -- or was not in

21 bankruptcy, would Dr. Annie Hoang still have her portion

22 of 1960 Family Practice?

23    **A. Yes.**

24    Q. So the shareholders of 1960 Family Practice at

25 the time the bankruptcy was filed were you, Dr. Le,

TRUSTEE1960-051928

Page 17

1  correct?
2    **A. Yes.**
3    Q. Dr. Alex Nguyen, correct?
4    **A. Correct.**
5    Q. And Dr. Annie Hoang, correct?
6    **A. Correct.**
7    Q. Did those three -- did all three shareholders
8  vote to put 1960 Family Practice, PA, into bankruptcy?
9    **A. No.**
10    Q. Were they aware that you were going to file
11  bankruptcy for 1960 Family Practice?
12    **A. I don't know --**
13    Q. Okay. Has your medical license ever been
14  suspended for any reason, ma'am?
15    **A. No.**
16    Q. How are you currently employed?
17    **A. I am an independent contractor.**
18    Q. Okay. When you say you're an independent
19  contractor, who are you working for as an independent
20  contractor?
21    **A. For a company that staff emergency room.**
22    Q. So a company that staffs emergency rooms?
23    **A. Yes.**
24    Q. Okay, ma'am. And what's the name of that
25  company?

Page 18

1    **A. Viventi Med, LLC.**
2    Q. Could you spell that, please?
3    **A. Viventi, V-I-V-E-N-T-I, Med, M-E-D, LLC.**
4    Q. Do you have any own ownership in Viventi Med,
5  LLC?
6    **A. I don't think so.**
7    Q. Does your husband have any ownership in Viventi
8  Med, LLC?
9    **A. Yes.**
10    Q. How much of that does your husband own?
11    **A. I don't know.**
12    Q. Does he have any other members in that LLC with
13  him, ma'am?
14    **A. I don't know.**
15    Q. Where are the offices of Viventi Med, LLC?
16    **A. I don't know.**
17    Q. You don't know where your employer is, ma'am?
18    **A. It's -- everything is online. I don't know where**
19  **they're located to tell --**
20    Q. Okay. How do you find out where you are supposed
21  to go to staff emergency rooms?
22    **A. They email me.**
23    Q. And what does the email contain?
24    **A. It says this location needs a physician on this**
25  **date and day, can you cover that shift. I can say yes or**

Page 19

1  no to that shift.
2    Q. How many independent contractors does Viventi
3  Med, LLC, have?
4        MS. FALCON: Objection. Form.
5    **A. I don't know.**
6    Q. (BY MS. ZIEK) Would your husband know the
7  answers to these questions, ma'am?
8    **A. I don't know.**
9    Q. Do you or your husband own any other LLCs, ma'am?
10    **A. Yes.**
11    Q. Okay. Let's start with you, Dr. Le. How many
12  LLCs have you been involved with?
13        MS. FALCON: Objection. Form.
14    **A. I don't know.**
15    Q. (BY MS. ZIEK) Would it be more than ten, ma'am?
16    **A. I cannot -- I don't know.**
17    Q. Okay. How many are you involved with currently?
18    **A. I don't -- I don't know. I have staff that**
19  **handle that. I don't know.**
20    Q. Okay. Who would know the answers to these
21  questions of your staff?
22    **A. Stacy Williams.**
23    Q. And what company does Stacy Williams work for?
24    **A. She works for Viventi Med, LLC.**
25    Q. And how long have you known Ms. Williams?

Page 20

1    **A. More than 20 years.**
2    Q. Was she originally employed by 1960 Family
3  Practice, ma'am?
4    **A. Yes.**
5    Q. And how long was she with 1960 Family Practice?
6    **A. More than 20 years. I would think until the day**
7  **it filed for bankruptcy.**
8    Q. After it filed for bankruptcy, did your husband
9  hire Ms. Williams?
10        MS. FALCON: Objection. Form.
11    Q. (BY MS. ZIEK) Well, who at Viventi Medical, LLC,
12  hired Ms. Williams?
13        MS. FALCON: Objection. Form.
14    Q. (BY MS. ZIEK) You can answer the question,
15  ma'am.
16        MS. FALCON: If you know.
17    **A. I don't know.**
18    Q. (BY MS. ZIEK) Well, how did Ms. Williams know
19  that there was an opening at Viventi Med, LLC?
20        MS. FALCON: Objection. Form.
21    **A. She hired -- they hire me as an independent**
22  **contractor to staff emergency room, and I'm also their**
23  **medical director for the emergency room.**
24    Q. (BY MS. ZIEK) When you say you're the medical
25  director for the emergency room, what emergency room?

TRUSTEE1960-051929

Page 21

1    A.  Houston Medical Emergency Room.

2    Q.  And where is that located?

3    A.  2306 Rayford Road, Spring, Texas 77386.

4    Q.  And who hired you as the medical director for

5    that emergency room, ma'am?

6    A.  The director of human resources.

7    Q.  And who was that, ma'am?

8    A.  Melissa Igo.

9    Q.  And how long have you known Melissa Igo?

10   A.  More than five years.

11   Q.  Has Melissa Igo ever worked for 1960 Family

12   Practice?

13   A.  Yes.

14   Q.  Other than working as the medical director for

15   the emergency room Houston Medical Room and working for

16   Viventi Med, LLC, do you hold any other positions?

17   A.  No.  I do through my various LLC but not as a

18   pay -- payroll position..

19   Q.  Well, as an independent contractor, ma'am, are

20   you a 1099 employee or a W-2?

21   A.  I am a -- both.  I am a W-2.  No, I'm sorry, I

22   think I'm a W-2.

23   Q.  So you are not an independent contractor?

24   A.  Yeah, I'm not an independent contractor.  I think

25   originally I was an independent contractor, but I changed

Page 22

1    my status to W-2.

2    Q.  And when was that status changed?

3    A.  I don't remember.

4    Q.  Was it within the last 12 months, ma'am?

5    A.  I don't -- it will be on the record.  I don't

6    remember when.

7    Q.  Okay, ma'am.  How long have you worked for

8    Viventi Medical, LLC?

9    A.  Since COVID hit in 2019 -- I'm sorry, 2020.

10   Q.  Was it before or after you sold the assets of

11   1960 Family Practice to United Memorial Medical Center?

12   A.  After.

13   Q.  And how long have you been the medical director

14   for the emergency room?

15   A.  One year or so, since -- ever since I was hired

16   with Viventi Med.  It was -- I remember it was during

17   COVID time, when they need someone to be the medical

18   director.

19   Q.  And would that be, again, after you sold the

20   assets to UMMC?

21   A.  Yes.

22   Q.  Have you ever worked for your husband in any of

23   his LLCs?

24   A.  No, I don't think so.

25   Q.  So you've never done anything with his radiology

Page 23

1    practice?

2    A.  No.

3    Q.  Do you have any businesses with your children?

4    A.  I don't understand the question.

5    Q.  Okay, ma'am.  I'll get to it in a second.

6        Allergy of Texas, LLC, what is that, ma'am?

7    A.  It's an LLC.

8    Q.  Okay.  And who runs that LLC?

9    A.  I do.  I do.  I'm the manager.

10   Q.  You're the managing member?

11   A.  No, not managing.  Manager.

12   Q.  Okay.  So is that LLC managed by managers and not

13   members, then?

14   A.  Correct.

15   Q.  Okay.  Are you the only member of Allergy of

16   Texas, LLC?  I'm sorry, let me rephrase it.

17        Are you a member of Allergy of Texas, LLC?

18   A.  I don't know.

19   Q.  Who would know, ma'am?

20   A.  Stacy Williams.  It's an unpaid position, so I

21   don't know.

22   Q.  And what does Allergy of Texas, LLC, do?

23   A.  It's a management company/staffing.

24   Q.  And what does it staff?

25   A.  It staff the administrative staff, like billing,

Page 24

1    collection, accounting.

2    Q.  And how long has Allergy of Texas -- how long

3    have you been the manager of Allergy of Texas, LLC?

4    A.  Since 2019, after 1960 Family Practice sold to

5    United Memorial Group.

6    Q.  Okay.  Was Allergy of Texas, LLC, in existence

7    prior to you selling 1960 Family Practice's assets to

8    UMMC?

9        MS. FALCON:  Objection.  Form.

10   A.  Yes.

11   Q.  (BY MS. ZIEK)  Were you the manager of it when

12   you were also a shareholder in 1960 Family Practice, PA?

13   A.  I don't remember.

14   Q.  You don't remember whether you were managing it

15   when you were working for 1960 Family Practice, PA?

16   A.  Yes.  Allergy of Texas was created to hire

17   allergists to do allergy testing for 1960 Family Practice.

18   Q.  And when did its purpose change?

19   A.  2019, after UMMC bought 1960 Family Practice.

20   Q.  So, in 2019, you, as the manager, changed the

21   purpose of Allergy of Texas, LLC, to become a staffing

22   company versus hiring allergists to do allergy testing?

23   A.  Correct.

24   Q.  And how many people does Allergy of Texas, LLC,

25   employ?

TRUSTEE1960-051929    LEXITAS

TRUSTEE1960-051930

Page 25

1    A.  When?  During what period?

2    Q.  I'm sorry.  From -- let's start out in 2018,

3  before COVID.

4    A.  I think it didn't have anyone.  I'm sorry.

5  Allergy of Texas created to hire allergists to do allergy

6  testing.  For a short period of time in the mid 2000, they

7  have done a little bit of allergy testing.  And then they

8  stop.  And then it was -- it has no employee.

9        UMMC bought out 1960 Family Practice asset

10  in 2019, September 2019.  The billing and collections

11  staff, Stacy Williams and Melissa Igo, move from 1960

12  Family Practice to Allergy of Texas and they create a

13  payroll for administrative and billing staff since

14  September 19th -- since September 2019.

15    Q.  So Stacy Williams and Michelle Igo never went to

16  work for UMMC, correct?

17    A.  Melissa Igo.

18    Q.  I'm sorry.  Melissa.

19    A.  No, they did not.

20    Q.  Did 1960 Family Practice ever own a pharmacy?

21    A.  Yes.

22    Q.  And what was the name of the pharmacy?

23    A.  Express Specialty Pharmacy.

24    Q.  Did that specific pharmacy supply all of the

25  pharmaceutical needs of 1960 Family Practice?

Page 26

1    A.  No.  It's a retail pharmacy.  It fills

2  prescription like Walgreens or CVS --

3    Q.  Okay.

4    A.  -- for the patients of 1960 Family Practice.

5    Q.  So that's where 1960 Family Practice would send

6  the patients to have their prescriptions filled?

7    A.  If the patient choose that.

8    Q.  Okay.  Is that pharmacy still in existence today?

9    A.  No.

10    Q.  When did that pharmacy cease to exist?

11    A.  November 2019 or December 2019.  By the end of

12  2019, it was closed.

13    Q.  Okay.  And why was the pharmacy closed?

14    A.  Because the pharmacy was losing money.

15    Q.  How long had the pharmacy been losing money,

16  ma'am?

17    A.  For a year -- a year or more.

18    Q.  Have you ever opened any other pharmacy?

19    A.  Yes.

20    Q.  When was that pharmacy opened?

21    A.  When?  I don't remember.  20 -- in the mid 2000s.

22  I cannot remember the exact date.

23    Q.  So in the mid 2000s, what other pharmacy did you

24  open?

25    A.  Express Specialty, LLC.

Page 27

1    Q.  Is that pharmacy still ongoing?

2    A.  It was sold to UMMC in 2021.

3    Q.  And who were the members of Express Specialty,

4  LLC?

5    A.  It was myself and my husband.

6    Q.  Were you sending any of your patients to Express

7  Specialty, LLC?

8    A.  I stopped practicing medicine, seeing patients

9  since 2016, so, no, I would not.  I don't have patients.

10    Q.  Were you recommending that the doctors who worked

11  for 1960 Family Practice send their patients to have

12  their -- to have their prescriptions filled at Express

13  Specialty, LLC?

14    A.  No, because they're sending to their pharmacy at

15  Express Specialty that's owned by the Family Practice.

16  The other pharmacy was not located inside the Suite 105

17  where the Family Practice is.

18    Q.  Okay.  Where was this pharmacy located?

19    A.  It was located in a different location at Spring.

20    Q.  Did you have any family member or relative

21  working at the Express Specialty, LLC, pharmacy?

22    A.  Yes.

23    Q.  Who was working there?

24    A.  Briefly my daughter.  She's a pharmacist.

25    Q.  And when did she cease working there?

Page 28

1    A.  I cannot remember.  Sometime, I think, 20 -- I

2  think she worked there 2019 after UMMC bought out the

3  Family Practice pharmacy.

4    Q.  Did your daughter originally work for the

5  pharmacy Express Specialty Pharmacy that 1960 owned?

6    A.  I don't remember.  I don't know.

7    Q.  You don't remember if your daughter worked for

8  the pharmacy you owned?

9    A.  No, because all pharmacy are managed by the

10  pharmacist in charge.

11    Q.  All right.  Who was the pharmacist in charge?

12    A.  His name -- it was Marcia Smith.  And then it

13  was -- she resigned and Freeman -- somebody named Freeman

14  something.

15    Q.  And who hired the managing pharmacist?

16    A.  They have a manager there.  Her name is Julia

17  Valdez.

18    Q.  And so you would not have been the person who

19  would have ever interviewed the pharmacist that worked

20  either for Express Specialty Pharmacy and/or Express

21  Specialty, LLC.  Is that a correct statement?

22    A.  I don't get involved in the day-to-day operation.

23    Q.  That wasn't the question, ma'am.

24        MS. ZIEK:  Objection.  Nonresponsive.

25    Q.  (BY MS. ZIEK)  The question was did you ever

TRUSTEE1960-051930

LEXITAS

TRUSTEE1960-051931

Page 29

1  interview the pharmacists for those positions?
2  **A. No.**
3  Q. Including your daughter?
4  **A. Marcia interview my daughter.**
5  Q. Where does your daughter currently work?
6  **A. She went -- after that -- she was there for --**
7  **very briefly as a relief -- they call a relief pharmacist.**
8  Q. Yes, ma'am.
9  **A. And then she went to work at Kroger Pharmacy.**
10  Q. And I believe your earlier testimony is your
11  daughter is not married. Is that correct?
12  **A. Correct.**
13  Q. Does she have a significant other she lives with?
14       MS. FALCON: Objection. Form.
15  **A. I think that's...**
16  Q. (BY MS. ZIEK) Do you have any grandkids, ma'am?
17  **A. No, I don't.**
18  Q. Texas Radiology Associates, who owns that
19  business, ma'am?
20  **A. My husband.**
21  Q. Was that business started while you were in --
22  while you were married to him?
23  **A. I don't know.**
24  Q. I think you earlier testified that you and your
25  husband got married out of medical school, correct?

Page 30

1  **A. Yes.**
2  Q. Was your husband a practicing physician, a
3  practicing radiologist at the time you got married?
4  **A. He just finished his residency.**
5  Q. Have you been continuously married to your
6  husband since you got married out of medical school?
7  **A. Yes, yes.**
8  Q. Who owns Providence Hospital of North Houston,
9  LLC?
10  **A. It's a partnership. It's an LLLC who owns it.**
11  Q. I understand it's an LLC, ma'am. Do you have
12  membership interests in that LLC?
13  **A. Yes.**
14  Q. And how much of Providence Hospital of North
15  Houston do you own?
16  **A. I don't remember.**
17  Q. Is it more than 50 percent, ma'am?
18  **A. I don't think so.**
19  Q. Who are the other members?
20  **A. My husband.**
21  Q. So between you and your husband, you own a
22  hundred percent of Providence Hospital of North Houston,
23  LLC. Is that a correct statement?
24  **A. Yes.**
25  Q. And what does Providence Hospital of North

Page 31

1  Houston, LLC, own?
2  **A. I don't understand the question.**
3  Q. Does it own the hospital, ma'am?
4  **A. Yes.**
5  Q. And where is that hospital located?
6  **A. It's on Red Oak.**
7  Q. And how many beds does that hospital have?
8  **A. 16.**
9  Q. Who runs the hospital Providence Hospital of
10  North Houston, LLC? Who operates it?
11  **A. CEO, COO.**
12  Q. And are the CEO and the COO -- excuse me, are
13  they employees of Providence Hospital of North Houston,
14  LLC, or a different entity?
15  **A. They were employed by TMMS staffing that staff**
16  **the Providence Hospital of North Houston.**
17  Q. And do you-all have any interest in that staffing
18  company?
19  **A. Yes.**
20       MS. FALCON: Objection. Form.
21  **A. TMMS.**
22  Q. (BY MS. ZIEK) Is that a yes?
23  **A. Yes.**
24  Q. Is TMMS an LLC also?
25  **A. Yes.**

Page 32

1  Q. And who owns TMMS LLC?
2  **A. Myself. Myself and my husband.**
3  Q. Does TMMS LLC also provide the doctors for
4  Providence Hospital of North Houston?
5  **A. No.**
6  Q. Who provides the doctors?
7  **A. Doctors are not being hired by the hospital.**
8  **Hospital cannot hire the physician. Against corporate**
9  **practice of medicine.**
10  Q. Okay. So are the doctors independent contractors
11  who have staff privileges there?
12  **A. We don't call them independent contractor. Any**
13  **doctors can apply for staff privileges and they get staff**
14  **privileges.**
15  Q. Do you know how many doctors at Providence
16  Hospital of North Houston have staff privileges there?
17  **A. Between active and courtesy, over 200.**
18  Q. (BY MS. ZIEK) Dr. Le, let me show you --
19       MS. ZIEK: Our lease is in there?
20       MS. FALCON: Yeah, yeah.
21       MS. ZIEK: Okay. So tell me what number
22  they are.
23       MS. FALCON: B2 is Number 2.
24       MS. ZIEK: Okay.
25       MS. FALCON: B3 is Number 3.

TRUSTEE1960-051932

Page 33

1    Q.  (BY MS. ZIEK)  I'm going so show you just --
2   we're going to already have these in the record, but I
3   want you to have these in front of you.
4            MS. FALCON:  You need these two?
5            MS. ZIEK:  I'll just give her copies.
6   They're the same ones.
7    Q.  (BY MS. ZIEK)  Let me show you what has been
8   marked as B1 and B2.
9            MS. FALCON:  B2 and B3.
10           MS. ZIEK:  I'm sorry, B2 and B3.
11   Q.  (BY MS. ZIEK)  Have you seen these documents
12  prior to coming here today?
13   **A.  Yes.**
14   Q.  Okay.  What are they, ma'am?
15   **A.  They are -- this is the lease for Building 2 on**
16  **847 FM 1960.**
17   Q.  Okay.  And B3?
18   **A.  B3?  I don't have B3.  Okay.**
19   Q.  It's right there.
20   **A.  Okay.**
21           MS. FALCON:  Do we need a stapler?
22           MS. ZIEK:  We couldn't staple them.  They
23  weren't going through all the way, so unless you have a
24  really thick one.  That's why we put paper clips on them.
25   **A.  I don't see the difference.**

Page 34

1    Q.  (BY MS. ZIEK)  Did I hand you two of the same
2   kind?  One would have handwriting that says "Building 2"
3   at the top.
4    **A.  Yes.**
5    Q.  And the other one would be Building 3 with the B3
6   in the first paragraph.
7    **A.  Yes.  Yes.**
8    Q.  Okay.  Do your signatures appear on each of these
9   documents, ma'am, on behalf of 1960 Family Practice, PA?
10   **A.  It is shown on the last page, right here.**
11   Q.  Well, it looks like it's on page 34 of my copy --
12   **A.  Correct.**
13   Q.  -- on B2, correct?
14   **A.  Correct.**
15   Q.  And it looks like it's also on page 34 on B3,
16  correct?
17   **A.  Hold on.  Hold on.  Correct.**
18   Q.  Okay, ma'am.  And these lease agreements were
19  originally with Broadstone FMFP Texas B2, LLC, and
20  Broadstone FMFP Texas B3, LLC, correct?
21   **A.  Correct.**
22   Q.  And were these leases for buildings on 1960
23  that -- 1960 Family Practice was utilizing?
24   **A.  Yes.**
25   Q.  Okay.  When you signed these agreements, did you

Page 35

1   understand the terms and conditions of them, ma'am?
2            MS. FALCON:  Objection.  Form.
3    **A.  I have lawyer who review the lease.**
4    Q.  (BY MS. ZIEK)  Okay.  And based on whatever
5   advice your lawyer gave you, did you understand your
6   lawyer's advice?
7    **A.  I don't understand the question.  What do you**
8   **mean?**
9    Q.  Okay, ma'am.  Before you entered into this, had
10  you made yourself aware of everything you thought you
11  needed to be aware of before you signed it?
12           MS. FALCON:  Objection.  Form.
13   **A.  I had the lease review by the lawyer, and I ask**
14  **him, is this okay?  And he said, it looks fine.**
15   Q.  (BY MS. ZIEK)  Okay.  So could you turn to
16  page 21, ma'am.
17           MS. FALCON:  Of which exhibit?
18           MS. ZIEK:  I'm sorry, of either one, either
19  B2 or B3.  They're still the same.
20           MS. FALCON:  Let's be clear.
21   Q.  (BY MS. ZIEK)  Go ahead and turn to B2, page 21.
22   **A.  Okay.**
23   Q.  Did you understand when you entered into this
24  agreement that if you were going to assign either B2 or
25  B3, either lease, that you needed the consent of the

Page 36

1   landlord?
2            MS. FALCON:  Objection.  Form.
3    **A.  I'm not a lawyer, so I don't know what that**
4   **means.**
5    Q.  (BY MS. ZIEK)  Okay, ma'am.  Let's just read the
6   first paragraph.
7    **A.  Okay.**
8    Q.  A starts out with "Tenant" --
9            Was 1960 Family Practice PA the tenant?
10   **A.  Yes.**
11   Q.  Okay.
12           -- "may not assign, mortgage, or pledge this
13  lease, voluntarily or involuntarily, whether by operation
14  of law or otherwise, or sublet any of the leased premises
15  at any time, to any other person in each case without the
16  prior written consent of landlord, which consent shall not
17  be unreasonably withheld, conditioned, or delayed provided
18  that..." and then it continues on, correct, ma'am?
19   **A.  Yes.**
20   Q.  Did I read that correctly?
21   **A.  Yes.**
22   Q.  So you, 1960, understood that you could not
23  assign this lease, correct, without the consent of the
24  landlord?
25   **A.  Did I assign the lease?**

TRUSTEE1960-051932

LEXITAS

TRUSTEE1960-051933
Huong Le Nguyen

Page 37

1    Q.  I'm asking did you understand that provision when
2  you signed this, ma'am?
3        MS. FALCON:  Objection.  Form.
4    **A.  I understand that I may not assign, mortgage, or**
5  **pledge, voluntarily or involuntarily, whether by operation**
6  **of law or otherwise, is exactly what's written in here.**
7    Q.  (BY MS. ZIEK)  Okay.  And that you could not
8  sublet any of the lease premises at any time without the
9  consent of the landlord, correct?
10   **A.  I don't think we ever sublease out to anyone**
11  **without consent.**
12   Q.  Okay.  That's what I'm asking.  You understood
13  that if you were going to sublease, you had to go get the
14  landlord's consent, correct?
15       MS. FALCON:  Objection.  Form.
16   Q.  (BY MS. ZIEK)  Did you or did you not understand,
17  ma'am, that you needed the landlord's consent to sublet
18  any portion of premises in either Building 2 or 3?
19       MS. FALCON:  Objection.  Form.
20   Q.  (BY MS. ZIEK)  You can still answer, ma'am.
21   **A.  Like I said, I do things with -- whenever I do**
22  **something, I ask my lawyer.**
23   Q.  Okay, ma'am.
24   **A.  And if my lawyer say yes, I say okay.  I'm not a**
25  **lawyer.  I can't do things without having a lawyer say yes**

Page 38

1  or no.
2    Q.  Okay.  So later on down that paragraph after
3  small little 3, iii, "Any assignment, mortgage, or pledge
4  of this lease or any subletting of any portion of the
5  lease premises without the landlord's prior written
6  consent shall be null and void."
7        MS. ZIEK:  Amy, I think he's trying to give
8  you something.
9    Q.  (BY MS. ZIEK)  Do you see that, ma'am?
10   **A.  Yes, I do see that.**
11   Q.  Okay.  So did you understand in your capacity as
12  the president of 1960 that you could not sublet or assign
13  any portions of these leases without the landlord's
14  consent?
15   **A.  What I'm saying is that whenever there is that**
16  **case, I turn to my lawyer and -- that's it.  I don't --**
17  **I'm not a lawyer.  I'm not a -- I don't read leases.  I**
18  **listen to my lawyer.**
19   Q.  Okay.  So you didn't read --
20       MS. FALCON:  Before you move on, don't --
21  make sure you don't talk about what your lawyer tells you
22  because that is privileged.
23   Q.  (BY MS. ZIEK)  Yeah, that is privileged.  I don't
24  want you to say that.
25   **A.  Yes.  But that's what I'm trying to say.  I --**

Page 39

1  what -- you are trying to ask me to be a lawyer, and I'm
2  telling you I'm not a lawyer.  Every time I do something,
3  I tell my lawyer and I just -- they do what they need to
4  do.
5    Q.  Okay.  So is it your testimony -- did you read
6  these agreements before you signed them?
7    **A.  My lawyer reads them.**
8    Q.  Okay.  Ma'am, that wasn't the question.  The
9  question was, did you read them?
10   **A.  I glanced at them, but I don't understand -- even**
11  **if you're reading it to me right now, right in front of my**
12  **face, and you could repeat it a hundred times, I still**
13  **don't understand.  I just turn it to my lawyer and my**
14  **lawyer tells me yea or nay and they take over.**
15       MS. ZIEK:  Objection.  Responsiveness.
16       Do we have the lease guaranties?
17       MS. FALCON:  Yeah.
18       MS. ZIEK:  What numbers are they?
19       MS. FALCON:  4 is the one dated June 23,
20  2011.
21       MS. ZIEK:  It's B4?
22       MS. FALCON:  Uh-huh.  It's -- no, it's just
23  Exhibit 4.
24       MS. ZIEK:  Okay.
25       MS. FALCON:  And it's the one for

Page 40

1  Building 2.
2        MS. ZIEK:  Uh-huh.
3        MS. FALCON:  Exhibit 5 is the one for
4  Building 3.  And Exhibit 6 is the one with --
5        MS. ZIEK:  Yeah, the modification.
6        MS. FALCON:  -- the modification, yeah.
7    Q.  (BY MS. ZIEK)  Okay.  Let me show you what has
8  been marked as Exhibits 4 and 5 that are already in
9  evidence.  And I'll get them down there as well.  And I'm
10  not -- please understand I'm not throwing documents at
11  you.  I'm trying to get them across the table.
12       Please let me know when you are ready so --
13  I don't want to --
14       MS. FALCON:  Do you need any ice water or
15  anything?
16       **THE WITNESS:  I'm good.  Can I get another**
17  **bottle of water?**
18   **A.  Yes, ma'am, I'm ready.**
19   Q.  (BY MS. ZIEK)  Okay.  Have you seen Exhibits 4
20  and 5 before coming here today?
21   **A.  If I have, been so long ago, I don't remember.**
22   Q.  Okay.  Dr. Le, what did you do to prepare for
23  your deposition today?
24   **A.  I talked to my lawyer.**
25   Q.  Okay.  And other than talking to your lawyer, did

TRUSTEE1960-051933
LEXITAS

Page 41

1  you review any documents prior to coming here today?

2   **A. No.**

3   Q. I need to ask another question. Are you on any

4  type of medication that would keep you from answering

5  truthfully today?

6   **A. No. I'm on doxycycline antibiotics.**

7   Q. With regard to Exhibit Number 4, ma'am, what is

8  your understanding of what this document is?

9   **A. It's a lease guaranty.**

10   Q. Okay. Is your signature on it on page 5?

11   **A. Yes.**

12   Q. Okay. And is also your signature on page 5 of

13  Exhibit 5?

14   **A. Yes.**

15   Q. In layman's terms, not lawyer terms, what was

16  your understanding of these two documents?

17   **A. That we guarantee a lease.**

18   Q. Okay. And when you say you guaranteed a lease,

19  are we talking about Exhibit B2 and B3?

20   **A. These -- the lease guaranty, yes.**

21   Q. Okay. But what did these guaranties actually

22  guarantee? Were they the leases that are marked as B2 and

23  B3?

24   **A. Yes.**

25   Q. And who were the original guarantors on Exhibit 4

Page 42

1  and 5?

2   **A. On page 5, Huong Le, Quoc Le, and Alex Nguyen.**

3   Q. Okay, ma'am. And what was your understanding of

4  everybody's liability with regard to this lease guaranty?

5   MS. FALCON: Objection. Form.

6   **A. I don't understand, I truly don't.**

7   Q. (BY MS. ZIEK) Did you read this agreement before

8  you signed it, ma'am?

9   **A. My lawyer read it, yes.**

10   MS. ZIEK: Objection. Responsiveness.

11   Q. (BY MS. ZIEK) Did you read this agreement,

12  ma'am, before you signed it?

13   **A. I don't remember.**

14   Q. Okay, ma'am. Under paragraph 3, it says that the

15  "Guarantors waive presentment, demand, protest, notice of

16  default, nonpayment and protest of all demands, notices,

17  and surety defenses generally."

18   Do you see that, ma'am?

19   **A. Yes.**

20   Q. Did you discuss that provision with your lawyer?

21  Not what he said. I'm asking did you discuss that

22  provision with your lawyer?

23   **A. No.**

24   Q. Do you understand that provision as you sit here

25  today?

Page 43

1   **A. No.**

2   Q. Okay, ma'am. Going -- continuing down, paragraph

3  number 9, it states that the "Guarantor's liability shall

4  be primary and joint and several with that of the tenant

5  and any other Guarantors on this lease."

6   Do you see that, ma'am?

7   **A. Yes.**

8   Q. Do you understand what "joint and several

9  liability" means?

10   MS. FALCON: Objection. Form.

11   **A. No.**

12   Q. (BY MS. ZIEK) Did you discuss that provision

13  with your lawyer?

14   MS. FALCON: Objection.

15   Don't answer that question. That's a

16  privilege question.

17   Q. (BY MS. ZIEK) I didn't ask what the lawyer said.

18  I asked did you discuss that with your lawyer?

19   MS. FALCON: You may answer that question

20  only.

21   **A. No.**

22   Q. (BY MS. ZIEK) Okay. Then it continues on that

23  "Landlord may proceed against a guarantor under this

24  guaranty without exhausting or initiating any remedy

25  against any other guaranties of the lease."

Page 44

1   Do you see that, ma'am?

2   **A. Yes.**

3   Q. Do you understand what that means?

4   **A. No.**

5   Q. And it continues on that it "may proceed against

6  the Tenant, Guarantor, or any other Guarantors under this

7  lease agreement separately or concurrently."

8   Do you understand that, ma'am?

9   **A. No. To me, it's like Chinese. I don't**

10  **understand. I'm not a lawyer. I didn't go to school to**

11  **be a lawyer.**

12   Q. I'm not asking what you understand as a lawyer.

13  I'm not asking you. I'm asking you as a layperson what

14  you understood your obligations under this guaranty would

15  be when you signed it?

16   **A. No. Like I said, if my lawyer said to sign it, I**

17  **sign it.**

18   Q. Okay. And I'm asking a different question,

19  ma'am. Did you understand what your obligations were

20  under this guaranty before you signed it?

21   **A. No.**

22   Q. You didn't understand that the landlord could go

23  against you only, as a guarantor, on all of these causes

24  of action?

25   MS. FALCON: Objection. Form.

TRUSTEE1960-051935

Page 45

1    A. No.

2    Q. (BY MS. ZIEK)  You didn't understand that even if

3    the Court -- even if we added all the guarantors in a

4    lawsuit, that we didn't have to proceed against any of

5    them; we could proceed against one or none of them?

6        MS. FALCON:  Objection.  Form.

7    A. No.

8    Q. (BY MS. ZIEK)  Okay.  Number 10 says that the

9    "Landlord shall not be required to pursue any remedies it

10   may have against the Tenant or pursue security or any

11   other parties as a condition to the enforcement of this

12   guaranty."

13       Did you understand that when you signed it?

14   A. I didn't even understand it today.  I don't know

15   what you're saying.

16   Q. Ma'am, what do you understand your liability to

17   be in this lawsuit?

18       MS. FALCON:  Objection.  Form.

19   A. I --

20       MS. FALCON:  And don't answer anything that

21   you've discussed with us.  That would be privileged.

22   A. I thought my liability ends in June -- what is

23   it, June 2011, which I told Jerry that I would not renew

24   the lease with the company.

25   Q. (BY MS. ZIEK)  Okay.  So you think your liability

Page 46

1    ends at a time certain, correct?

2    A. Correct, because I asked my staff --

3    Q. Okay.  Again, I want your understanding, not what

4    you've asked somebody.

5        Okay.  Your liability ends at a date

6    certain.  You understood that.  Did you understand that if

7    the tenant had monies or obligations owed at the time that

8    that date certain ended, that you would be liable for

9    them?

10       MS. FALCON:  Objection.  Form.

11   A. No, I did not know that.  I did not understand

12   that either.

13   Q. (BY MS. ZIEK)  How many guaranty agreements have

14   you signed in your life, ma'am?

15   A. I don't remember.

16   Q. Is it more than five?

17   A. Yes.

18   Q. More than ten, ma'am?

19   A. I don't think so.  I don't remember.

20   Q. And what do you believe a guaranty agreement

21   does?

22   A. It may sound lame, I don't know.  Like I said, I

23   have lawyers that manage this.  Every time there's a

24   lease, they review it.

25   Q. Have you only signed guaranties in regard to

Page 47

1    leases, ma'am?

2    A. Loans at the bank.

3    Q. Okay.  With loans at the bank, what happens if

4    the maker defaults on their loan?

5    A. I don't know.  Like I said, the lawyer reads it

6    and they tell me.  That's what I have lawyers for.

7    Q. Okay, ma'am.  But your lawyers aren't the people

8    that are going to be sued if something goes wrong on these

9    agreements, correct?

10   A. But they were hired to work for me.

11   Q. I understand they were hired to work for you.

12   A. Correct.

13   Q. I asked you a question.  The lawyers aren't the

14   ones who are going to be sued on these agreements, are

15   they, ma'am?

16   A. I don't know.

17   Q. So is it your testimony before the judge and a

18   jury that you don't have any clue what a guaranty

19   agreement is?

20   A. No.  I have an idea.  I just don't know the term.

21   And I don't sign until a lawyer reads it.  And if he say,

22   yes, it looks fine, then I sign.

23   Q. Okay.  What's your idea of what a guaranty

24   agreement is, ma'am?

25   A. That we are guarantee to be in a space for a

Page 48

1    lease.

2    Q. Are you guarantying the financial obligations of

3    the lease, ma'am?  Did you understand that?

4    A. Yes.

5    Q. And that if a tenant defaulted, that the landlord

6    could look to the guarantors to get payment, did you

7    understand that also?

8    A. Yes.

9    Q. Did you understand that the landlord could go

10   against you, Dr. Quoc Le, and Alex Nguyen, all together,

11   or it could select one of you just to pursue?  Were you

12   aware of that, ma'am?

13   A. No.

14   Q. Did you discuss -- strike that.

15       And it's also your testimony that you didn't

16   understand that it was joint and several liability,

17   meaning we could recover all of our damages from you if we

18   were the landlord versus recover them from Dr. Nguyen or

19   Dr. Quoc Le at the time?

20   A. I didn't know that.

21   Q. What did 1960, what -- what did they occupy

22   Building 2 for?

23   A. I don't remember, honestly.  I don't.

24   Q. So as we sit here today, when you vacated in 2019

25   and sold the assets to UMMC September of 2019, you can't

TRUSTEE1960-051936
Huong Le Nguyen                          Pagess 49..52

Page 49

1  remember what you were utilizing Building 2 for?
2         MS. FALCON:  Objection.  Form.
3     Q.  (BY MS. ZIEK)  Is that your statement, ma'am?
4         MS. FALCON:  Objection.  Form.
5     A.  Yes, because I -- it has so many uses, I don't
6  remember.  At one point it was our conference room.
7  Another point, the IT people stay.  Another point, the
8  building people move in.  I just -- it revolves, like
9  going through a revolving door.  I don't remember.
10    Q.  (BY MS. ZIEK)  Okay.  Do you recall what
11 Building 3 was being occupied for?
12    A.  Initially it was for an OB-GYN practice, a pain
13 management practice, then become a research.  I think even
14 some allergies practice.  It just, like I say, revolving
15 door.  I just don't remember what it was used for, but I
16 know it was for medical offices.
17    Q.  (BY MS. ZIEK)  Okay.  And did 1960 continue to
18 occupy Building 2 and 3 through September of 2019?
19    A.  Correct.
20    Q.  Was 1960 Family Practice's medical facility
21 located at that -- those buildings -- located in those
22 buildings?  I'm sorry.
23    A.  In Building 1, yes.
24    Q.  Do you recall when Building 2 and 3 were
25 transferred to my client KME Holdings, LLC?

Page 50

1     A.  I remember I met with Jerry -- he identified as
2  the landlord -- sometime -- I can't remember exact date
3  when, but he came by and introduced himself as the new
4  landlord.
5         MS. ZIEK:  21 was the beginning one?
6         MS. FALCON:  Yes.
7         (Exhibits 22 & 23 marked.)
8     Q.  (BY MS. ZIEK)  Let me show you what's been marked
9  as Exhibit 21 and 22.  And these are huge, so -- again,
10 not throwing them.
11        REPORTER:  Don't you already have a 21?
12        MS. FALCON:  Oh, you do.  You sure do.
13        MS. ZIEK:  Okay.  So let's do 22 and 23.
14        MS. FALCON:  So 23 is --
15        MS. ZIEK:  Okay.  Hold on one second.  Here
16 we go.
17        Can you read me which exhibits are which?
18 I'm sorry.
19        MS. FALCON:  So 22 is Building 3, I believe.
20        MS. ZIEK:  And 23 would be Building 2?
21        MS. FALCON:  Yes.
22    Q.  (BY MS. ZIEK)  Can you identify Exhibits 22 and
23 23, ma'am?
24    A.  Tenant and Guarantor Estoppel Certificate.
25    Q.  "Estoppel" certificate?

Page 51

1     A.  Oh, "estoppel."  Okay.
2     Q.  Okay.  Ma'am, does your signature appear on
3  these?
4     A.  On page 5.
5     Q.  Go to the third page, ma'am.  And the first three
6  pages aren't -- don't appear to be -- don't appear to have
7  numbers on them, but go to page 3.
8     A.  Yes.
9     Q.  Did you sign as the president of 1960 Family
10 Practice and also as a guarantor on this?
11    A.  Yes.
12    Q.  And who -- whose signatures as guarantors also
13 follows yours on that?
14    A.  Alex Nguyen.
15    Q.  And who else, ma'am?
16    A.  Ann -- Thu A. Hoang.
17    Q.  Is that Annie Hoang, who we've been talking
18 about?
19    A.  Yes.
20    Q.  Okay, ma'am.  And what is the date of both
21 Exhibit 23 and -- 22 and 23 -- I'm sorry 23 and 24?
22        MS. FALCON:  22 and 23.
23    Q.  (BY MS. ZIEK)  22 and 23?
24    A.  It says March 27, 2018.
25    Q.  Okay, ma'am.  Do you recall signing this, signing

Page 52

1  both of these documents?
2     A.  It's my signature.  I don't remember.  This is so
3  long ago.
4     Q.  It was approximately four years ago, correct,
5  ma'am?
6     A.  Yes.
7     Q.  Okay, ma'am.  On paragraph 2 it basically says,
8  "The Guaranty executed by Guarantors is in full force and
9  effect and constitutes the valid binding and forceable
10 obligations of Guarantors."
11        Do you see that, ma'am?
12    A.  Yes.
13    Q.  Continues to say, "There are no amendments,
14 assignments or modifications of any kind to the guaranty."
15        Is that correct?
16    A.  Correct, it says that here.
17    Q.  "There are no promises, agreements,
18 understandings or commitments between Landlord and
19 Guarantors which are not set forth in the Guaranty."
20        Do you see that as well?
21    A.  Yes.
22    Q.  Okay, ma'am.
23        MS. ZIEK:  And I am sure -- I know this is
24 the lease addendum.  What number is it?
25        MS. FALCON:  I don't think we have that.

TRUSTEE1960-051936

LEXITAS

TRUSTEE1960-051937

Page 53

1       MS. ZIEK:  Oh, wow.  Okay.  24, is that what
2   it would be?
3       MS. FALCON:  Is it the guaranty addendum?
4       MR. MATTHEWS:  Yes.
5       MS. ZIEK:  Yes.
6       MS. FALCON:  Oh, no, no, we do have that.
7       MS. ZIEK:  That's what I thought.
8       MS. FALCON:  Sorry.  That's Number 6.
9       Q.  (BY MS. ZIEK)  Let me show you, Dr. Le, what's
10  been marked as Exhibit Number 6.  And, again, I'm not
11  throwing this at you.  I'm just trying to toss it across
12  to get it to you.
13      A.  That's fine.
14      Q.  Have you ever seen this document, ma'am?
15      A.  I don't remember.
16      Q.  Okay, ma'am.  Do you know what it is?
17      A.  No.  What is this?
18      Q.  Do you recall an occasion where 1960 Family
19  Practice requested that Dr. Quoc Le get off as the
20  guarantor and that Annie Hoang come on?
21      A.  Yes.
22      Q.  Do you know if this -- this is the agreement that
23  reflects that, ma'am?
24      MS. FALCON:  Objection.  Form.
25      A.  I don't know.

Page 54

1       Q.  (BY MS. ZIEK)  Do you know Dr. Hoang's signature,
2   ma'am?
3       A.  I don't know.
4       Q.  How long did you work with Dr. Hoang?
5       A.  More than 15 years.
6       Q.  In 15 years of practice, you don't know whether
7   that's her signature or not?
8       A.  No, we -- no.
9       Q.  Okay.  Do you understand why you would have
10  signed a Tenant and Guarantor Estoppel Certificate that
11  said there had been no amendments, assignments, or
12  modifications of any kind to the guaranty?
13      A.  I don't know.  What is estoppel?
14      Q.  Estoppel is basically at that point in time --
15  that's the status of it at that point in time.
16      So, basically, do you know why you were
17  signing this Tenant and Guarantor Estoppel Certificate?
18      A.  No.  Why -- why, I don't know.
19      Q.  Do you also understand that you were warranting
20  that -- well, that you were representing that there was no
21  uncured default, event of default, or breach by the
22  landlord or tenant existing under the lease, under
23  paragraph 7, of either Exhibit 22 or 23?
24      A.  Like I said, this is like Chinese to me.  I don't
25  know.  I'm not a lawyer.  You're asking me to interpret

Page 55

1   things I don't know.
2       Q.  So is it fair to say you don't know why you
3   signed that either?
4       A.  I don't.  Basically it's this.  Whenever there is
5   a thing, I turn to my lawyer, have them review it.  This
6   looks -- they say sign and I sign.
7       Q.  Would you ever discuss the conditions with your
8   lawyer of what's in these documents?
9       A.  Like what?
10      MS. FALCON:  Objection.
11      Q.  (BY MS. ZIEK)  For instance, if there was --
12      MS. FALCON:  Don't -- don't answer questions
13  that she asks you to say what your lawyer and you
14  discussed.  That's privileged.
15      Q.  (BY MS. ZIEK)  Correct.  I'm asking more along
16  the lines of would you have told your lawyer if there had
17  been a default in the lease?
18      MS. FALCON:  Don't answer that question.
19  That's privileged.
20      Q.  (BY MS. ZIEK)  Okay, ma'am.  How would your
21  lawyer know one way or the other whether the statements
22  herein were true and correct?
23      MS. FALCON:  That's privileged.  Don't
24  answer the question.
25      A.  I listen to my lawyer, see.  I only listen to my

Page 56

1   lawyer.  That's it.
2       Q.  (BY MS. ZIEK)  Okay, ma'am.  But your lawyer is
3   not responsible for the statements that are made herein
4   and the representations you have made to the landlord and
5   any prospective purchaser, are they?
6       A.  I don't understand your question.
7       Q.  Okay, ma'am.  Do you understand what an estoppel
8   certificate is?
9       A.  Like I told you, I even -- I thought it was
10  estoppel.  I don't know.  I don't know what an estoppel
11  is.
12      Q.  Okay, ma'am.  It basically describes that the
13  tenant and the guarantor gives this tenant and guarantor
14  estoppel letter to the landlord and KME Holdings as a
15  buyer.
16      You understood KME Holdings, LLC, bought
17  Buildings 2 and 3, correct?
18      A.  Yes.
19      Q.  Okay.  And as a condition of them buying this,
20  that they requested that certain covenants and
21  representations be made by you as the guarantor and you
22  also as the tenant for 1960 Family Practice.  Were you
23  aware of that, ma'am?
24      A.  No.
25      Q.  Do you know if this tenant and estoppel

TRUSTEE1960-051937
LEXITAS

TRUSTEE1960-051938

Huong Le Nguyen

Pagess 57..60

Page 57

1 certificate were signed by you, Alex Nguyen, and Annie
2 Hoang at the same time?
3    **A. I don't know -- I don't remember. I don't know.**
4    Q. Was there any discussion between you, Dr. Nguyen,
5 and Annie Hoang about signing this Tenant and Guarantor
6 Estoppel Certificate?
7    **A. I don't remember. I don't remember.**
8    Q. Would there have been any meetings or any notes
9 from a meeting that might have been held, had one been
10 held, of you discussing the Tenant and Guarantor Estoppel
11 Certificate?
12    **A. I don't remember. And I don't remember any**
13 **minutes or meeting about this.**
14    Q. Okay. Did you have any meetings or minutes
15 within 1960 Family Practice which would have discussed the
16 addendum, which is Exhibit 6 --
17        MS. ZIEK: Is that what it was?
18    Q. (BY MS. ZIEK) -- Exhibit 6 to the original lease
19 guarantees when Annie Hoang went on as the guarantor and
20 Quoc Le was taken off?
21    **A. I don't remember, and I don't have any minutes**
22 **regarding about the lease.**
23    Q. Even when the lease was entered into?
24    **A. Correct.**
25    Q. Did you keep -- did 1960 Family Practice, LLC --

Page 58

1 I'm sorry, PA, keep minutes of meetings that they had with
2 all the shareholders?
3    **A. I don't keep the minutes. If the staff, like**
4 **Stacy Williams, were present, then she would put notes.**
5 **But myself, no.**
6    Q. So is it your testimony that Stacy Williams would
7 act as the secretary when you-all had meetings?
8    **A. Yes.**
9    Q. And to the extent Stacy Williams would be
10 present, she would take the notes and file the notes of
11 the minutes of the meetings between you, Dr. Nguyen, and
12 Dr. Quoc Le at one point and Dr. Annie Hoang at another?
13        MS. FALCON: Objection. Form.
14    **A. I -- she was not required to take minutes. But**
15 **if she does, then she does.**
16    Q. (BY MS. ZIEK) And where would those minutes have
17 been kept, ma'am?
18    **A. I guess -- I don't know where she kept them.**
19    Q. Have you ever defaulted on a note at the bank,
20 ma'am, or a company you owned defaulted on a note at the
21 bank?
22    **A. I don't know what you mean by "default on a note**
23 **on a bank."**
24    Q. Okay. Did you ever have a company that you
25 guaranteed the debt for that didn't make the payments on

Page 59

1 the note?
2    **A. I don't remember.**
3    Q. Have you ever had an occasion from the time you
4 got out of medical school until now that a guaranty
5 agreement was ever -- that a bank or a financial
6 institution ever sought to enforce a guaranty agreement
7 against you, ma'am?
8        MS. FALCON: Objection. Form.
9    **A. I don't remember.**
10    Q. (BY MS. ZIEK) Do you have any other guaranty
11 agreements on any other leased space of which 1960 Family
12 Practice was leasing buildings?
13    **A. Yes.**
14    Q. And who are those guaranty agreements with?
15    **A. The 290 building. I don't know who the landlord**
16 **is.**
17    Q. And any others?
18    **A. The first building with Broadstone.**
19    Q. Is Broadstone seeking to enforce its guaranty
20 agreement against you on Building 1?
21    **A. No.**
22    Q. Was the lease still in effect on Building 1 at
23 the time 1960 Family Practice filed bankruptcy?
24    **A. Yes.**
25    Q. And who was occupying Building 1 at the time 1960

Page 60

1 Family Practice filed bankruptcy?
2    **A. It was 1960 Physician Associates managed by UMMC.**
3    Q. Is that building also on leases that are similar
4 in nature to Exhibits B2 and B3?
5    **A. Before 2019, yes, I believe so. After 2019, I**
6 **don't know.**
7    Q. Did -- did the lease on Building 1 expire before
8 June 23rd of 2023?
9    **A. Yes.**
10    Q. Were you on a month-to-month -- was 1960 Family
11 Practice, PA, on a month-to-month in Building 1 at the
12 time it filed bankruptcy?
13    **A. No.**
14    Q. Do you recall how much was left on the lease on
15 Building 1 when 1960 Family Practice filed bankruptcy?
16    **A. It was up to 2011 -- I mean 2021.**
17    Q. So it expired in 2021?
18    **A. Correct.**
19        MS. ZIEK: We on 25 or 26?
20        MS. FALCON: No. I think we're on 24.
21        (Exhibit 24 marked.)
22        MS. FALCON: Is there two there or just one?
23        MS. ZIEK: It's just one.
24    Q. (BY MS. ZIEK) What is Exhibit 24, ma'am?
25    **A. It's an Asset Purchase Agreement.**

TRUSTEE1960-051938

LEXITAS

TRUSTEE1960-051939

Page 61

1    Q. And who is it between?

2    A. 1960 Family Practice, PA, and Doctors Hospital,

3    which is UMMC.

4    Q. Okay, ma'am. What is the date of this agreement?

5    I think it's in the very first paragraph, ma'am.

6    A. Where is it?

7    Q. The very first paragraph, ma'am.

8    A. Oh. September 1, 2019, yes.

9    Q. Okay. And did an attorney prepare this agreement

10   for you?

11   A. No.

12   Q. Who prepared this agreement?

13   A. Stacy Williams.

14   Q. Why would you have Ms. Williams prepare this

15   agreement in lieu of a lawyer?

16   A. We didn't have the money to pay for the lawyer.

17   Q. Okay. What does this agreement purport to do,

18   ma'am?

19   A. That they would buy the asset of 1960 Family

20   Practice.

21   Q. And when you say "they," who do you mean?

22   A. UMMC.

23   Q. Okay. And what was the purchase price that they

24   were buying the assets of?

25   A. $500,000.

Page 62

1    Q. And did this also include locations where 1960

2    was practicing medicine?

3    A. I don't know. I think it does, but I don't

4    remember. Oh, can I go back to the statement, who

5    prepared it?

6    Q. Yes.

7    A. It was prepared by Stacy Williams and David

8    Ellent. Originally David Ellent with Genesis was going to

9    buy the 1960 asset purchase and then -- it was

10   signed and -- it was going back and forth between Stacy

11   and David, David Ellent.

12   Q. Okay.

13   A. And so a lot of work was done by David Ellent,

14   too. So I don't know if he has the lawyer to prepare it

15   or just mainly -- for us, we only have Stacy Williams, but

16   I don't know if David Ellent and Genesis have their own

17   lawyer to prepare this or not. So I don't know if this is

18   prepared by the lawyer or not.

19   Q. Okay. Can we turn to page 3? And it says

20   "Purchase of Assets" -- do you see that, ma'am -- and

21   "Assumption of Liabilities, Article II" on page 3?

22   A. Yes.

23   Q. Okay. It basically says that "Purchaser shall

24   sign a lease or sublease agreement for each of the

25   practice locations."

Page 63

1    Do you see that, ma'am?

2    A. Yes.

3    Q. Did that include the two buildings of my client?

4    A. I don't know. And, by the way, they never did

5    sign. So I don't know --

6    Q. Okay. Did you ever ask permission from my

7    clients to have a sublease entered into with UMMC?

8    A. Like I said, that's the reason why -- it was

9    never signed at the time of purchase, the sublease or the

10   assignment.

11   Q. That wasn't the question, ma'am.

12        MS. ZIEK: Objection. Nonresponsive.

13   Q. (BY MS. ZIEK) The question was when -- let's

14   just start -- when did you decide you were going to sell

15   the assets of 1960 Family Practice?

16        MS. FALCON: Form.

17   A. It was about July or June, somewhere between May,

18   June, July, April, something like that, in 2019.

19   Q. (BY MS. ZIEK) Did you know that you would be

20   vacating Buildings 2 and 3 that are representative by

21   Lease B2 and B3 in June, July?

22   A. Of 2019?

23   Q. Yes, ma'am.

24   A. Like I said, I told Jerry that when my lease

25   expire in June 2021 that I was not going to renew the

Page 64

1    lease.

2    Q. That wasn't the question, ma'am.

3    A. Your question is -- during that time, 2019, we

4    were still occupying the building.

5    Q. I understand that, ma'am, but you were also

6    looking to sell your assets. Is that correct?

7    A. Correct.

8    Q. Okay. And part of what you were selling, it

9    appears, would have been the locations that those assets

10   were -- were occupying, the space those assets were

11   occupying, for lack of a better word?

12   A. Correct, correct.

13   Q. Okay. And part of your assets or part of 1960's

14   assets were occupied in Buildings 2 and 3, correct?

15   A. Correct.

16   Q. Okay. So in May, June, or July, when you are

17   discussing this Asset Purchase Agreement, did you tell the

18   landlords that you would be subleasing or assigning these

19   leases?

20   A. Because nothing was signed. We -- it wasn't --

21   nothing was signed.

22   Q. Okay, ma'am.

23   A. We were looking for buyers. I got it. I got it.

24   Q. Okay. So now after you get a buyer -- you

25   obviously knew sometime before September 1 of 2019 you

TRUSTEE1960-051940

Huong Le Nguyen

Pagess 65..68

Page 65

1  were selling, correct?  You had a buyer?

2      A.  The assets.

3      Q.  Yes.  And that a sublease or an assignment would

4  be necessary, correct?

5      A.  No.

6      Q.  You didn't know a sublease or an assignment would

7  be necessary?

8      A.  No, we never sign it because the lease still

9  belong to 1960 Family Practice.  The 1960 Family Practice

10  own by me, so I would still be on the lease until 20

11  whatever.

12      Q.  2021.

13      A.  Correct.

14      Q.  Okay.  But you've told me earlier that 1960

15  Family Practice wasn't just owned by you; it was owned by

16  Annie Hoang --

17      A.  And Alex Nguyen.

18      Q.  -- and Alex Nguyen?

19      A.  I had the majority share vote, yes.

20      Q.  Okay.  Did you tell them that you were selling

21  the assets -- sorry -- that you were selling the assets of

22  1960 Family Practice in September of 2019?

23      A.  I don't have to because I'm the majority

24  shareholder, manager, partner and I can make decision

25  and -- based on super majority vote, which is 75 percent.

Page 66

1      Q.  You could substantially sell all of the assets?

2      A.  Correct.

3      Q.  Okay.  So now we've suddenly come to realize that

4  you have at least 75 percent, correct?

5      A.  Yes.

6      Q.  Of 1960 Family Practice?

7      A.  More than that.

8      Q.  More than that, okay.

9      A.  Right.

10      Q.  So Alex Nguyen and Annie Hoang had very little

11  interest in 1960 Family Practice, correct?

12      A.  Yes.

13      Q.  Okay.  So the question again, ma'am, is, when you

14  made the election to sell these assets September 1st of

15  2019, did you contact KME Holdings, LLC, to get their

16  consent to sublease?

17          MS. FALCON:  Objection.

18      A.  We were not subleasing.  There was no sublease.

19  That's what I keep telling you.  There was no sublease.

20      Q.  (BY MS. ZIEK)  Okay.  So it's 1960 Family

21  Practice PA's position that at all points in time they

22  have occupied Buildings 2 and 3 --

23      A.  Correct.

24          MS. FALCON:  Objection.  Form.

25          MS. ZIEK:  I haven't finished.

Page 67

1          MS. FALCON:  There was a pause.  Sorry.

2      Q.  (BY MS. ZIEK)  Okay.

3          -- from 2011 to June of 2021?

4          MS. FALCON:  Objection.  Form.

5      Q.  (BY MS. ZIEK)  Is it your testimony, ma'am, that

6  1960 Family Practice, PA, owned by you at all points in

7  time has occupied the space in Buildings 2 and 3 from the

8  beginning of the lease, which is June 23, 2011, until

9  June 22nd of 2021?

10          MS. FALCON:  Objection.  Form.

11      A.  Yes.

12      Q.  (BY MS. ZIEK)  And that it remained obligated for

13  all amounts due and owing under the lease agreements which

14  are B2 and B3?

15          MS. FALCON:  Objection.  Form.

16      A.  1960 Family Practice, yes.

17      Q.  (BY MS. ZIEK)  Okay.  And that you as a

18  guarantor, if 1960 Family Practice failed to make any

19  payments on any of the obligations under lease -- the

20  lease agreements, which are marked B2 and B3, that the

21  guarantors would be responsible for those amounts?

22          MS. FALCON:  Objection.  Form.

23          MS. ZIEK:  What's your objection?

24          MS. FALCON:  Your questions are so long,

25  they're very difficult to follow.  I'm not certain she's

Page 68

1  actually understanding what you are asking.

2          MS. POYSER:  Same objection.

3      Q.  (BY MS. ZIEK)  So did you understand my question?

4      A.  Can you repeat it one more time for me?

5      Q.  Yes, because I'm just trying to get in all the

6  facts that are necessary for the question.

7      A.  Okay.

8      Q.  Is it your testimony, then, that if there was a

9  default within B2 or B3 by 1960, you, as an individual

10  guarantor, would be obligated to make those payments?

11      A.  No, because what my understanding was that UMMC

12  was continued to make payment on 1960 Family Practice, and

13  they told me they would not put in default.

14      Q.  Okay, ma'am.  But where does it say that UMMC was

15  responsible for the payments under B2 and B3?

16      A.  It says they will sign -- they shall sign.  They

17  have not signed a lease, a sublease, because --

18      Q.  It doesn't say that, ma'am.  It says buyer agrees

19  to sign.  It doesn't say they will.  It doesn't say they

20  shall.

21      A.  It says right here 2 - 1 -- 2.1(d) -- (d),

22  "Purchaser shall" -- shall -- not sign..

23      Q.  Wait a minute.  On page 4 --

24      A.  No, page 3.  I'm on page 3.  I'm reading on page

25  3.  It says, "Purchaser shall sign."

TRUSTEE1960-051940

TRUSTEE1960-051941
Huong Le Nguyen

Page 69

1    Q.  Okay.  And did you obtain that?

2    A.  No.  They're supposed to obtain that.

3    Q.  Well, ma'am, you're the one that has the

4  liabilities, would you agree with me, under B2 and B3, as

5  1960 Family Practice, and under the guaranties which are 4

6  and 5?

7    A.  But it says right here the "Purchaser shall

8  sign."  They "shall" sign.

9    Q.  Understood.  But where is KME?  Did KME agree to

10  this, ma'am?

11    A.  They "shall sign."

12    Q.  Ma'am --

13        MS. ZIEK:  Objection.  Nonresponsive.

14    Q.  (BY MS. ZIEK)  -- did KME agree or consent to

15  1960's sale of all of its assets to UMMC?

16    A.  They don't have to because I did not assign the

17  lease.

18    Q.  Okay, ma'am.  But as a subtenant, they also have

19  to agree.  Would you agree with me?

20    A.  They are not subtenant.  They -- okay.  1960

21  Family Practice has the lease.  1960 PA has always been

22  occupying that lease.  The asset purchase was done.  They

23  continued to operate.  No changes at all.  There was no

24  change at all.  They make their payment and they said that

25  they shall sign, they shall, after.  That means after.

Page 70

1  Not before.  Not, like, they will sign on that day.

2  That's my understanding on a layman's term.

3    Q.  But you also understood that they hadn't signed a

4  sublease, correct?

5    A.  Correct, they have not signed, because they --

6  this is my understanding.  They will go up to KME.  They

7  will get a sublease agreement with the landlord and they

8  shall sign.  That mean if KME allow that, then they shall

9  sign.  But if --

10    Q.  What if KME didn't agree to it, ma'am, what would

11  happen then?

12    A.  Then they continue to make rent payment for 1960

13  Family Practice.

14    Q.  Under what agreement?

15    A.  Under the current agreement.

16    Q.  Where does it say that if there's no -- there is

17  no lease agreement -- where does it say in this document,

18  ma'am, that if there is no lease agreement with KME

19  Holdings, LLC, that they'll continue to make your lease

20  payments or 1960's lease payments?

21    A.  Because that's what they said they did -- they

22  would do that.

23    Q.  Okay.  Ma'am.

24        MS. FALCON:  Can we take a break, because

25  it's been almost two hours?

Page 71

1        MS. ZIEK:  Sure.

2        Off the record, please.

3        (Recess taken from 11:50 a.m. to 12:54 p.m.)

4    Q.  (BY MS. ZIEK)  Dr. Le, when we were on the break,

5  did you take the chance to look at any documents when you

6  were on the break?

7    A.  I think -- yes, I think it was the APA.

8    Q.  The Asset Purchase Agreement?

9    A.  Yes, the Asset Purchase Agreement.

10    Q.  Did you look at any other documents?

11    A.  No.

12    Q.  We were discussing Exhibit 24 when we broke,

13  correct?

14    A.  Yes.

15    Q.  Okay.  And we were discussing basically what you

16  had done pursuant to the terms of the lease agreements as

17  a representative of 1960 Family Practice to obtain the

18  consent of the landlord KME Holdings, Inc., to sublease to

19  UMMC.  Do you recall that line of questioning, ma'am?

20        All I asked is do you recall we were

21  discussing that, ma'am?

22    A.  Yes.

23    Q.  Okay.  So my question is what steps did you

24  undertake with KME to see if they -- if UMMC could

25  sublease from 1960 Family Practice?

Page 72

1    A.  No.

2    Q.  Had you in the past, when you were going to

3  sublease to other parties within Buildings 2 or 3, had you

4  undertaken to contact the landlord to obtain their consent

5  before you went ahead and entered the sublease?

6    A.  Yes.

7    Q.  And so you knew as a condition to sublease, did

8  you not, that you needed the landlord's consent?

9    A.  Yes.

10    Q.  Hold on a second.

11        Well, thank God they were all stapled.

12        Okay.  And along those lines, let me show

13  you what has been marked as Exhibit 26.  Is that correct?

14        MS. FALCON:  25, I think.

15        (Exhibit 25 marked.)

16    Q.  (BY MS. ZIEK)  Can you identify that document?

17        MS. ZIEK:  It is coming apart.  Sorry it's

18  coming apart.

19    A.  Yes.

20    Q.  (BY MS. ZIEK)  What is Exhibit 25?

21    A.  It's a Sublease Agreement made on the 15th day of

22  July, 2011, between 1960 Family Practice and Lymphedema

23  Wound Consultant.

24    Q.  And it appears that Lymphedema & Wound Care

25  Consultants of America, Inc., were a subtenant of 1960

TRUSTEE1960-051941

TRUSTEE1960-051942

Page 73

1  Family Practice, PA, in one of the buildings, correct?

2     **A. Yes.**

3     Q. Were they still a subtenant at the time that 1960

4  Family Practice, PA, ceased being a tenant?  I'm sorry,

5  strike that.

6        Were they still a subtenant at the time that

7  1960 Family Practice, PA, sold all of their assets to

8  UMMC?

9     **A. Yes.**

10       (Exhibit 26 marked.)

11    Q. (BY MS. ZIEK)  Let me show you what's been marked

12  as Exhibit Number 26,

13       (Discussion off the record.)

14    Q. (BY MS. ZIEK)  And can you identify Exhibit

15  Number 26?

16    **A. It's a Consent to Sublease between Broadstone and**

17  **1960 Family Practice and the Eye Physicians of North**

18  **Houston.**

19    Q. Okay.  And the Eye Physicians of North Houston,

20  was that another subtenant that was also in one of the

21  buildings?

22    **A. Yes.**

23    Q. Okay.  So it was clear that 1960 Family Practice

24  knew that they were to obtain the consent of the landlord

25  if they were going to sublease, correct?

Page 74

1     **A. Yes.  The Eye Physicians of North Houston also**

2  **contact the landlord, Broadstone, for the sublease**

3  **agreement.**

4     Q. Okay.  But the sublease agreement itself was

5  entered into between -- between you and the eye clinic,

6  correct?

7     **A. Yes.**

8     Q. Okay.  At the time on September 1st of 2019 when

9  UMMC was to take over all of the assets of 1960 Family

10  Practice, did you have a sublease prepared for Buildings 2

11  and 3 that were presented to UMMC for signature?

12    **A. I don't remember.**

13    Q. Let me show you what's been marked as Exhibit

14  Number 26.  And I just copied one.

15       (Discussion off record.)

16       (Exhibit 27 marked.)

17    Q. (BY MS. ZIEK)  Exhibit 27.

18       Okay.  So this is just one of two your

19  lawyer has presented to me in response to the subpoena

20  duces tecum.  Okay?  I'm going to make that representation

21  to you.

22       This appears to be a Sublease Agreement on

23  Building 3 for 847 Cypress Creek Parkway.  Do you see

24  that, ma'am?

25    **A. Yes.**

Page 75

1     Q. And the sublease agreement is between whom?

2     **A. 1960 Family Practice, PA, and UMMC.**

3     Q. Who drafted this document, ma'am?

4     **A. I don't know.  I don't know.  I think it was just**

5  **a copy of the previous Sublease Agreement.**

6     Q. If you look at Exhibit 25, it doesn't appear that

7  that is correct.

8     **A. No?  Okay.  I don't know.**

9     Q. Okay.  So you don't know who drafted it.  Do you

10  know who directed it to be drafted?

11    **A. Stacy Williams.**

12    Q. Is Ms. Williams a lawyer?

13    **A. No.**

14    Q. What is Ms. Williams' educational background?

15    **A. She work for me as the practice administrator for**

16  **past 20 years.**

17    Q. Okay.  Do you know what her educational

18  background is?

19    **A. Oh, it's been so long, I don't know.**

20    Q. Do you know if she has any legal training?

21    **A. I don't know.  I don't think so.**

22    Q. Was this sublease ever prepared to UMMC for

23  signature?

24    **A. Not by me.  Not by me.  Maybe Stacy, but not by**

25  **me.**

Page 76

1     Q. Okay.  Do you know why it wouldn't have been

2  signed at the same time that Exhibit 24 was signed?

3     **A. It just timing, that they said they -- UMMC said**

4  **they would kind of take care of it.**

5     Q. Okay.  Was there some rush that was going on in

6  August or September of 2019 that necessitated a rush to

7  get these documents prepared and signed?

8     **A. Yes.**

9     Q. What was the precipitating event?

10    **A. There were a lot of physicians leaving.  One of**

11  **them is Dr. Nguyen.  And the practice could not meet his**

12  **payroll anymore.  So the practice billing has decreased a**

13  **lot.  The expenses will continue to be the same.  And we**

14  **had a lot of difficulty meeting payroll to employee.**

15    Q. Was 1960 Family Practice then defaulting on its

16  obligations in August or September of 2019?

17    **A. What kind of obligation?**

18    Q. Well, you just said it had an inability to meet

19  payroll.  Had it defaulted in its payroll obligations?

20    **A. It has not default in payroll, but we are about**

21  **to be default in payroll.**

22    Q. You mean in September or August, you were about

23  to be in default on the payroll?

24    **A. Correct.**

25    Q. Okay.  Because as of today, 1960 Family Practice

TRUSTEE1960-051942
LEXITAS

TRUSTEE1960-051943

Page 77

1  has no longer any payroll, correct?

2    **A.  Correct.**

3    Q.  Okay.  Were there any other items you were about

4  to be in default on?

5    **A.  Expenses, supply to manufacturing company,**

6  **medical supply, rent.  We weren't sure how we would meet**

7  **our rent obligation.**

8    Q.  And it wasn't just the rent obligations on

9  Buildings 2 and 3, was it, ma'am?

10    **A.  No, it was total rent on all the buildings that**

11  **we owe, that we had paid rent before.**

12    Q.  Okay.  How many buildings was that comprised of?

13    **A.  One -- Building 1 on 1960, Family Practice,**

14  **Building 2, Building 3.  There's a building on Spring and**

15  **there's a building on -- 290 location, Cypress.  There are**

16  **total five buildings.**

17    Q.  Okay.  We already know that you as the guarantor

18  are being sued on Building 2 and 3.  Were you also a

19  guarantor on Building 1?

20    **A.  Yes.**

21    Q.  Were you being sued by the -- by Broadstone for

22  past due rent in Building 1?

23    **A.  Not at this time.  They were threatening a**

24  **lawsuit, yes.**

25    Q.  Okay.  Did they ever follow through with the

Page 78

1  threatening of the lawsuit?

2    **A.  I don't remember.  But as of today, there are no**

3  **lawsuit.**

4    Q.  Okay.  But you don't recall whether Building 1

5  had filed a lawsuit against you, the landlord for

6  Building 1?

7    **A.  I think they did.  I just can't remember how it**

8  **was -- it almost -- they -- I'm not sure -- they would**

9  **threaten a lawsuit, but then all of a sudden it just kind**

10  **of went away.  And then we receive a notice that there's**

11  **non-suit.**

12    Q.  So there was a notice of non-suit you received,

13  but you don't remember being sued or being served with the

14  papers?

15    **A.  I don't remember whether they served the paper.**

16  **I think they sue more of the family practice, 1960 Family**

17  **Practice, not on the guarantor but on the family practice.**

18    Q.  Okay.  Would it be fair to say that Mr. -- I'm

19  sorry, Dr. Nguyen and Dr. Hoang were also on the guaranty

20  of Building 1?

21    **A.  Yes.**

22    Q.  Okay.  The Spring building, who was the landlord

23  in the Spring building?

24    **A.  It's Physicians Alliance of Red Oak, and Dr. Alex**

25  **Nguyen is one of the owner and Michael Michelle, LLC, and**

Page 79

1  **Le Nguyen Family, LP.**

2    Q.  Okay.  Are you current or were you current on the

3  Spring building?

4    **A.  They were not current.**

5    Q.  Okay.  Have you been sued by Physicians Alliance

6  of Red Oak, LLC?

7    **A.  The Physicians Red Oak, LLC, did not file a**

8  **lawsuit with 1960 Family Practice.**

9    Q.  Okay.  Did they file against the guarantors?

10    **A.  No.**

11    Q.  So as we sit here today, even though there may be

12  past due obligations on the Spring building, Physicians

13  Alliance of Red Oak, LLC, who is the landlord, did not sue

14  you individually.  Is that correct?

15    **A.  That is correct.**

16    Q.  Okay.  On the 290 Cypress matter, were you a

17  guarantor on that building?

18    **A.  Yes.**

19    Q.  Have you been sued on that?

20    **A.  Yes.**

21    Q.  And how much of the lease term was still

22  remaining at 290 and Cypress when 1960 Family Practice

23  sold their assets to UMMC?

24    **A.  I don't remember exactly, but I think maybe seven**

25  **to ten months.  I don't remember exact amount -- exact how**

Page 80

1  **much lease was left.**

2    Q.  Okay, ma'am.  How long did you think the leases

3  were, B2 and B3, in this case?

4    **A.  June 2021.**

5    Q.  You thought you were ten-year leases?

6    **A.  Correct.**

7    Q.  Why don't you go ahead and look at B2 and B3.

8        MS. FALCON:  You mean Exhibit 2 and

9  Exhibit 3, the current Exhibit 2 and Exhibit 3?

10        MS. ZIEK:  I thought you said they were B2

11  and B3?

12        MS. FALCON:  Exhibit 2 and Exhibit 3.  But

13  they are -- I mean, their Building 2 is Exhibit 2.

14        MS. ZIEK:  I thought you said they were

15  Exhibits B2 and B3.  I'm sorry, I misunderstood, Amy.

16        MS. FALCON:  No worries.

17        MR. MATTHEWS:  So we all stipulate any

18  reference to Exhibit B2 means Exhibit 2?

19        MS. FALCON:  Exactly.

20        MR. MATTHEWS:  And the same for B3.

21        MS. FALCON:  Yes.

22    Q.  (BY MS. ZIEK)  Okay.  Can you turn to the very

23  last page?

24    **A.  Yes.  Right here.**

25    Q.  How many initial lease terms are there, ma'am?

TRUSTEE1960-051944

Page 81

1    A.  12.

2    Q.  So it's not a ten-year lease, is it?

3    A.  No.

4    Q.  It's a 12-year lease, correct?

5    A.  For some reason I always stuck in my mind that

6    only June 2021.

7    Q.  Okay.  But it was a 12-year lease, you are aware

8    of that, correct, now that I've pointed it out?

9    A.  Now that you show it to me, the initial term is

10   12 years.

11   Q.  Okay.  And if you'd want to check on also B2

12   or -- the very last page --

13   A.  Okay.

14   Q.  -- it's also 12 years, correct, the initial term?

15   A.  Yes, I see that.  Yes.

16   Q.  Okay.  Did you give notification to KME Holdings,

17   LLC, that you were going to sell substantially all of your

18   assets of 1960 Family Practice to them before you did it?

19   A.  No.

20   Q.  Were you aware that one of the events of default

21   is if all of the assets of the tenant are sold --

22   A.  No.

23   Q.  -- that that would cause a default?

24   A.  No.

25   Q.  So let's look at B2 and B3 again.  I think it's

Page 82

1    Provision 22.  Let me make sure.  I'm sorry, it's -- yeah,

2    it's Provision 22 on page 23.

3           Provision 22 is "Events of Default,"

4    correct, ma'am?

5    A.  Yes.

6    Q.  Okay.  If you'll turn the page to -- to the one

7    on page 24, if you'll turn to (xiv), which is 14, Roman

8    numeral (xiv) --

9    A.  Uh-huh.

10   Q.  -- it says, "An event of default is if tenant

11   shall sell or transfer or enter into an agreement to sell

12   or transfer all or substantially all of its assets or

13   51 percent or more of the direct or indirect equity

14   interest in tenant change ownership from that ownership in

15   existence on the day thereof are more than 51 percent of

16   the direct or indirect interest and tenant shall be

17   pledged, transferred, hypothecated or conveyed in a single

18   transaction or a series of related transactions."

19          Do you see that, ma'am?

20   A.  Yes.

21   Q.  Okay.  So based on the lease, you entering into

22   Exhibit Number 24, the Asset Purchase Agreement, was a

23   default under the lease, correct?

24          MS. FALCON:  Objection.  Form.

25   A.  No.

Page 83

1           MS. ZIEK:  What's your objection?

2           MS. FALCON:  Calls for a legal conclusion.

3    Q.  (BY MS. ZIEK)  Okay.  Ma'am, what's your

4    understanding of paragraph 14?

5    A.  We -- UMMC bought the asset, but 1960 Family

6    Practice still own by myself and the physician.  And so

7    they bought the furniture, the supply -- the asset.  But

8    the money and the -- I mean, the entity itself is still

9    there.

10   Q.  I understand that the entity is still there, but

11   that's not what --

12   A.  But they're not -- but they're not buying more

13   than 50 percent of the asset.  They only buy the asset,

14   so -- the furniture, the supply, all of that asset, they

15   did not buy all the -- the 51 percent.

16          The entity is still there.  It's always

17   there.  It's owned by myself.  It never change.  That's

18   why I continue to operate the 1960 Family Practice entity

19   even after they purchase the, quote -- quote, the asset,

20   so they can have the furniture to sit the patient and have

21   a computer, the patient can have a phone line.  But it

22   doesn't mean that they buy a hundred percent of the asset.

23   Q.  Okay, ma'am.  That's not what paragraph 14 says.

24   It says, tenant shall sell or transfer or enter into an

25   agreement to sell or transfer all or substantially all of

Page 84

1    its assets or 51 percent --

2    A.  But they did not buy 51 percent.  That's what I'm

3    trying to say.

4    Q.  Okay.  What assets remained after the Asset

5    Purchase Agreement to UMMC of 1960 Family Practice?  What

6    assets remained, ma'am?

7    A.  We still have the telephone system, the computer

8    system, the AR -- I mean, the account receivable, and the

9    name, 1960 Family Practice.  They bought only $500,000

10   worth of furniture, you know, the rug, the lights, the

11   fixture.

12   Q.  Did they buy the patient files?

13   A.  No.

14   Q.  Okay.  Where did the patient files go?

15   A.  The patient file belongs to the physician -- of

16   1960 Physician Associates.

17   Q.  Okay.  Who owns Physician Associates?

18   A.  No one owns 1960 Physicians.  It's a nonprofit

19   organization.

20   Q.  Okay, ma'am.  So are you saying that the

21   telephone, computers, AR, and the name of 1960 Family

22   Practice was worth more than 500,000?

23   A.  I'm not saying that.  I'm saying that they

24   purchased the asset, and the list of asset they purchase

25   were listed in the APA, the chair, the furniture, the --

TRUSTEE1960-051944
LEXITAS

Page 85

1 they did not buy the patient file.  They did not buy the
2 physician.  They did not buy 1960 Physician Associates.
3 That's the name of the practice, 1960 Physician
4 Associates.  1960 Family Practice was an inactive entity.
5 It has the lease, it has the furniture, it has the supply,
6 and it has the vendor contracts.
7    Q.  Okay.  So it wasn't an inactive company the way
8 you're describing it.  If it had the vendor contracts, if
9 it had the landlord leases, if it had the furniture, the
10 supplies, all of that was necessary to run --
11    A.  It doesn't have the physician.
12    Q.  All of that was necessary to run 1960 Family
13 Practice, correct?
14    A.  All of that in order for the Family Practice --
15 like a table, a chair, fixtures.
16    Q.  Understand, ma'am, what we're talking about.
17    A.  They did not buy 51 percent of the asset, period.
18    Q.  Well, I just asked you --
19    A.  The 1960 Family Practice still belongs to me,
20 period.
21    Q.  Well, it actually is in bankruptcy right now.
22    A.  Correct.
23    Q.  So what were the --
24    A.  I'm sorry, it belongs to the trustee right now,
25 but I have authority -- continue to have authority on 1960

Page 86

1 Family Practice after September 2019.
2    Q.  This will good a lot quicker if you just answer
3 the questions I'm asking.
4    A.  Yes, ma'am.
5    Q.  Okay?
6    A.  Yes, ma'am.
7    Q.  So I'm asking you what assets other than a
8 telephone system, a computer system, some ARs, and a name,
9 did 1960 Family Practice, PA, still have after they signed
10 this Asset Purchase Agreement with UMMC?
11    A.  They still have the name of the practice.  They
12 still have the website.  They still have the contract.
13    Q.  And when you say "the contract," what contract
14 are you talking about?
15    A.  Some insurance contracts.
16       MS. FALCON:  I'm sorry, what was that?
17       THE WITNESS:  Insurance contract.
18    Q.  (BY MS. ZIEK)  What value does the insurance
19 contract have if 1960 Family Practice, PA, is no longer
20 doing business?
21    A.  1960 Family Practice, you mean, or not the PA?
22 There's two.  There's 1960 PA, which is 1960 Physician
23 Associates.
24    Q.  No, I'm talking about 1960 Family Practice, PA.
25    A.  Okay.  1960 Family Practice, PA.

Page 87

1    Q.  Yes, ma'am.
2    A.  Yes.
3    Q.  What value does the insurance contract have if
4 it's no longer seeing patients?
5    A.  None.
6    Q.  On the ARs, what value has the trustee assigned
7 the ARs, if any?
8    A.  We collect after the closing.  I think we collect
9 more than 500,000.
10    Q.  Okay.  So you have 500,000 there that went
11 into -- that went where, ma'am?  What did the 500 pay for?
12    A.  500,000 that UMMC paid to us, that paid for, it
13 paid for -- like I said, it paid for the furniture, the
14 fixture, the computer system, the telephone system, the --
15    Q.  Does 1960 Family Practice, PA, still have that
16 500,000?
17    A.  No, it -- everything went to 1960 Family
18 Practice.  No, it does not have that 500,000.
19    Q.  Okay.  What did you utilize the 500,000 to pay
20 for?
21    A.  To pay the debt.
22    Q.  Okay.  And what debt, ma'am?
23    A.  Payroll, vendor -- there were a lot of debt --
24 supply, vaccine.
25    Q.  Did you use any of the 500,000 to pay your

Page 88

1 obligations under the leases?
2    A.  I don't know.  I don't know.  I think we did
3 for -- for August -- August payment for -- for the
4 August -- I think we did some.  I don't remember.  I have
5 to admit, I don't know.
6    Q.  Okay.  And would those be in the books and
7 records of 1960 Family Practice?
8    A.  Yeah, it's in the bankruptcy filing.  If you go
9 through the bankruptcy filing --
10    Q.  That wasn't the question, ma'am.  Did -- was
11 it -- did it remain, upon receipt, in 1960 Family Practice
12 PA's account?
13    A.  Which one?
14    Q.  The 500,000?
15    A.  No, it went to ALT -- AOT.
16    Q.  Was that Allergy --
17    A.  Of Texas, correct.
18    Q.  Okay.  And why did Allergy of Texas receive money
19 that belonged to 1960 Family Practice?
20    A.  Because Allergy of Texas took over TMMS Staffing
21 and there were about 20-plus billing/collection employee
22 that UMMC did not hire and we need them to continue to
23 operate.
24    Q.  Operate what, ma'am?
25    A.  The 1960 Family Practice collection --

TRUSTEE1960-051946

Page 89

1  billing/collection.  There were a lot of account
2  receivables that still have to be work up on.
3      Q.  Okay.  And of all the account receivables that
4  had to be worked up for 1960 Family Practice, PA,
5  approximately how much of it was collected?
6      A.  I think it was over a million-something.
7      Q.  Okay.  And did any of that million dollars, was
8  it utilized to pay any of the amounts due my client under
9  their lease agreements that 1960 owed them?
10     A.  UMMC was supposed to pay those.
11     Q.  Wait a minute, ma'am.  We don't have a sublease
12  with UMMC.  Would you agree with me on that?
13     A.  Correct.
14     Q.  And we had no assignment of your leases either,
15  did we?
16     A.  Correct.
17     Q.  Okay.  So whether UMMC had a deal with you or not
18  didn't affect me, correct?
19         MS. FALCON:  Objection.  Form.
20     Q.  (BY MS. ZIEK)  Didn't affect my clients.  My
21  clients were still looking to 1960 Family Practice and you
22  as a guarantor to pay the debt, correct?  Is that a yes,
23  ma'am?
24     A.  Correct, yes.
25     Q.  So the question was, of that million dollars, how

Page 90

1  much of that went to pay my client the amounts it was owed
2  under the lease agreements?
3      A.  Like I say, UMMC said they would satisfy the
4  liability, so they would pay the landlord directly.
5      Q.  When you say "they would satisfy the
6  liabilities," what liabilities did UMMC specifically say
7  and assume pursuant to this agreement?
8      A.  The lease.
9      Q.  They didn't assume the lease, did they, ma'am,
10  because you didn't have the landlord's consent to assume
11  the lease, correct?
12     A.  But they would pay the liability.  See, 1960
13  Family Practice continue to have the liability with the
14  landlord.  The liability of that -- that we have to
15  continue to obligate to you is being taken care of by
16  UMMC.
17     Q.  That's what you thought, correct?
18     A.  Well, that's what -- that's what we all thought,
19  because they -- that's what they thought so too.  Because
20  if they weren't, why would they make payment to KME?
21     Q.  Well, whether they made payment to KME or not,
22  ma'am, they have not been assigned the lease, correct?
23     A.  Correct.
24     Q.  They had not assumed all the -- ail of the
25  obligations under these leases, had they?

Page 91

1         MS. FALCON:  Objection.  Form.
2      Q.  (BY MS. ZIEK)  Had they, ma'am?
3      A.  They had not signed a sublease and they had not
4  been assigned --
5      Q.  And they had no lease with us, correct?
6      A.  Correct.  1960 Family Practice has the lease with
7  KME.
8      Q.  Okay.  All right.  And so when 1960 knew that
9  UMMC wasn't paying portions of building -- I think it's
10  Building 2 --
11     A.  I did not know that.
12     Q.  How did you not know that if --
13     A.  How do I know?
14     Q.  Okay, ma'am.  Well, wait a minute.  You are
15  responsible for the payment no matter what, correct,
16  because there's been no assignment --
17     A.  Correct.
18     Q.  -- and no sublease?
19     A.  Correct.
20     Q.  Okay.  So were you or 1960 -- were you as a
21  guarantor or was 1960 Family Practice, PA, writing those
22  checks to my client every month?
23     A.  Up to September 1, 2019.
24     Q.  And after September 1st, what agreement can you
25  point to that my client was obligated to accept payments

Page 92

1  from anybody other than you?
2      A.  Well, they did accept it.
3      Q.  I didn't ask that question.  I ask what agreement
4  obligated my client to accept payments from anybody other
5  than the guarantors or the tenant?
6      A.  Well, you ask your client.  They cashed a check.
7         MS. ZIEK:  Objection.
8         (Simultaneous speakers.)
9      Q.  (BY MS. ZIEK)  You did cash some of my client's
10  checks, and we'll get to that in a minute.
11         But what I'm asking right now is -- I'm
12  asking you a question, ma'am, and the question is what
13  obligated UMMC, not 1960, to pay us?
14     A.  They assume my liability.
15     Q.  Okay.  And that's an agreement between you and
16  UMMC, correct?
17     A.  That is correct.
18     Q.  Okay.  And so if UMMC wasn't paying for any
19  reason whatsoever, ma'am -- and it didn't matter, we
20  weren't obligated to accept payments from them -- you were
21  to have made those payments, correct?
22     A.  Yes.
23     Q.  Was UMMC ever given the right to use the name
24  "1960 Family Practice"?
25     A.  No.

LEXITAS
TRUSTEE1960-051946

TRUSTEE1960-051947

Huong Le Nguyen

Page 93

1    Q.  So at no point in time after the sale did UMMC
2  ever use "1960 Family Practice"?
3    A.  That is correct.
4    Q.  Okay.  I just have a quick question.  On page 15
5  of Exhibit Number 24, it talks about Benefit and
6  Assignment.  Do you see that, ma'am?
7    A.  What page are you looking at?
8    Q.  Page 15 under 13.5, Benefit and Assignment.
9    A.  Okay.  Hold on, hold on.
10   Q.  Okay.  The last sentence says, "Seller may assign
11 all or part of its rights and obligations hereunder to an
12 Affiliate of Seller, including but not limited to Minh
13 Nguyen, MD, or Huong Le, MD."
14       Do you see that, ma'am?
15   A.  Yes.
16   Q.  Why would this -- why would this contract have
17 been assignable to you or your husband individually?
18   A.  I don't know.  I think at that point -- like I
19 said, it was -- it was kind of like between David Ellent,
20 Stacy, Genesis, and they kind of draft the thing together,
21 and then UMMC came in place.
22   Q.  Did you read it before you signed it, ma'am?
23   A.  Probably, yes.  Yes.  But we didn't assign
24 anything.  So -- at the point is we just want to leave
25 everything open.  We didn't assign.  There was no benefit

Page 94

1  assignment.  Nothing happened on that cause..
2    Q.  That wasn't the question.
3       MS. ZIEK:  And there was no question, so I
4  object to her response.
5    Q.  (BY MS. ZIEK)  Did the bulk of the employees of
6  1960 Family Practice, PA, end up working for UMMC?
7    A.  Yes, the front desk, the medical assistant, some
8  of the HR people.
9    Q.  And did they then enter into contracts with
10 doctors who were staffing 1960 Family Practice, PA?
11   A.  No, they -- there is a 1960 Physician Associates.
12 That's where all the -- all the physician contract is
13 held, under that nonprofit organization.
14   Q.  Okay.  And who owns 1960 Physician Associates?
15   A.  Like I said, no one owns it.  It's a nonprofit
16 organization.
17   Q.  Nonprofit?
18   A.  Correct.
19   Q.  Did you start 1960 Physician Associates as a
20 nonprofit?
21   A.  No.  It was started by a nonprofit.
22   Q.  Okay.  And what nonprofit started it?
23   A.  It's just nonprofit.  They file a nonprofit --
24 like Memorial Hermann.
25   Q.  I understand that, ma'am.  What I'm trying to get

Page 95

1  to is who started this nonprofit, did you or someone you
2  know?
3    A.  No, it was the lawyer -- a group of lawyer.
4    Q.  Do you know if the Physician Associates, LLC,
5  held contracts to provide physicians for 1960 Family
6  Practice, PA?
7    A.  No, the physician -- 1960 Physician Associates
8  have their own contract.  They are employed by 1960
9  Physician Associates.  1960 Family Practice does have the
10 chair, the lease, the table, the facility.
11   Q.  Okay.  I think I got it now.
12       So whoever was a physician at 1960 Physician
13 Associates, LLC, could work wherever they wanted?
14   A.  Correct.
15   Q.  Okay.
16   A.  There's employment agreement.
17   Q.  Was there an employment contract between them and
18 1960?
19   A.  No.  There is an employment contract between the
20 physician and 1960 Physician Associates.
21   Q.  Okay.  Did you have an employment contract with
22 1960 Physician Associates, LLC?
23   A.  Yes.
24   Q.  Was it still in existence when you sold 1960
25 Family Practice, PA, in September of 2019?

Page 96

1    A.  No.  No.
2    Q.  It had already terminated?
3    A.  No.  Because I retire, so there was no
4  contract -- no employment contract.  I stopped seeing
5  patients in 2016.
6    Q.  When you stopped seeing patients, did you cease
7  coming to the locations of Building 1, 2, and 3?
8    A.  No, I still come.
9    Q.  And what did you do, then, if you no longer were
10 seeing patients?
11   A.  I still have an office and I help with
12 administration.  I help the 1960 Physician Associates
13 making sure that they are -- continue to perform so they
14 can meet the rent obligation of 1960 Family Practice.
15   Q.  I think one of the reasons you said you ended up
16 selling had something to do with Dr. Alex Nguyen leaving.
17 Is that correct?
18   A.  Well, he was a producer for 1960 Physician
19 Associates.  So when he left, there was a lot of sort of
20 like bickering.  There were rumor of defamation.  So a lot
21 of physician, after that, felt very uneasy and unstable at
22 1960 Physician Associates, so they left also.
23   Q.  And when they left, that means the revenues for
24 1960 Family Practice, PA, went down.  Is that correct?
25   A.  The 1960 Physician Associates went down, yes.

TRUSTEE1960-051947

LEXITAS

TRUSTEE1960-051948

Huong Le Nguyen

Page 97

1    Q.  Okay.  So if -- was Physician Associates -- how

2   was Physician Associates generating money that 1960 Family

3   Practice, PA, was utilizing to pay the rent?

4    **A.  The 1960 Physician generate the money into 1960**

5   **Physician Associates, then it pay to 1960 Family Practice,**

6   **the vendor, the supplier, and the rent and all that.  When**

7   **it stopped making payment because it doesn't have the**

8   **money, then 1960 Family Practice is on the hook.**

9    Q.  Okay.  So in 1960 Family Practice, when the

10  physician association -- or association quit paying 1960

11  Family Practice, PA, at that point in time, were they

12  paying in excess -- was 1960 Family Practice, PA, charging

13  any kind of surcharge on the services it was providing the

14  doctors?

15   **A.  No.**

16   Q.  It was a straight whatever --

17   **A.  That's true.**

18   Q.  -- 1960 Family Practice, PA, incurred was just

19  then passed back with no administrative cost or overhead

20  tacked onto it.  Is that a fair statement?

21   **A.  Correct.**

22   Q.  Okay.  Pursuant to this sublease, which is

23  Exhibit 25 or 26, the Sublease Agreement for Building 3

24  between UMMC --

25       MS. FALCON:  It's 25.

Page 98

1       MS. POYSER:  It's 27.

2       MS. ZIEK:  27?  Okay.  Thank you.

3    Q.  (BY MS. ZIEK)  Number 27, ma'am, if you'll turn

4   to Exhibit C, it has an ACH agreement.  Do you see that,

5   ma'am?

6    **A.  Exhibit C.  Hold on.  Yes.**

7    Q.  Okay.  What is Physicians Alliance of Red Oak?

8    **A.  That's the one that is the building on 2920, the**

9   **Spring building.**

10   Q.  And that's the actual owner, correct?

11   **A.  Of the Spring building located on FM 2920.**

12   Q.  Okay.  Why would the sublease have been directing

13  UMMC to pay Physicians Alliance of Red Oak?

14   **A.  Because they occupy the space in that -- at the**

15  **Spring building, the 2920 building.**

16   Q.  Okay.  But this is for Building 3 of Cypress

17  Creek, 847 Cypress Creek Parkway, which was one of my

18  client's buildings, correct?

19   **A.  Correct.  I think it just an error in terms of**

20  **the location.**

21   Q.  Well, if UMMC was to pay you direct and you in

22  turn were supposed to pay us --

23   **A.  No, no.  Physicians Alliance of Red Oak is the**

24  **owner of a Spring building that has nothing to do with**

25  **this.  I think this attachment is attaching a wrong --**

Page 99

1    Q.  You think it's an error?

2    **A.  Yes, absolutely.**

3    Q.  It should have been an ACH agreement to 1960

4   Family Practice, PA?

5    **A.  Correct.  Or this -- this one right here should**

6   **have been another sublease with the -- there are**

7   **Building 1, Building 2, Building 3, 290 building, and**

8   **Spring building.  There are five buildings, so there**

9   **should be five subleases.**

10   Q.  Okay.  So you just think that this was an error?

11   **A.  Yes, yes.  For sure, yes.**

12   Q.  Did you do an appraisal prior to selling the

13  assets to UMMC?

14   **A.  No.**

15   Q.  How did you come about deciding $500,000 was all

16  that the assets of 1960 Family Practice, PA, were worth?

17   **A.  Well, no, they were worth -- like I said, David**

18  **Ellent with Genesis, Stacy Williams had met.  They were**

19  **interested to buy 1960 Family Practice asset, so they were**

20  **debate back and forth, back and forth.**

21       **And the reason why we did not go with**

22  **Genesis and David Ellent is because they would not give**

23  **any cash up front, so we would not be able to get the 500**

24  **plus the liability.  So we want to know how much -- I ask**

25  **my HR company, how much do we need to satisfy one month of**

Page 100

1   **payroll to the physician, the malpractice insurance, the**

2   **vendor, just to get the practice flowing for 30 days, and**

3   **she said your expenses run between 500- to 600,000 a**

4   **month.**

5    Q.  Okay.  And so you basically sold what you were

6   doing for one month's worth of expenses.  Is that correct?

7    **A.  Correct.  Kind of -- that number was kind of --**

8   **we were in a crisis where we didn't know whether we could**

9   **meet payroll.**

10   Q.  Okay.  Did you ever go seek loans from banks to

11  make payroll?

12   **A.  We tried.**

13   Q.  When you say "we tried," did you go seek a loan

14  from a bank when you knew --

15   **A.  No.**

16   Q.  -- 1960 Family Practice was in straits, in dire

17  straits?

18   **A.  I paid out of my own personal money, yes.**

19   Q.  And when you say you paid out of your personal

20  money --

21   **A.  I loaned the practice -- I loaned 1960 Family**

22  **Practice over $2 million.**

23   Q.  Did you ever take any money out of 1960 Family

24  Practice?

25   **A.  No.  When -- I mean, as a -- when -- like a**

TRUSTEE1960-051948    LEXITAS

Page 101

1  salary?

2      Q.  No.  I'm saying as any kind of distribution,

3  dividend, stock -- I mean on your stock, anything?

4      **A.  Yes.**

5      Q.  Did you ever take money out of 1960 Family

6  Practice?

7      **A.  Yes.  We stopped doing that after about 2017.**

8  **But before that, yes, we did.**

9      Q.  And how much would you have taken out on a yearly

10  basis before 2017 when you stopped?

11     **A.  It was a good amount.**

12     Q.  More than 2 million?

13     **A.  No, probably -- no, I don't think over 2 million.**

14     Q.  So what was the time frame that you personally

15  loaned 1960 $2 million?

16     **A.  Between 2018 and 2019.**

17     Q.  Did you receive payment back for any of that

18  2 million?

19     **A.  I don't know.  I don't think so.**

20     Q.  Would Ms. Williams know?

21     **A.  Yes, my accountant would know, Patricia**

22  **McDonnell -- McConnell, M-C-C-O-N-N-E-L-L.  I think I took**

23  **out about 2.6 million against my life insurance policy.  I**

24  **have a -- what do you call -- one of those variable life**

25  **insurance policy.  So I was able to take out a loan**

Page 102

1  against that life insurance policy.

2      Q.  Is that loan still against the policy?

3      **A.  I think this year, just now, we paid it.  It was**

4  **a high interest rate loan.**

5      Q.  And when you say "we paid it," who do you mean?

6      **A.  I paid it.  I pay back to the life insurance**

7  **policy.**

8      Q.  Okay.

9          (Exhibit 28 marked.)

10     Q.  (BY MS. ZIEK)  Let me show you what's been marked

11  as Exhibit 28.  What is that, ma'am?

12     **A.  It's a Managed Access Service Agreement on**

13  **September 16, 2019.**

14     Q.  And who is it between?

15     **A.  Allergy of Texas and UMMC, on these entity.**

16     Q.  1960 Family Practice -- I'm sorry, 1960 Physician

17  Associates, 1960 Family Practice, and that's the PA,

18  correct?

19     **A.  Correct.**

20     Q.  1960 Digital Imaging, correct?

21     **A.  Correct.**

22     Q.  Providence Hospital of North Houston, correct?

23     **A.  Yes.**

24     Q.  And TMMS, what does that stand for?

25     **A.  Texas Medical Management Services.**

Page 103

1      Q.  Okay.  And what does this Managed Access and

2  Service Agreement do?

3      **A.  It just provide IT access because -- the Complete**

4  **IT Network access.**

5      Q.  Okay.  And was this Complete IT Network access

6  part of the assets that 1960 Family Practice retained?

7      **A.  Yes.**

8      Q.  So, in essence, the network and all of the

9  computers that make up this were owned by 1960 Family

10  Practice, correct?

11     **A.  Yes.**

12     Q.  Okay.  And this Managed Access, how much were

13  they supposed to pay you to access the IT or the

14  information on the network?

15     **A.  It's in here.  I don't know.  It's whatever it**

16  **state in here.**

17     Q.  It says 2400 a week.  Do you see that, ma'am, on

18  page 2, not numbered but the second page?

19     **A.  Second page.  Where is that at?**

20     Q.  Up at the top, (g).

21     **A.  Okay, yes.**

22     Q.  And then it goes on to say that UMMC will pay the

23  cost associated with the network done at the request of

24  UMMC, correct?

25     **A.  Correct.**

Page 104

1      Q.  And that basically if they have to disable users,

2  that kind of stuff, there will be additional charges,

3  correct?

4      **A.  Yes.**

5      Q.  Is UMMC still utilizing this -- this network?

6      **A.  No, I don't think so.**

7      Q.  When did they cease utilizing this network?

8      **A.  I don't know when the last time they pay.  It**

9  **only effective for three months from -- if you go into**

10  **term --**

11     Q.  Uh-huh.

12     **A.  -- I think they only use it for three months.**

13     Q.  Okay.  So for three months, that's all they

14  utilized it for?  Is this system still being utilized

15  today?

16     **A.  I don't think so.**

17     Q.  Okay.  Where is all of this, the computer

18  equipment and all of that, now?

19     **A.  They're located in Building 1.**

20     Q.  Is the network still up and running?

21     **A.  I don't know.**

22     Q.  Who would know, ma'am?

23     **A.  UMMC.**

24     Q.  Did you ultimately sell the network to UMMC?

25     **A.  No.**

Page 105

1    Q.  Then why would UMMC know if they only had access
2  to it for three months?
3    A.  They have their own network.  They built their
4  own network.
5    Q.  Okay.  I understand that they built their own
6  network, ma'am, but these were items that belonged to 1960
7  Family Practice.  What happened to the items that belonged
8  to 1960 Family Practice?
9    A.  I think it is still sitting there in the server
10  room.
11    Q.  Do you know if they're using the server?
12    A.  Like I said, I don't know.  But all I know is
13  they stopped paying and they have their own network.  They
14  said this network is too old.  They only need it for three
15  months to transfer all the medical records from 1960
16  Physician Associates into their own network.  Their own
17  network is a lot more robust than our network.
18    Q.  So who owns the medical records that were sitting
19  on this system?
20    A.  1960 Physician Associates.
21    Q.  Okay.  So why isn't 1960 Physician Associates
22  part of this -- part of this agreement?  If they own the
23  information sitting on the server that was owned by 1960
24  Family Practice, why weren't they part of this agreement?
25    A.  Because they're 1960 -- they are.  On the asset

Page 106

1  purchase or what --
2    Q.  No, ma'am.  I'm talking about the Managed Access
3  and Service Agreement.
4    A.  Yeah, 1960 Physician Associates.
5    Q.  No, it basically says -- why haven't -- why
6  weren't they a signatory on this?
7    A.  Oh, because they only own the record, but we
8  own -- we own the actual line and the server and the
9  computer and all that.  They just have is the patient
10  database.
11    Q.  Okay.  And I'm asking I guess a question that
12  seems to be difficult to answer.  Why didn't 1960 Family
13  Practice, PA, obtain 1960 Physician Associates --
14    A.  Because there's no ownership of 1960 Physician
15  Associates.  There's no one owns it.  No human.
16    Q.  I understand that, but somebody has to have the
17  ability to act on behalf of 1960 Physician Associates,
18  would you agree with me, ma'am, even though they're a
19  nonprofit?  Nonprofits usually are run through --
20    A.  The manager -- the manager would, but not me.  I
21  don't know who.
22    Q.  I didn't ask you if you know who.  I asked you
23  wouldn't 1960 Physician Associates' manager have been
24  required to give permission to 1960 Family Practice, PA,
25  to be able to transfer their data to UMMC?

Page 107

1    A.  No.
2    Q.  Why not?
3    A.  Because the HIPAA.  We are not -- we -- okay.
4  We're a computer with a network.  We're this.  We're not
5  anything.  There's -- the medical record, the patient
6  file, everything belongs to the physician, and the
7  physician are employed by 1960 Physician Associates.
8    Q.  I'm well aware of that, ma'am.  But when I put
9  something on somebody's network and somebody else comes in
10  and says, "I want to see what she put on my network," I
11  have to get somebody else's permission to do that.
12    A.  (Nodding negatively.)
13    Q.  No?  Okay.
14         So as far as the physical network itself,
15  servers, computers, everything, you don't know where that
16  stuff is, or you believe it's in Building 1, correct?
17    A.  It is in Building 1, yes.
18    Q.  And you don't know what part, if any, of those
19  assets that UMMC is still utilizing today?
20    A.  Correct.
21    Q.  Was that network housed in a different building
22  previous to this agreement being made?
23    A.  It was housed at the hospital, Providence
24  Hospital of North Houston.  No, I'm sorry, it was not
25  housed at Providence Hospital.  It's a network that housed

Page 108

1  at the Building 1.  Providence Hospital of North Houston
2  has the route, but it -- it can access it and inside that
3  network, the firewall.  So they have many, many account.
4  Everybody kind of dive into that central hub, and the
5  central hub is in Building 1.
6    Q.  Okay.  So this contract, in your opinion, was
7  only good for three months.  Is that correct?
8    A.  I think they renew every three months or they
9  said they only need it for three months, and I don't know
10  what happened after that.
11    Q.  Well, who would know, ma'am?
12    A.  I think Stacy Williams.
13    Q.  And Stacy Williams is employed by a company you
14  own, correct?
15    A.  Correct.  That's why she's -- she's working at
16  Allergy of Texas.  She's business officer.  She signed the
17  agreement.
18         MS. ZIEK:  The notices of default I know are
19  in.  Do you recall what -- what exhibits they are, and
20  I'll just give her a copy?
21         MS. POYSER:  7, I think.
22         MS. FALCON:  No, no, it is 7.  It is 7.  But
23  I don't think I put in --
24         MS. ZIEK:  Did you only put in the one?
25         MS. FALCON:  I only put the one in for

TRUSTEE1960-051951

Page 109

1  Building 2.
2         MS. ZIEK:  I'll put in another one.
3         (Exhibit 29 marked.)
4    Q.  (BY MS. ZIEK)  I'm going to show you what's been
5  marked as Exhibit 7 and Exhibit 29, Dr. Le.
6         MS. ZIEK:  I'll give you a copy of both of
7  them.
8    Q.  (BY MS. ZIEK)  Have you seen these letters before
9  coming here today?
10   A.  No.
11   Q.  You've never seen them?
12   A.  Who is Kim Brown?  Who is she?
13   Q.  It doesn't matter who Mr. Brown is.  But have you
14 seen these letters before coming here today?
15   A.  I don't think so.
16   Q.  You reside at 50 Palmer Crest Drive, correct?
17   A.  Correct.
18   Q.  Okay.  Is there any reason to believe that these
19 letters didn't make it to you if that's your address?
20   A.  Yeah.  Did they send it?
21   Q.  I'm asking.
22   A.  Did I sign for it?  I don't think I have.
23   Q.  Okay, ma'am.  Did 1960 Family Practice, PA, still
24 have a location at 2320 Northwest Freeway, Suite 900 --
25   A.  No.

Page 110

1    Q.  -- Jersey Village?
2    A.  No.
3    Q.  They were still liable on that lease, correct?
4    A.  Uh-huh.
5    Q.  Wasn't that the lease building on 290?
6    A.  Yes.
7    Q.  Okay.  And you were still liable on that lease,
8  correct?
9    A.  Not now.
10   Q.  I'm not asking about now, ma'am.  I'm asking
11 about October 22nd --
12   A.  Oh, October 22nd.
13   Q.  -- of 2019, the date on these letters.
14   A.  Oh, I see.  Yes, yes.
15   Q.  Okay.  So you were still on the lease at that
16 building, and that's your home address, correct?
17   A.  Correct.
18   Q.  Okay, ma'am.  But you've never seen these letters
19 before; that's your statement?
20   A.  No.
21   Q.  Okay.
22   A.  I mean, did I sign for it?  I don't know.  Was it
23 ever delivered to my home?
24   Q.  I'm asking, ma'am, if you've seen it.
25   A.  I don't think so.

Page 111

1    Q.  If you say no, then that's what I'm going to go
2  with.
3    A.  Okay.  I don't know.
4         MS. ZIEK:  Do you have an extra copy of her
5  answer for her?
6         (Exhibit 30 marked.)
7    Q.  (BY MS. ZIEK)  Dr. Le, I'm going to ask you to
8  take a look at Exhibit 30, ma'am.
9    A.  Okay.
10   Q.  This is a Second Amended Answer Counterclaims and
11 Cross-Claim that you filed this morning in this case.
12 Were you aware of that, ma'am?
13   A.  Aware of --
14   Q.  That you filed this this morning in this case?
15   A.  I know my attorney did something.  I don't know.
16   Q.  Okay.  Did you had a chance to review this before
17 your attorney --
18   A.  No, I don't think so.
19   Q.  So you didn't review it?
20   A.  No.
21   Q.  In this, you're filing -- you filed a
22 counterclaim against my client.  Were you aware of that,
23 ma'am?
24   A.  Yes.
25   Q.  Okay.  And in your own words tell me what you are

Page 112

1  suing my client for.
2    A.  That you allow Dr. Quoc Le be removed as a
3  guarantor and substitute Dr. Hoang as a guarantor and cap
4  her only at 5 percent.
5    Q.  But you told my client in Exhibit 22 and 23 that
6  there had been no modifications.  Do you recall that,
7  ma'am?
8    A.  Modification of what?
9    Q.  Of the guaranty.
10   A.  I don't understand what you are saying.  What are
11 you saying?
12   Q.  Go to Exhibit 22 and 23.
13   A.  Okay.
14   Q.  Okay.
15   A.  It is -- yes, I know -- okay.  22 and 23, okay.
16 Let me just go there.
17   Q.  Under paragraph 2 --
18   A.  Okay.
19   Q.  -- "the Guaranty executed by the Guarantors is in
20 full force and effect and constitutes a valid binding and
21 forceable obligation of Guarantors."
22         Do you see that, ma'am?
23   A.  Yes, I do.
24   Q.  "There are no amendments, assignments or
25 modifications of any kind to the Guaranty."

TRUSTEE1960-051951
LEXITAS

TRUSTEE1960-051952
Huong Le Nguyen

Page 113

1       Do you see that?

**2      A. Yes, ma'am.**

3      Q. Okay. So that wasn't true when you signed this,

4  was it, ma'am?

**5      A. Signed what?**

6      Q. When you signed 23 and 22?

**7      A. As I said, all of this I review my attorney and**

**8  they give me something. They said everything looks fine,**

**9  sign it. I -- I don't --**

10      Q. Ma'am, is that a true statement as we sit here

11  today? That's a yes-or-no question?

**12      A. On what?**

13      Q. What I just read, that there are "no amendments,

14  assignments or modifications of any kind to the guaranty"?

**15      A. I don't know. I don't know. I'm so confused, I**

**16  don't know.**

17      Q. Well, Dr. Le, you just said one of this things

18  you are suing my client for is that we allowed a

19  modification to a guaranty and capped Dr. Hoang's

20  liability at 5 percent even though I've already pointed

21  out to you you're joint and severally liable regardless,

22  correct?

**23      A. Yes.**

24      Q. Okay. So the lease amendment, which is

25  exhibit --

Page 114

1       MS. ZIEK: I don't know. Somebody give it

2  to me, please.

3       MR. MATTHEWS: What's that?

4       MS. ZIEK: The addendum to the original

5  lease guaranty. What number is it?

6       MS. FALCON: 6.

7      Q. (BY MS. ZIEK) Hold on just one second.

8       On Exhibit 6, when was the Addendum to the

9  Original Lease Guaranty done? Number 6, what date was it?

10       MS. FALCON: Exhibit 6.

**11       THE WITNESS: Oh, October 31, 20 --**

12       MS. FALCON: Are you talking about

13  Exhibit 6?

14       MS. ZIEK: Uh-huh.

15       MS. FALCON: She's not on Exhibit 6.

16       MS. ZIEK: Well, but she's got the date,

17  because she's obviously reading from it.

**18      A. It says Broadstone -- it says Broadstone, not**

**19  KME.**

**20      "Broadstone execute an addendum to original**

**21  guaranty whereas Broadstone, without permission or consent**

**22  of Dr. Le, remove Dr. Quoc Le as Guarantor and substitute**

**23  Thu A. Hoang as Guarantor. The addendum also cap Hoang's**

**24  liability at 5 percent."**

**25      Broadstone did that.**

Page 115

1      Q. (BY MS. ZIEK) Okay. I understand that's your --

2  your allegation. But under 22 and 23, these are estoppel

3  certificates given to my client when my client bought the

4  building in 2018, correct? And did Quoc Le sign this,

5  ma'am?

**6      A. That's something between you and Broadstone. I**

**7  don't know.**

8      Q. No. No, ma'am, it's not between me and

9  Broadstone. That's between you and Broadstone when you

10  made a representation my client relied upon. You're aware

11  of that, correct?

**12      A. No. I mean, you buy a building from Broadstone.**

**13  You need to due diligence with Broadstone. Why would I be**

**14  liable for something --**

15      Q. Because you signed something swearing out

16  something was true or not. Are you aware of that, ma'am?

**17      A. Yes.**

18      Q. With this Estoppel Certificate, correct, 23 and

19  22?

**20      A. Correct.**

21      Q. Okay. And that statement is made. And --

22  Broadstone is not -- Broadstone is not making those

23  statements. You are, correct, ma'am?

**24      A. But --**

**25      Q. Wait a minute.**

Page 116

**1      A. -- the whole thing here is --**

2      Q. Ma'am, answer the question asked.

**3      A. Correct, yes.**

4      Q. If you need to explain, your client's

5  more than a wonderful adversary. She can get you to

6  explain it whenever it's her turn, okay?

**7      A. Okay. Sure.**

8      Q. So your signature is on this, correct, ma'am?

**9      A. Correct, yes, ma'am.**

10      Q. And you knew, because my client is listed as the

11  buyer in the paragraph --

**12      A. Correct.**

13      Q. -- that you were giving these statements and that

14  my client would be relying upon the statements you were

15  giving him, correct?

**16      A. Yes.**

17      Q. Okay. Where is Quoc Le's signature on this?

**18      A. I don't know.**

19      Q. It's not on there, is it, ma'am?

**20      A. Well, you see it isn't. It's not in there.**

21      Q. That's correct. But you understood that

22  Dr. Annie Hoang was signing, correct, because you signed

23  two rows above her?

**24      A. Correct. I signed, but my point is I -- I only**

**25  know myself, and I know I signed this. I don't know any**

TRUSTEE1960-051952
**LEXITAS**

TRUSTEE1960-051953

Huong Le Nguyen

Page 117

1  other person.  And you're --
2      Q.  But you signed it both as 1960 Family Practice,
3  PA, correct?
4      **A.  Correct.**
5      Q.  You already knew Quoc Le -- Dr. Quoc Le had left,
6  correct?
7      **A.  Yes.**
8      Q.  In fact, you had purchased his -- his shares of
9  stock, correct?
10     **A.  Correct.**
11     Q.  Okay.  And did -- was there anything in the
12 purchase agreement between 1960 Family Practice, PA, and
13 Dr. Quoc Le that said he would remain liable on any
14 obligations of 1960 Family Practice, PA, once his stock
15 had been bought?
16     **A.  I don't think so.  I don't know.**
17     Q.  Okay.  So two years after the addendum to the
18 lease agreement was signed, you represented to my client
19 that there had been no -- no modifications or amendments,
20 correct --
21     **A.  Correct.**
22     Q.  -- to either of the two leases?
23     **A.  Correct.**
24     Q.  But you are suing my client now because there's
25 an addendum, correct?

Page 118

1      **A.  But it has been removed.  I thought that my**
2  **attorney said they removed that claim.**
3      Q.  Okay.  Well, you just saw that they haven't,
4  correct?
5      **A.  No, I just saw -- I just kind of looked through**
6  **it, and you said I have seen this today.  I said, no, I**
7  **have not read the specific.  But it is dated today and it**
8  **looks like they removed it.**
9      Q.  No.  Number 31, ma'am, says, "The execution of
10 the Guaranty addendum on October 31, 2016, breached the
11 terms of the Guaranty as it modified Dr. Le's obligations
12 and liability under the guaranty without her written
13 agreement."
14         Do you --
15     MS. FALCON:  Before we go further, that was
16 a mistake.  Those should have been taken out this morning,
17 so that's just a mistake.  You are correct, the
18 counterclaim was removed.  Those were left in there by
19 mistake.
20     MS. ZIEK:  The counterclaim was removed in
21 its entirety?
22     MS. FALCON:  No.  The counterclaim relating
23 to the guaranty change was removed, and the declaration
24 should have been removed as well.
25     **THE WITNESS:  So don't kill the messenger.**

Page 119

1      MS. FALCON:  Our apologies.  That's our
2  mistake.
3      MS. POYSER:  I'm sorry.  Just for
4  clarification what this is, so the new whatever you are
5  going to file subsequently will remove Number 31 from
6  page 35?
7      MS. ZIEK:  And 30.  It would have to.
8      MS. FALCON:  Yeah, it will remove 30 and 31.
9      MS. POYSER:  And that is the only thing it
10 will remove?
11     MS. FALCON:  Yes.
12     MS. ZIEK:  Okay.
13     Q.  (BY MS. ZIEK)  Okay.  Let's go down, on page 4,
14 the declarations you were asking for.  Do you see this,
15 ma'am?
16     **A.  What page is it?**
17     Q.  Page 4.
18     **A.  Okay.  Sorry.  Page 4.**
19     Q.  Okay.  You're asking for a declaration, even
20 though the written contract says what it says, that the
21 lease required KME to provide notice to the tenant.  The
22 tenant is 1960, correct?
23     **A.  Yes.**
24     Q.  And 1960 is not a party to this lawsuit any
25 longer, is it, ma'am, because of the bankruptcy?

Page 120

1      **A.  I don't know.  I don't know the law.**
2      Q.  Okay.
3      **A.  I don't know.**
4      Q.  But you're not -- we're not suing you as the
5  tenant, correct?
6      **A.  You're suing me as a guarantor.**
7      Q.  Okay.
8         That "KME filed the lawsuit without
9  providing proper notice of intent to accelerate it
10 followed by notice of acceleration required by the lease
11 and Texas law," that's your position, correct?
12     **A.  I don't know what that means, but, yes, I -- all**
13 **I know is the lease end 2011 as my guarantor ends.**
14     Q.  You mean that the lease that was entered into in
15 2011 ended your obligations ten years later?
16     **A.  Correct.**
17     Q.  So that all the obligations that weren't paid by
18 anyone, UMMC or any subtenant, remain the obligation of
19 you as the guarantor, correct?
20     MS. FALCON:  Objection.  Form.
21     **A.  No.  I -- I only guarantee ten years on lease.**
22     Q.  (BY MS. ZIEK)  Understand.  But until June 22nd
23 of 2021, if there were amounts remaining that were due and
24 owing the landlord, you would be responsible for those as
25 a guarantor?

TRUSTEE1960-051953

LEXITAS

TRUSTEE1960-051954

Page 121

1          MS. FALCON:  Objection.  Form.

2          MS. ZIEK:  What's the objection?

3          MS. FALCON:  You are saying remaining

4    obligations.  Those could be obligations that go after

5    that date.  So, no, that's not -- that's not the

6    position --

7          MS. ZIEK:  I think I said it with the date

8    time frame in there.

9      Q.  (BY MS. ZIEK)  So I said from the date you

10   guys -- meaning 1960 Family Practice no longer was on the

11   premises, okay, which was September 1st of 2019, according

12   to your asset sale agreement, until June 22nd of 2021, if

13   there were any obligations that went unpaid during that

14   time frame, you -- you, as a guarantor, guaranteed the

15   tenant's obligations, correct, for those amounts?

16     **A.  Yes.**

17     Q.  Okay.  Number 25, it says that Dr. Le, as a

18   guarantor, "has no liabilities or obligations to KME due

19   to KME's failure to comply with lease notice

20   requirements."

21         Do you see that, ma'am?  On what facts do

22   you base that?

23         MS. FALCON:  Objection.  Form.

24         MS. ZIEK:  What's the objection?

25         MS. FALCON:  You are asking her to draw

Page 122

1    legal conclusions from a pleading that is about legal

2    issues.

3      Q.  (BY MS. ZIEK)  Well, this is her pleading, and I

4    get to ask about her causes of action.

5          MS. FALCON:  Yes, you can.  And I can

6    object.

7      Q.  (BY MS. ZIEK)  And one of the causes of action

8    says you have no liability.  So tell me why you have no

9    liability to my client.

10         MS. FALCON:  Objection.  Form.

11     **A.  Because you trying to find another tenant to get**

12     **that sublease.  As a -- I'm a landlord.  In other**

13     **building, when my tenant doesn't pay the lease, I try to**

14     **get somebody else to pay.**

15     Q.  (BY MS. ZIEK)  And if you can't get somebody else

16   to pay, you still go after your tenant, don't you?

17     **A.  I try -- I'm a good landlord.  I'm nice.  I'm**

18     **trying to do everything possible.  I hire agent.  I get**

19     **the tenant -- you know, hey, y'all need to pay.**

20         **I give them notice.  I just don't -- I mean,**

21     **I'm not that greedy.  This is greed.  I felt like it's**

22     **greed.  So, anyway, that's just the way I am.**

23     Q.  Well, I'm glad that's the way you are.

24     **A.  Yes, that's why I have a heart.  I'm a doctor.**

25     Q.  This is a business --

Page 123

1      **A.  Yes.**

2      Q.  -- would you agree?  And would you agree you

3    entered into written obligations?

4      **A.  Right, but I don't know -- I didn't even know the**

5      **tenant -- I didn't even know the tenant moved out.  I**

6      **don't know if they have somebody moving in.  I didn't even**

7      **know the building was not even occupied.  I had no idea.**

8      Q.  But, ma'am -- but, ma'am, you, as 1960 Family

9    Practice, PA, remained obligated because you neither got

10   it assigned or subleased, correct?  So you as the

11   tenant --

12         (Simultaneous speakers.)

13     Q.  (BY MS. ZIEK)  -- and the guarantor should have

14   remained diligent on what was supposed to be going on with

15   regard to these buildings because you were personally

16   liable under the guaranty, would you agree with me?

17     **A.  But when did they stop occupying the building?  I**

18     **didn't even know when they stopped.  I had no idea.**

19     Q.  Well, ma'am, as a tenant or a guarantor of lease

20   obligations, don't you think it's something that you

21   should have been aware of?

22     **A.  No.  I thought -- I thought everything -- I**

23     **thought they were leasing.  I honestly thought.  I didn't**

24     **even know.  I was, like, surprised.  I was like, oh, my**

25     **God, they didn't even occupy.**

Page 124

1          **I never got any notice that, hey, your**

2      **building is empty.  I didn't have anything that said, hey,**

3      **did -- I try to find a tenant for you.**

4          **Usually, you know, the word in community,**

5      **this building is empty.  Go find someone else.  Y'all did**

6      **none of that.**

7      Q.  You don't know what we did, do you, ma'am?

8      **A.  I don't know.**

9      Q.  Okay.  So your statement that we did nothing --

10     **A.  But you didn't give it to me.  How do I know?**

11     **You didn't tell me, hey, your building --**

12     Q.  What are your obligations and responsibilities as

13   a guarantor under this lease?  What do you think your

14   obligations as a guarantor are?

15     **A.  If I was the landlord, I would send a letter to**

16     **tell you the guarantor -- what is your guarantor?  You**

17     **know, you guaranty the building.  We just want to let you**

18     **know the building is not occupied.  You know, if you know**

19     **any doctor, you know any practices, can you make sure they**

20     **occupy -- can you go and talk to current --**

21     Q.  Show me in the lease where my client has that

22   obligation to you.  Show me in the lease where my client

23   has that obligation to you?

24         MS. FALCON:  Objection.  Form.

25     **A.  It is greed.  Yeah.  If you were human, you would**

TRUSTEE1960-051954
LEXITAS

TRUSTEE1960-051955
Huong Le Nguyen

1  do that.  That's just common sense.  Common sense would
2  tell me to do that.
3      Q.  (BY MS. ZIEK)  That isn't common sense, ma'am.
4      A.  It is.
5      Q.  I'm asking you where we're obligated to do that
6  in the lease?
7      A.  I think that it's just common sense.  Like,
8  you don't -- you -- you know, like, if my credit card is
9  default, the credit card company does that, but they send
10  you -- like, I drive a car.  My car go almost empty on the
11  gas.  Common sense, the car flash, your car is about to be
12  empty out of gas.
13     Q.  And you've been sued, correct, ma'am?
14     A.  I didn't sue on this.
15     Q.  Yeah.  Okay.  So you had notification?
16     A.  After --
17         MS. FALCON:  Objection.  Form.
18     A.  I just got sued this year -- I mean, 20 -- I just
19  got sued.
20     Q.  (BY MS. ZIEK)  Do you know how many attempts were
21  made to serve you, ma'am?
22     A.  Huh-uh, no.
23         (Court reporter instruction.)
24     Q.  (BY MS. ZIEK)  Okay.  We have broken our own
25  rules where we're talking over each other.  Okay?  So let

1  me finish my question.  Answer the question I ask.  And,
2  again, if you need to expound on anything, you have a
3  lawyer that's more than capable of getting it out of you.
4      Okay.  "KME accepted late payments from
5  tenants."  Which tenants are you talking about, ma'am?
6      A.  I think I'm talking about UMMC.
7      Q.  Were you ever late?  1960?
8      A.  I don't know.
9      Q.  Well, who would know, ma'am, if you don't know?
10     A.  My accountant would know.  I told you we were in
11  financial problem.  We had financial problem.
12     Q.  And, again, how long were you in financial
13  problems?
14     A.  Starting about 2017.
15     Q.  So before my client ever bought the building, you
16  were having financial problems.  Is that your statement?
17     A.  When did they buy?
18     Q.  My client bought sometime in March of 2018,
19  ma'am?
20     A.  Okay.
21     Q.  So you were having financial trouble before my
22  client bought the building.  Is that your statement?
23     A.  I think so.
24     Q.  Okay, ma'am.  Was there anything in the estoppel
25  or did -- agreement or letter or certificate or anywhere

1  that you wrote as a tenant or even as the guarantor, who
2  knew the tenant was having financial -- financial
3  hardship, did you write Broadstone and let them know you
4  were having financial problems?
5      A.  I don't know.  I think they have our financials.
6  They request our financials and we provide them the
7  financial of 1960 Family Practice.
8      Q.  Okay, ma'am.  That wasn't the question, because
9  financials can be made to look any way they need to,
10  believe me.
11     A.  I don't think so.  Not my CPA.
12     Q.  Not your CPA?
13     A.  No.
14     Q.  So you believe your financials would show that
15  you were having financial issues in 1960 Family Practice?
16     A.  Whatever financial we have, we send it in
17  correctly.
18     Q.  Okay.  Did you also send in financials as a
19  guarantor?
20     A.  I don't think they asked for that.
21     Q.  That wasn't the question, ma'am.  Did you send in
22  financials as a guarantor?
23     A.  I don't remember.
24     Q.  Did you have any conversations with anyone at
25  Broadstone as to the financial problems that 1960 Family

1  Practice was having?
2      A.  I don't know.
3      Q.  You don't know whether you personally did or you
4  don't know whether somebody on your staff did?
5      A.  I know I personally don't remember talking to
6  Broadstone.  I do know that when they ask for financials,
7  we provide them financials.
8      Q.  Did you have any conversations in 2018 or 2019
9  with KME about 1960 Family Practice having financial
10  problems?
11     A.  Like I said, I only meet Jerry Stein -- I don't
12  know what his name is -- once, and I told him that we
13  would not be renewing the lease.
14     Q.  Okay.  Not renewing the lease and having
15  financial problems are two different things.  You are
16  aware of that, right?
17     A.  Correct.
18     Q.  Okay.  Question:  Did you tell Jerry Stein, who
19  was a representative of KME at the time, that 1960 was
20  having financial problems?
21     A.  He never ask.  I don't remember saying anything
22  about financial or issue with financials.
23     Q.  But you agree with me that in 2018 and '19 you
24  were having financial issues at 1960 Family Practice?
25     A.  Correct.  And, amazingly, we make our rent

TRUSTEE1960-051955

LEXITAS

TRUSTEE1960-051956

Huong Le Nguyen

Page 129

1    obligation.

2        Q.  Up until the time you didn't, correct?

3    **A.  Up to September 1, 2019.**

4        Q.  And at no point in time when you were dealing

5    with David Ellent --

6    **A.  David Ellent.**

7        Q.  -- or UMMC did you inform Jerry Stein or KME that

8    you were selling your assets, correct?

9    **A.  Huh?**

10          MS. FALCON:  Objection.  Form.

11       Q.  (BY MS. ZIEK)  That 1960 was selling its assets?

12   **A.  Huh?**

13       Q.  At no time in 2018 or '19 or during the duration

14   that you were talking to David Ellent or UMMC did you ever

15   inform KME Holdings, LLC, that you were selling the

16   assets, did you?

17   **A.  We were selling assets but not at 51 percent.  I**

18   **kept saying that over and over and over again.**

19       Q.  Ma'am, you and I --

20   **A.  We never sold 51 percent of our asset.**

21          (Discussion off record.)

22          MS. ZIEK:  I still have a while.

23          MR. MATTHEWS:  Do you?

24       Q.  (BY MS. ZIEK)  Okay.  On 29 you say that KME

25   reached a settlement with current lessee, UMMC, which

Page 130

1    acquired all of 1960 Family Practice's assets and

2    liabilities.

3              You're telling me now that's not true,

4    correct?

5          MS. FALCON:  Objection.  Form.

6        Q.  (BY MS. ZIEK)  That was your statement earlier,

7    correct?

8          MS. FALCON:  Objection.  Form.

9    **A.  What?**

10       Q.  (BY MS. ZIEK)  That UMMC did not acquire all of

11   1960 Family Practice's assets and liabilities, correct?

12          MS. FALCON:  Objection, form.

13   **A.  We still have --**

14          MS. ZIEK:  What's your objection to the

15   form?

16          MS. FALCON:  You are talking about what a

17   document says without asking her to look at the document

18   that actually governs what that actually says.

19       Q.  (BY MS. ZIEK)  Paragraph 29 in your -- in

20   exhibit number, whatever it is --

21          MS. POYSER:  30.

22          MS. ZIEK:  Is it 30?

23          MS. POYSER:  Uh-huh.

24          MS. FALCON:  Not that exhibit.  You are

25   asking her about the Asset Purchase Agreement, which --

Page 131

1          MS. ZIEK:  No, I'm not.

2          MS. FALCON:  -- which is --

3          MS. ZIEK:  No, I'm not.  I'm asking her

4    about Exhibit 30, the Second Amended Answer and

5    Counterclaim and Cross-Action.

6        Q.  (BY MS. ZIEK)  Paragraph 29, do you see it,

7    ma'am?

8    **A.  Yes.**

9        Q.  What does it say, please?

10   **A.  That KME reach a settlement with the current**

11   **lessee, UMMC, which acquire all of 1960 Family Practice**

12   **assets and liability and under term of settlement receive**

13   **payment from UMMC for alleged amount owed under the lease.**

14   **The amount payment received by settlement must be credited**

15   **towards an outstanding amount alleged owed and due.**

16       Q.  Okay.  And what paragraph in the lease states

17   that that must occur?

18   **A.  All liability is in the APA.**

19       Q.  No, I didn't -- I'm sorry.  It wasn't a clear

20   question.

21          It says, "The amount of payment received by

22   the settlement" -- and that's the settlement reached

23   between KME and UMMC, correct? -- "must be credited

24   towards the outstanding amount alleged owed and due."

25          Why is that, ma'am?

Page 132

1    **A.  Because 2019 to June 2021 --**

2        Q.  Uh-huh?

3    **A.  -- if you said there were rent due or there was**

4    **a -- money due, if UMMC paid to KME a certain amount of**

5    **money and paid the lease a certain amount, I should get**

6    **credit for.  Why would they get double-dipping?  You can't**

7    **sue me and then you get money from UMMC, for what?**

8        Q.  If I get -- if I lease to UMMC after June --

9    **A.  After '21.**

10       Q.  -- of 2021, the only person who would be entitled

11   to that credit would be the tenant, correct?

12   **A.  The 1906 FP or the --**

13       Q.  FP, Family Practice, correct?

14   **A.  But the money that you receive, is it for the --**

15   **before -- I should get credit for the money that you**

16   **received -- what does that money represent?**

17       Q.  It represents a lease, ma'am, a six-month lease?

18   **A.  From what time to what time lease?**

19       Q.  From June of 2021 through December of 2021?

20          MS. FALCON:  Objection.  Form.

21          MS. ZIEK:  She asked what it represented.  I

22   gave her that.

23          MS. FALCON:  You're -- it's a best evidence.

24   You are describing a document that you have not put in

25   front of her and nor do you have in front of you.

TRUSTEE1960-051956
LEXITAS

Page 133

1        So, objection.  Form.

2        MS. ZIEK:  It doesn't matter.  I know what

3   the time frame was.  Okay?

4        MS. FALCON:  Objection.  Form.

5   Q.  (BY MS. ZIEK)  Okay, ma'am.  Just assume with

6   me --

7        (Simultaneous speakers.)

8   Q.  (BY MS. ZIEK)  Wait a minute.  No.  Time out.

9        Assume with me, ma'am, that the lease

10  agreement is June 2021 through December 2021.

11  **A.  No, I'm only obligate to June 2021.**

12  Q.  Exactly.  My point.

13  **A.  Yeah, you -- you are suing --**

14  Q.  So if I get money afterwards, you are not

15  entitled to that credit if it's for rent afterward s,

16  correct?

17  **A.  How about rent before?  Why didn't you use that**

18  **money to apply to credit for rent before?**

19  Q.  Because I didn't have a lease before.  I have a

20  lease now for a certain time frame, okay?  And that's

21  money for that certain time frame that I'm obligated to

22  mitigate, because you told me to go out and find somebody,

23  right?  That's what a nice landlord does; they go out and

24  try to find a tenant, correct?  I think that's what you

25  said.  Not greedy landlords.

Page 134

1   **A.  Correct.**

2   Q.  Okay.  And so --

3   **A.  So the money that -- should have been credited**

4   **towards me.**

5   Q.  Okay.  You need to let me finish --

6   **A.  Okay.  I'm sorry.  I'm sorry.**

7   Q.  -- before you start.

8   **A.  That's fine.**

9   Q.  Okay.  So you've said that already in this

10  deposition, correct?

11  **A.  Correct.**

12  Q.  Okay.  And so if I choose to go out and find a

13  lessee now for this building, it's for credit up until the

14  end of the initial term, correct?  It's not credit -- it's

15  not crediting you as a guarantor would receive?

16  **A.  That's why you are double-dipping.  You're trying**

17  **to get me to go to pay for you before 2021.  Now you get**

18  **UMMC to pay you after 2021.  So you're -- and you're suing**

19  **both.  You get -- you are suing me for what UMMC did not**

20  **pay from 2019 to 2021.**

21  Q.  Not only what you UMMC but what 1960 Family

22  Practice didn't pay?

23  **A.  Right.  Did not pay, right.**

24  Q.  Okay.

25  **A.  Yeah, you are suing that.**

Page 135

1   Q.  Okay.

2   **A.  And what I'm saying is that you receive money**

3   **from UMMC.  That money should have been credit towards me.**

4   Q.  Why would it have been credited towards you if it

5   wasn't for a time frame that you weren't liable for?

6   **A.  Because now you holding me liable for that.**

7   Q.  I'm not holding you liable for after June 2021.

8   The Court has already said I can't hold you liable for

9   that.

10  **A.  Exactly.  So the money you received should have**

11  **been credit for me.**

12  Q.  Oh, so in your opinion everything that we're

13  receiving now should be back-end loaded so that you don't

14  owe anything but then 1960 --

15  **A.  Yes.**

16  Q.  -- that you put into bankruptcy is supposed to

17  bear that burden.  Is that your testimony, Dr. Le?

18  **A.  I'm a guarantor.**

19  Q.  Understand.

20  **A.  But it means that I didn't occupy the building.**

21  **The tenant occupy the building.  1960 Family Practice**

22  **occupy the building.  UMMC paid to you money.  Any money**

23  **that UMMC paid to you should have been credit toward the**

24  **guarantor.**

25  Q.  And I asked you where in the lease that it says

Page 136

1   that?

2   **A.  Common sense.**

3   Q.  It's not common sense, ma'am.  I'm asking you,

4   where in the lease does it say that?

5   **A.  Because that's what UMMC told me.**

6   Q.  So now UMMC told you --

7        (Simultaneous speakers.)

8   **A.  Yes.**

9   Q.  (BY MS. ZIEK)  Wait a minute.

10  **A.  I had a conversation with Syed --**

11  Q.  Okay.  So --

12  **A.  -- and I said, why did you not pay the lease and**

13  **put me into this bind so KME would sue me under the**

14  **guaranty.  And Syed at UMMC said, no, I have to pay every**

15  **single dime that was owed to us.**

16       MS. ZIEK:  Okay.  Objection.  Response.

17  **A.  Okay.  That's fine.**

18  Q.  (BY MS. ZIEK)  You are saying what somebody else

19  said.  It's called hearsay.

20  Q.  Okay.

21       MS. ZIEK:  So, objection to your response.

22  Q.  (BY MS. ZIEK)  Let's move on.

23       Are you personally paying Porter & Hedges

24  for their services here?

25       MS. FALCON:  You have our engagement

Page 137

1  agreement.
2      Q.  (BY MS. ZIEK)  I'm asking a question.  Are you
3  personally paying for them?
4      A.  Yes.
5      Q.  Okay.  It's not coming out of some -- an LLC that
6  you own?
7      A.  I think that's privileged information between me
8  and my lawyer.
9      Q.  Well, it's really not, but okay.
10         (Exhibit 31 marked.)
11     Q.  (BY MS. ZIEK)  Let me show you what's been marked
12  as Exhibit 31, ma'am.
13     MR. MATTHEWS:  31.  Is that right?
14     MS. ZIEK:  Uh-huh.  I think that's right.
15     Q.  (BY MS. ZIEK)  This was something that you
16  produced to show the payments made to Porter & Hedges,
17  correct?
18     A.  Correct.
19     Q.  Because you've asked for now your attorney's
20  fees, correct?
21     A.  Correct.
22     Q.  Why is the client name yours individually and
23  Allergy of Texas, PLLC?
24     A.  Because the 1960 trustee sue Allergy of Texas.
25     Q.  So are these fees yours personally and Allergy of

Page 138

1  Texas, PLLC?  So when the -- so the trustee has sued
2  Allergy Texas of -- PLLC.  Is Porter & Hedges representing
3  you in that cause of action?
4      A.  Correct.
5      Q.  Okay.  So are these fees segregated in any way or
6  do you receive one bill for both services?
7      A.  I don't know.  I receive one bill like this and
8  we pay.
9      MS. FALCON:  I'm going to correct that, just
10  because it's on here.  This matter is KME Holdings.  The
11  other lawsuit is a different matter.
12     Q.  (BY MS. ZIEK)  Okay.  Then why is Allergy of
13  Texas, PLLC, listed as the client in the KME Holdings
14  matter?
15     A.  You ask the lawyer.  I don't know.
16     MS. FALCON:  Because they're both clients of
17  the firm.
18     Q.  (BY MS. ZIEK)  Does Allergy of Texas, PLLC, pay
19  for your personal services in the KME Holdings lawsuit?
20     A.  I don't know.
21     Q.  Who would know?
22     A.  No one, because when we get the bill, whatever
23  LLC has the money, we pay for that.
24     Q.  Okay.  So is it your testimony, because this is
25  what I think I heard you just say, that whatever LLC has

Page 139

1  the money when you receive a bill from Porter & Hedges,
2  that's who pays it?  Is that your testimony?
3      A.  From between Allergy of Texas and myself, yes.
4      Q.  Okay.  Would there be other LLCs that might have
5  paid some of these bills?
6      A.  No.
7      Q.  Okay.  After KME -- after -- I'm sorry.  Let me
8  start over.
9          After 1960 Family Practice went into
10  bankruptcy -- well, let me start before that occurred.
11         After September 1st of 2019, who was
12  receiving the subtenant payments on Buildings 2 and 3?
13     A.  No one.  I don't think we did.  I don't remember.
14  We supposed to.  And then we pay -- or I thought the
15  tenant told me, the subtenant, like the eye doctor, told
16  me that Jerry or somebody with KME told them to pay KME
17  directly.
18     Q.  Okay.  Was there ever an occasion that you
19  received checks from the subtenants that were not passed
20  on to KME?
21     MS. FALCON:  Objection.  Form.
22     A.  I don't know.
23     Q.  (BY MS. ZIEK)  Well, who would know, ma'am?
24     A.  My accountant would.
25     Q.  And who is the accountant?

Page 140

1      A.  Patricia McConnell.
2      Q.  Okay.  So Patricia McConnell would be the only
3  person that would know if all of the subtenant payments
4  received by 1960 Family Practice were paid to KME.  Is
5  that your statement?
6      A.  Yes.
7      Q.  Okay.  Did you have any direct communications
8  with Jerry Stein or did everything go through Stacy
9  Williams and Patricia McConnell?
10     A.  I do not have any direct communication with Jerry
11  Stein except for one time when he came in the back --
12     Q.  When he came into the building?
13     A.  Yes.
14     Q.  Okay.  And do you recall when that was?
15     A.  I don't remember.  I -- somewhere when he
16  introduced himself as the new landlord.
17     Q.  So you had notification that KME Holdings had
18  bought the building.  Is that correct?
19     A.  Jerry came and said he's the new landlord.
20     Q.  Was there ever an occasion that some of the
21  subtenants didn't pay their common area maintenance
22  assessments?
23     A.  Yes.
24     Q.  Did 1960 have to step in and pay those
25  assessments?

TRUSTEE1960-051959

Huong Le Nguyen

Pagess 141..144

Page 141

1    A. I don't know.  I don't know.

2    Q. Okay.  Since you were considered the landlord on

3    the subleases, correct --

4         MS. FALCON:  Okay.  Form.

5    Q. (BY MS. ZIEK)  Well, take a look at the sublease

6    that I gave you.  In front of Lymphedema, who is listed as

7    the landlord?

8    A. I am.  We are.

9    Q. Okay.  So you were the landlord on the subleases,

10   correct?

11        MS. FALCON:  Objection.  Form.

12   A. With Lymphedema, yes, I think so.

13        What exhibit is this with Lymphedema?

14        MR. MATTHEWS:  25.

15   Q. (BY MS. ZIEK)  25.

16   A. Okay.  There you go, yes.

17   Q. And even on the Building 3 draft that we had that

18   UMMC didn't sign, you were listed as the landlord on that,

19   correct?

20        MS. FALCON:  Objection.  Form.

21   A. The Family Practice, 1960 Family Practice.

22   Q. (BY MS. ZIEK)  Okay.  So 1960 Family Practice was

23   listed as landlord on the subleases, correct?

24   A. Correct.

25   Q. Okay.  So if you were the landlord at that time

Page 142

1    and somebody such as Lymphedema wasn't paying their CAM,

2    what steps did you undertake to make sure the CAM was

3    paid?

4         MS. FALCON:  Objection.  Form.

5    A. My staff would notify them.

6    Q. (BY MS. ZIEK)  So other than notification by your

7    staff, did 1960 step in and pay it?

8    A. That, I don't know.

9    Q. Would you agree with me that the CAM was part of

10   what was required to be paid to KME Holdings?

11   A. No.  I thought we only responsible for the base

12   rent.

13   Q. You're unaware of the other charges contained

14   within the lease that you were responsible for?

15   A. I thought we paid CAM directly.

16   Q. When you say you thought you paid CAM directly --

17   A. I thought the Family Practice paid CAM.

18   Q. In what way, ma'am?

19   A. I don't -- I don't know, but I thought that we

20   only collect the base rent from the subtenant.

21   Q. So you thought on subtenants the only thing you

22   collected was base rent?

23   A. Correct, that's what I thought.  I don't know.

24   But I know when they -- they were -- Patricia has

25   mentioned that if Lymphedema has not been paid their

Page 143

1    CAM -- I know that we have sent a lot of notices to them.

2    My accountant called them.  We used to have a lawyer and

3    she would be calling them.

4    Q. And did she get anywhere, ma'am?

5    A. I don't know.  I thought -- they told me sometime

6    Lymphedema pay, sometime they don't pay.

7    Q. Okay.  And if Lymphedema didn't pay, did you ever

8    sue Lymphedema to enforce the sublease?

9    A. No.

10   Q. Did 1960 then step in and pay it when they knew

11   Lymphedema hadn't paid the charges they were responsible

12   for?

13   A. I don't know.

14   Q. And, once again, the only person who may know is

15   Patricia McConnell?

16   A. Yes.

17   Q. Did Ms. McConnell report to you when subtenants

18   weren't paying their bills?

19   A. I think after many attempt, if she tries to

20   collect them and they did not pay.

21   Q. And that was because you were still a guarantor,

22   correct?

23   A. No, because 1960 Family Practice was the

24   landlord.

25   Q. Was there ever an occasion that she was

Page 144

1    concerned -- if UMMC didn't pay, that she was concerned

2    that you were still the guarantor on the lease?

3    A. I didn't know that UMMC didn't pay.  I did not

4    know that.

5    Q. Okay.  Did the subtenants always pay on time,

6    ma'am?

7    A. I don't know.

8         (Exhibit 32 marked.)

9    Q. (BY MS. ZIEK)  Let me show you what's been marked

10   as Exhibit Number 32.

11        MS. FALCON:  Which exhibit?

12        MS. ZIEK:  32.

13   Q. (BY MS. ZIEK)  Have you seen that before, ma'am?

14   A. No.

15   Q. Okay.  It appears to be from Patricia McConnell,

16   correct?

17   A. Correct.

18   Q. Who is your accountant?

19   A. Yes.

20   Q. To Stacy Williams, who works in one of your

21   offices, correct?

22   A. Correct.

23   Q. Hold on one second.

24        And who is that third person?

25   A. Hemant Khemka.

TRUSTEE1960-051959
LEXITAS

TRUSTEE1960-051960

Page 145

1     Q. Yes.

2     A. He was Patricia's boss.

3     Q. Okay. And what position did he hold -- did

4  Patricia McConnell work for your company or was she a CPA

5  on her own?

6     A. She work for me.

7     Q. Okay. And so it would stand to reason that her

8  boss worked for you as well, correct?

9     A. Correct.

10    Q. And it says, "I received the email below from

11  Jerry Stein today, who is a representative for KME

12  Holdings."

13         And this is dated December 20, 2019,

14  correct?

15    A. Correct.

16    Q. And it basically is a -- this is after the Asset

17  Purchase Agreement, correct?

18    A. Correct.

19    Q. And it says, "Last night I received the below

20  text from Jerry which I had forwarded to Hemant. Based on

21  my discussion with Hemant, he was going to talk with Ryan

22  as Jerry is threatening to lock the doors on the IT space

23  in Building 2 and on Building 3. These buildings have a

24  personal guarantee from Dr. Le on them for rent."

25         Do you see that?

Page 146

1     A. Yes.

2     Q. And this was a notification that rent was late in

3  December of 2019, correct?

4     A. Yes, I see that.

5     Q. Okay. Were you aware of that situation?

6     A. No.

7     Q. So your employees weren't passing along things

8  that were going forward, correct?

9     A. Correct.

10    Q. Okay. So, at the time, did you ever discover

11  that KME had not received its rent on December 20th of

12  2019 at all, from any of your employees?

13    A. No.

14    Q. Okay. Do you know what steps they undertook to

15  make sure that this rent was paid?

16    A. I think we talked to Ryan. Ryan is an employee

17  of UMMC.

18    Q. Okay. But obviously the rent was late, correct?

19    A. It looks like that was our December rent.

20    Q. And 1960 Family Practice was obligated to pay it,

21  correct?

22    A. Yes.

23    Q. And if 1960 Family Practice hadn't paid it, then

24  you, as a guarantor, would have been obligated to pay it,

25  correct?

Page 147

1     A. Well, not paying it, but I would be stepping in

2  and seeing why this rent was not paid.

3     Q. Okay. So you think a guarantor just steps in to

4  see why rent is not being paid; they're not obligated to

5  pay it if it's late?

6     A. I think that the tenant should try everything

7  they can, work out the solution with the landlord and

8  get -- and be paid, but the tenant is the one that benefit

9  from having the space and all that.

10    Q. But 1960 Family Practice was no longer in this

11  location, correct?

12    A. No, 1960 Family Practice has kind of never

13  been -- like I said, 1960 Physician Associates are all the

14  physicians that are using the space, but 1960 Family

15  Practice -- we're like the landlord.

16    Q. I understand you are like the landlord, but

17  you're our tenant, correct? You are KME Holdings' tenant?

18    A. Correct.

19    Q. And you are the one who have leased these

20  premises, correct?

21    A. Correct.

22    Q. And you are the person who is supposed to be on

23  the premises, correct?

24    A. No, we -- we, as 1960 Family Practice, lease it

25  out to 1960 Physician Associates for them to see their

Page 148

1  patients.

2     Q. Okay. Where is that lease, ma'am?

3     A. I don't know.

4     Q. There's a lease with a nonprofit?

5     A. I don't know. It may not have. We just kind

6  of -- when we -- 1960 Family Practice has the building.

7  1960 Physician Associates hire the doctors and they're the

8  ones that occupy the building --

9     Q. Okay.

10    A. -- since 2016.

11    Q. Other than the declarations you have requested in

12  here, have you requested any other relief against my

13  client?

14    A. What do you mean? I don't understand the

15  question.

16    Q. Well, this is your lawsuit against my client.

17  What have you -- what are you requesting from my client?

18    A. That we would release Dr. Hoang and her

19  percentage -- the relief. You read it today.

20    Q. Okay. That's been taken out of your lawsuit.

21  What are you asking the Court to order against my client,

22  KME?

23    A. I want to have credit for the money that UMMC

24  paid to KME.

25    Q. And you can't, as we sit here today, point to any

TRUSTEE1960-051961

Huong Le Nguyen

Page 149

1  provision where you get credit for any payments made after
2  June of 2021, can you?
3      MS. FALCON:  Objection.  Form.
4      **A.  I don't know how much they did not pay.  Like I**
5  **said, I thought they paid the rent.**
6      Q.  (BY MS. ZIEK)  Ma'am, what steps did you
7  undertake to ensure that UMMC was paying the rent?
8      **A.  Because I was never -- I was never in**
9  **communication with Jerry.  Jerry never told me that they**
10  **didn't pay the rent.  I didn't know they didn't pay the**
11  **rent.**
12      MS. ZIEK:  Objection.  Form.
13      Q.  (BY MS. ZIEK)  What steps did you take?
14      **A.  For what?**
15      Q.  Did you write a check every month?  1960 was
16  primarily responsible, correct?  Did 1960 write a check
17  every month?  Because there was no sublease, no
18  assignment, therefore it was 1960 Family Practice's
19  obligations to make these payments.  Did you ensure that
20  those payments were made on a monthly basis as the
21  president of the tenant?
22      **A.  Because --**
23      Q.  I didn't ask -- that's a yes or no, ma'am.
24      **A.  I don't know.  I don't know what you are trying**
25  **to ask me to do.  All I know is that UMMC said they would**

Page 150

1  **take care of the rent and they will pay to KME directly.**
2      Q.  Okay.
3      **A.  And other subtenant told me that KME, Jerry**
4  **and -- they said he was not a nice landlord like you were,**
5  **but that's besides the point.  He said that he direct them**
6  **to pay everything to him, that nothing go through Family**
7  **Practice anymore.**
8      Q.  And that was his right when Family Practice
9  abandoned the premises, correct?
10      **A.  We didn't abandon the premises.**
11      Q.  Well, were you still on the premises, ma'am?
12      **A.  Our stuff was on the premises.  We sold it to**
13  **UMMC.**
14      Q.  Then it's no longer your stuff, is it?
15      **A.  But at the same time -- no, no, no, the Family**
16  **Practice, PA, is seeing the patient.**
17      Q.  Ma'am, yes or no.  Once you sold it to UMMC, it
18  was no longer 1960 Family Practice's stuff, was it?
19      **A.  The name was.  The obligation.  You told us there**
20  **was the obligation still there.  You are saying Family**
21  **Practice still obligated.**
22      Q.  Exactly.  But you weren't on the premises, were
23  you?  Were you physically on those premises, ma'am, after
24  September 1st of 2019?
25      **A.  No.**

Page 151

1      Q.  Okay.  Was any of your staff on those premises
2  after September 1st of 2019?
3      **A.  No.**
4      Q.  So you were no longer on the premises, correct?
5      **A.  Yes, I was no longer on the premise.**
6      Q.  You hadn't sold 1960 Family Practice's name,
7  correct?
8      **A.  Correct.**
9      Q.  And so who for 1960 Family Practice, PA, was
10  still on the premises after September 1st of 2019?
11      **A.  The 1960 Family Practice.  The name is still --**
12  **we are still obligated for the lease, as you said.**
13      Q.  Okay.  And so what did you or your staff
14  undertake to ensure that your obligations were being paid?
15      **A.  That's what we said to UMMC, send us the check**
16  **and we'll send it to the landlord.**
17      Q.  Okay.  And did that occur?
18      **A.  Subtenant told us they are no longer able to send**
19  **a check to me because the landlord direct them to send it**
20  **directly to him.**
21      Q.  That's correct, because 1960 -- none of your
22  people were left on the premises, correct?
23      **A.  But they can mail the check to us or you can wire**
24  **a check to us.  I don't understand what you are trying to**
25  **say.  My point is that --**

Page 152

1      Q.  Okay.  Did you --
2      **A.  I was told by Syed at UMMC that Jerry Stein**
3  **direct UMMC to send a check to him.  And we all did.  They**
4  **all listened and send the check to him.**
5      Q.  Okay, ma'am.  But you also understood that UMMC
6  had no subtenant agreement with you, correct?
7      **A.  Correct.**
8      Q.  Also had no assignment of my lease to them,
9  correct?
10      **A.  Correct.  And they are supposed to, but they**
11  **didn't do it.**
12      Q.  Okay.  And that plays into how is that my
13  client's fault?
14      **A.  Then why did they -- why did Jerry Stein told the**
15  **subtenant or other tenant to direct pay to him, because**
16  **they do not pay to 1960 Family Practice.**
17      Q.  You understand that under those subleases and the
18  consents, we have that right?  You do understand that,
19  right?
20      **A.  Okay.  Okay.  So you do have that right.**
21      Q.  Okay.  Were you not aware of that?
22      **A.  My point is you say what step did I take.**
23  **There's nothing I can do when the landlord said send all**
24  **the checks to me.  Don't send to Family Practice.  Leave**
25  **them kind of like -- get them out of the loop --**

TRUSTEE1960-051961

LEXITAS

TRUSTEE1960-051962

Huong Le Nguyen

Page 153

1    Q.  1960 Family Practice could have been paying it
2  all along though, correct?
3    **A.  What do you mean?**
4    Q.  They could have paid for their obligations?
5    **A.  I didn't know it was not fulfilled.  That's the**
6  **whole point I'm telling you.  I did not know that.**
7    Q.  But whose obligation is it when you place people
8  in there my client didn't agree to lease to?  You placed
9  people in there.  You allowed UMMC in there, correct?
10        MS. FALCON:  Objection.  Form.
11    Q.  (BY MS. ZIEK)  1960 Family Practice sold their
12  assets in place with the location to UMMC, correct?
13    **A.  1960 Family Practice has the lease, and it leased**
14  **to -- like I said, the UMMC bought the equipment and the**
15  **asset, but it did not buy the company.  The company still**
16  **us.**
17    Q.  I don't have a problem with --
18    **A.  I don't understand what you are trying to tell**
19  **me.**
20    Q.  What I'm trying to say is who allowed UMMC to
21  come in and take over the assets?  Who allowed that,
22  ma'am?
23    **A.  We, 1960 Family Practice, has the right to sell**
24  **the asset to UMMC.**
25    Q.  That's correct.  But you have no right to place

Page 154

1  them into our building, correct?
2    **A.  They're not placed into your building.  The**
3  **Family Practice, the Physician Associates, has always been**
4  **there.  Syed did not come and put himself into that**
5  **building, no.  There was no building office going there.**
6  **Everything was the same.**
7        **Before 2019, the building was brown.  The**
8  **patient come in.  They see "1960 Family Practice."  After**
9  **2019, they still see 1960 Family Practice, the same name,**
10  **the same people.  The building says "1960."**
11    Q.  So did you receive all of the revenue after 2019
12  from Physicians Association?  Did 1960 Family Practice,
13  PA, do all the billing and receive all the monies from the
14  work being done at those buildings, ma'am?  Did they?
15    **A.  Yeah, they kept the money in 1960 PA.  Yes.**
16    Q.  So 1960 -- after September 1st of 2019, all of
17  the money on the work that the physicians were doing after
18  that date flowed through 1960?
19    **A.  No, it still stay in 1960 PA.  I don't think --**
20  **there is 1960 PA.  It has all the physicians.  The**
21  **physician come, see the patient at this building, okay,**
22  **Family Practice building.  UMMC just bought the asset, the**
23  **chairs, the furniture.**
24    Q.  I understand that.
25    **A.  They did not move over.  The building did not**

Page 155

1  say --
2    Q.  Well, wait a minute.  Did they move all that
3  furniture and equipment and everything out of those
4  buildings?
5    **A.  No.**
6    Q.  They utilized it within those buildings, correct,
7  ma'am?
8    **A.  They did not utilize it.  I'm telling you.**
9  **They -- there is no UMMC name.  You walk into 1960 Family**
10  **Practice building today, is there a UMMC name on it?**
11    Q.  Ma'am --
12    **A.  That's my point, because if you -- if you say**
13  **they occupy your building or I did not -- why did I allow**
14  **them to do that.  Just like Lymphedema, Lymphedema's name**
15  **is on the building.**
16    Q.  Understand, ma'am.
17    **A.  UMMC's name is not on the building.**
18    Q.  But UMMC is not owned by you, is it, ma'am?
19    **A.  No.**
20    Q.  Okay.
21    **A.  And they did not own the building.**
22    Q.  And neither did you, correct?
23    **A.  Neither is me.**
24    Q.  Okay.  And so --
25        (Simultaneous speakers.)

Page 156

1        MR. MATTHEWS:  You-all --
2    **A.  I think you keep going around and around in**
3  **circle.**
4    Q.  (BY MS. ZIEK)  No, you keep going around in
5  circles.
6    **A.  I don't know what to tell you anymore.  I'm just**
7  **telling you it is the way it is.  1960 Family Practice --**
8    Q.  And I'm asking you what -- how did the landlord
9  consent to the sale of its assets, your sale of its assets
10  to UMMC, and the use of their building without you still
11  remaining responsible?
12    **A.  That's why 1960 Family Practice is still**
13  **responsible.**
14    Q.  And you as a guarantor are, up to a certain
15  point, correct?
16    **A.  Up to June 2021.**
17    Q.  Okay.
18        REPORTER:  What number is that?
19        WITNESS:  33.
20        REPORTER:  Oh, it is 33?
21        MS. ZIEK:  Uh-huh.
22        (Exhibit 33 marked.)
23    Q.  (BY MS. ZIEK)  Okay.  Dr. Le, will you turn to
24  page 3.  Okay.  You gave a general objection that you
25  basically, in your individual capacity, were responding to

TRUSTEE1960-051962

LEXITAS

TRUSTEE1960-051963
Pagess 157..160

Page 157

1  this and not in your capacity as 1960 Family Practice
2  president, correct?  That's what the first paragraph
3  basically says.
4  **A.  Yes.**
5  Q.  Okay, ma'am.  I asked for "any and all
6  correspondence or agreements between KME and you
7  individually."
8  Other than the lease agreements and the
9  estoppel certificates, do you know of any other
10  agreements?
11  **A.  Not that I know.**
12  Q.  Okay.  And it's your testimony that you have no
13  correspondence between you or KME.  Is that your --
14  **A.  Not that I know.  Not that I'm aware of**
15  **personally.**
16  Q.  Okay.  Did you do --
17  **A.  Except for the one time.**
18  Q.  Okay.  Did you do a search of your computers to
19  make sure that you had never had any communications with
20  anybody, Jerry Stein, Matt Cartwright, anybody at KME?
21  **A.  I did a search on my AskDrLe@1960familypractice.**
22  **They should -- that's my business email.**
23  Q.  Uh-huh.
24  **A.  I did a search on COO@medicalcareoftexas.com.**
25  Q.  Uh-huh.

Page 158

1  **A.  And I did a search on HLEMD@hotmail.com.**
2  Q.  Uh-huh.
3  **A.  I did not see any correspondence.**
4  Q.  Okay.  The next one is "all correspondence and
5  agreements between UMMC and you concerning the premises
6  located at 847 and 845 Cypress Creek Parkway."
7  Do you see that, ma'am?
8  **A.  Yes.**
9  Q.  Okay.  And other than purchase agreement, ma'am,
10  are there -- and the IT agreement that we've introduced
11  into evidence, are there any other agreements?
12  **A.  I don't -- I don't know.  I don't know if there's**
13  **any other agreements.**
14  Q.  Well, did you have an agreement with UMMC, with
15  the pharmacy?
16  **A.  Oh, the sale of my Express Specialty Pharmacy?**
17  **Yes, it's after 2019.  It was --**
18  Q.  Well, this says from January 1st of 2018 to
19  present.  Do you see that, ma'am?
20  **A.  What number is this?**
21  Q.  Number 2.
22  **A.  "All correspondence and agreement between United**
23  **Medical Center, Defendant, concerning premises located at**
24  **847" -- right here, right here.**
25  I don't have anything regarding --

Page 159

1  Q.  The premises?
2  **A.  -- the premises, these Building 2 and Building 3.**
3  Q.  Okay.  So the pharmacy was not in either of those
4  buildings?
5  **A.  Correct.**
6  Q.  Okay.  But there is a sale of a pharmacy between
7  you and UMMC?
8  **A.  Correct.**
9  Q.  Okay.  How about communications or correspondence
10  with UMMC -- between you and UMMC?
11  **A.  I had a -- there was no written communication,**
12  **but I have met with Syed.  And I ask him, why didn't you**
13  **pay the lease, so, you know, I get sued for being a**
14  **guarantor.  And he said to me that he already pay all the**
15  **leases for KME.  He pay all his obligation to KME.**
16  Q.  His obligations.  He didn't say he paid yours,
17  correct?
18  **A.  Well, he said he paid all the liability of 1960**
19  **Family Practice.**
20  Q.  And when did he make that statement, ma'am?
21  **A.  A month ago.**
22  MS. FALCON:  Can we take a quick break?
23  It's been about two hours.
24  MS. ZIEK:  Sure.
25  (Recess taken from 3:02 p.m. to 3:22 p.m.)

Page 160

1  Q.  (BY MS. ZIEK)  Dr. Le, before we took a break, we
2  were looking at your responses to the subpoena duces
3  tecum, which were the documents you were to bring with you
4  today.  However, in accordance with my agreement with
5  counsel, she produced them early to me, okay?
6  **A.  What exhibit are we looking at, what number?**
7  Q.  We're looking at Exhibit Number 34 -- no, 33.
8  **A.  33.  Okay, I have it.**
9  Q.  Okay.  And I believe we were on Number 4:  "All
10  payments from any person or entity for rent, taxes,
11  interest, or other expenses with regard to the two
12  premises my client is the landlord on, received by you
13  from January 1st of 2018 to present, including all
14  payments received by you or any entity owned or controlled
15  by you for subtenants at either address cited herein."
16  Okay.  Do you recall receiving any payments
17  from subtenants for rent, taxes, or other expenses, which
18  are the CAM, after September 1st of 2019?
19  **A.  I don't know.**
20  Q.  Okay, ma'am.  Do you know if you paid ad valorem
21  taxes for the years 2019 for either of those premises?
22  **A.  I don't know.**
23  Q.  Do you know if you paid any insurance for those
24  premises after September 1st of 2019?
25  **A.  I don't know.  However, it's in the bankruptcy**

TRUSTEE1960-051963
LEXITAS

TRUSTEE1960-051964 Pagess 161..164

Page 161

1  court, I believe.  Patricia would know because she would
2  file that with the bankruptcy court.
3      Q.  Okay.  This is before the bankruptcy, ma'am.
4  Because I understand you filed bankruptcy approximately
5  November or December of 2020, correct?
6      A.  Correct.
7      Q.  Okay.  So for 2019, which taxes and insurance
8  would have been due sometime -- well, at least ad valorem
9  taxes would have been due by January 31st of 2020.  Did
10  you make any payments for ad valorem taxes on either of
11  those locations?
12      A.  I think it would be in the bankruptcy court, like
13  I said, because we --
14      Q.  So is that a no, you didn't --
15      A.  I don't know.
16      Q.  -- make payments?
17      A.  I don't know.
18      Q.  Who would know if you made any ad valorem tax
19  payments for that year?
20      A.  Patricia, the CPA.
21      Q.  If they weren't made and they were due, would
22  Ms. McConnell come to you for the money?
23      A.  Yes.
24      Q.  Okay.  Do you recall Ms. McConnell coming to you
25  to pay any of the ad valorem taxes on either of those

Page 162

1  premises for the year 19 -- I'm sorry, 2019?
2      A.  No, I don't remember.
3      Q.  Okay.  Same question on 2020.
4      A.  I don't remember.
5      Q.  Okay.  And it's -- and what I'm also asking is,
6  in 2020, did Ms. McConnell, who knew you were the guaranty
7  on these as per the email we've -- I'm sorry, the email
8  we've looked at, would she have come to you and said, hey,
9  look, 1960 is in bankruptcy.  Somebody needs to pay these
10  ad valorem taxes in 2020?
11      A.  I don't know.
12      Q.  You don't recall that conversation with her or
13  you don't think it occurred?
14      A.  I don't recall that conversation or I don't
15  remember she came and talked to me about the taxes
16  obligation on these buildings.
17      Q.  Do you recall any insurance obligations on these
18  buildings that 1960 Family Practice was to pay?  And if
19  1960 Family Practice didn't pay them, you, as a guarantor,
20  were obligated to pay them?
21      A.  Like I said, I don't remember that she asked me
22  to pay any kind of obligation on the building.
23      Q.  Number 5, "All correspondence between you
24  and any entity or person who has occupied the premises
25  located at 847 Cypress Creek or 845 Cypress Creek from

Page 163

1  January 1st of 2018 to present."
2          You objected to that, and you said that you
3  would limit your response to responsive communications
4  dated from and after September 19th.  Do you see that?
5      A.  Yes.
6      Q.  But it doesn't show that you produced anything?
7      A.  Because I don't have anything.  I search my
8  email.  I did not see anything.
9          (Exhibit 34 marked.)
10     Q.  (BY MS. ZIEK)  Well, let's talk about what you
11  don't have.  Did you see Exhibit Number 34, which is
12  something your counsel did produce?  And I only have one
13  extra copy.  I'll give you mine.
14          This is a text exchange, is it not, that you
15  produced?
16     A.  I did not produce.  I don't know.
17          MS. FALCON:  Well, we did.  We did produce
18  it.  This is one that Stacy and your team pulled.
19     A.  Okay.
20     Q.  (BY MS. ZIEK)  And at the top it says, "I just
21  emailed both of you an email that I had received from
22  Jerry Stein this morning.  After I sent that email, I
23  received the following text."
24          And it basically says "just sent your email
25  to both Hemant Khemka --

Page 164

1      A.  Uh-huh.
2      Q.  Is that how his name is pronounced?
3      A.  Hemant Khemka, yeah.
4      Q.  Okay.
5          -- "Hemant Khemka and to Stacy Williams?"
6          Do you see that?
7      A.  Yes, I do see that.
8      Q.  And the email that was being sent was, "Great.
9  It would be nice if someone would have the courtesy to
10  reply to my emails and voicemails.  I am sure we will get
11  your attention when people show up for work Monday morning
12  and the locks have changed," correct?  Did I read that
13  correctly?
14     A.  Yeah, you did.
15     Q.  Okay.  And it says, "I just sent to Dr. Le, Syed,
16  Ravi, and Ryan."
17          Do you see that?
18     A.  Yes.
19     Q.  What was sent to you, ma'am?
20     A.  I don't have it.  I don't know.
21     Q.  Is there some reason you don't have your emails
22  or your text messages back this far?
23     A.  What year is this?  2019?
24     Q.  Yes, ma'am.
25     A.  Uh-huh.  I look through my email.  Like I said,

TRUSTEE1960-051964
LEXITAS

Page 165

1    AskDrLe@1960FP.net, HLEMD@hotmail.com, and --
2       Q.  Who is Ravi?
3       A.  Ravi is with UMMC.
4       Q.  Who is Ryan?
5       A.  Ryan work for UMMC.
6       Q.  So three parties at UMMC and yourself, because
7    Syed is UMMC, correct?  Owns it?
8       A.  Correct, correct.
9       Q.  So you had some indication, at least to December
10   of 2019, things weren't being paid, correct?
11      A.  I did not know.  No, I did not.
12      Q.  Well, it says, "I just sent to Dr. Le."  Do you
13   have some reason to believe that's not true?
14      A.  I have some reason to believe I never received
15   the email or I never checked the email to see anything
16   that came through.
17      Q.  Okay.  So Stacy Williams -- I'm sorry, Patricia
18   McConnell, who works for you, never had any conversation
19   with you about, gee, in December of 2019, they're coming
20   to lock the doors because we haven't paid rent at these
21   buildings?
22      A.  Correct, I never -- I didn't know that, no.
23      Q.  Okay.  Where does Patricia McConnell live?
24      A.  In Tomball.
25      Q.  And she works for you at what location?

Page 166

1       A.  I think this was -- before that she was working
2    from home.
3       Q.  Where does she work for you now, ma'am?
4       A.  Oh, she work in the building -- Spring building
5    on 2920.
6       Q.  2920.  What's the address?
7       A.  5037-B FM 2920, Spring, Texas 77388.
8       Q.  Okay.  And does that -- does that location --
9    does she have a telephone number that you know?
10      A.  I don't know.  I know she has a telephone.  I
11   don't even know what that number is.
12      Q.  Okay.  And if someone were to go look to locate
13   Ms. McConnell in that office building, what suite would
14   she be in?
15      A.  One of the room in the back.  I don't know what
16   suite would that be.
17      Q.  Well, ma'am, is it a suite that you have an
18   office at?
19      A.  Yes, that building, I own that building, that
20   5037.
21      Q.  But you don't know the suite that Ms. McConnell
22   works in.  Is that your statement?
23      A.  Yes, I don't know what suite.  She takes one of
24   the back room.
25      Q.  Is there more than one suite to that building?

Page 167

1       A.  There's multiple room.  There's only two suite.
2       Q.  Okay.  So if there are only two suites, what
3    suite would she be in?
4       A.  Like I said, I don't know what suite.  Is it A or
5    B, I'm not sure.
6       Q.  What suite are you in, ma'am?
7       A.  I don't even know it either.  I don't know
8    whether Suite A or Suite B.  It's a small building, and I
9    own that building.
10      Q.  I get that you own it, but I'm finding it
11   difficult to believe you don't know what suite you office
12   in?
13      A.  It doesn't matter.  I don't have a suite.  I
14   don't know.  I just walk in.  Whoever's office is open, I
15   just walk in.  I don't really work in that office either.
16      Q.  Okay.  So it's your testimony you have no email
17   correspondence, no text messages, no anything.  Is that
18   correct?
19      A.  Regarding the rent did not make by UMMC.
20      Q.  Well, it's all communications, ma'am.
21      A.  All communication regarding the --
22      Q.  Those two premises, correct?
23      A.  Yes, those premises.
24      Q.  Well, it could be as much as a subtenant telling
25   you they are going to pay their rent or any of that.  You

Page 168

1    don't have any communications with subtenants?
2       A.  I have -- no, I have communication with the eye
3    doctor, Dr. Chundru.
4       Q.  Okay.  Did you produce that?
5       A.  I can.
6       Q.  Okay.  Was there any reason you didn't produce it
7    prior to today?
8       A.  I didn't know you wanted it from Dr. Chundru, the
9    eye doctor.
10      Q.  Did you have any communications with Lymphedema
11   telling them that they owed money?
12      A.  No.  I did have communication with Dr. Kevin
13   Moran who was a sublease from me and then it got changed
14   to Dr. David Ellent.
15      Q.  Okay.  And so you've had communications with them
16   as well?
17      A.  Correct.  I didn't know that you want
18   communication with the subtenant other than UMMC about the
19   lease.  I thought the -- I can produce communication
20   between 1960 Family Practice with the other subtenant.
21      Q.  Okay.  On Number 6 we asked for "All agreements
22   to lease, sublet, or offer to lease or any similar
23   documents indicating yours or any entity owned or
24   controlled by you, including 1960 Family Practice's
25   permission to occupy any of the premises located at the's

TRUSTEE1960-051966

Page 169

1  -- well, it's two -- there's two things -- located at 847
2  or 845 Cypress Creek from January 1st of '18 to present."
3          And even though you objected to it, you
4  agreed to produce the subtenant leases in effect on
5  September 1st of 2019.  Do you see that, ma'am?
6      A.  Yes.
7      Q.  Okay.  Do you recall -- do you recall what
8  subtenants there were when you were no longer -- when 1960
9  Family Practice, PA, was no longer on the premises?
10     A.  Besides UMMC?
11     Q.  Yes, ma'am.
12     A.  The eye doctor, the respiratory doctor,
13  Lymphedema, and one more.  I think rheumatology.
14     Q.  What was Genesis?
15     A.  Genesis is a primary care group with oncology,
16  and they sublease from Kevin Moran, who sublease from me.
17  He was an orthopedic doctor.
18     Q.  Okay.  Were you aware that Genesis moved out?
19     A.  Oh, when?  When did they move out?  No, I was not
20  aware of that.
21     Q.  Okay.  So you had no idea that Genesis also moved
22  out and broke their sublease?
23     A.  I did not know that.
24     Q.  Okay.  Number 8 says "All payments made by you on
25  the guaranty agreement made the basis of this suit."

Page 170

1          You're saying you've made no payments or you
2  can't locate any payments?
3      A.  I don't know if -- if there were any payment,
4  Patricia would have known.
5      Q.  Okay.  Okay.  "All statements made by you in your
6  individual capacity or in your capacity as an authorized
7  agent for 1960 Family Practice's dealing with the issue of
8  rent following 1960 Family Practice's sale of its assets,
9  including any statements made in the 341 meeting to the
10  trustee."
11          Do you see that?
12     A.  What number is this?
13     Q.  Number 9.
14     A.  Okay.
15     Q.  Did you produce those?  I didn't get 341 meeting
16  minutes.
17          MS. FALCON:  I thought we did produce those.
18  I think you have to get those from the trustee.
19          MS. ZIEK:  If you -- I didn't get -- I
20  didn't see them, but I'm not going to say they weren't
21  there, because I haven't gone through every native format
22  thing that you forwarded over.  I've only been through the
23  PDFs and some other stuff, so it may be there.  If it is
24  there, just point it out and I'll just deal with it.
25     Q.  (BY MS. ZIEK)  Okay.  The next one is "All

Page 171

1  documents produced to Dr. Nguyen by you in Cause
2  Number 2019-46875."
3      Q.  Do you see that, ma'am?
4      A.  Yes.
5      Q.  And you objected to that, correct?
6      A.  Correct.
7      Q.  Are you saying that there's no crossover between
8  those two lawsuits and this lawsuit?
9      A.  I don't know.  That's -- my attorney would have
10  to figure it out.
11     Q.  Okay, ma'am.  But personally do you believe
12  there's any crossover between the two?
13     A.  What lawsuit?
14     Q.  Between the one that -- Dr. Nguyen is suing you
15  for in Cause Number 2019-46875?
16     A.  I do think there are some relate.
17     Q.  So there is some relation, right?
18     A.  Yes.
19     Q.  Okay.  Number 11, "All agreements for settlement,
20  indemnification, compromise, guaranty or any other kind of
21  agreement which you have entered into with any other
22  person relating to this lawsuit."
23          Have you made any agreements with any of the
24  other guarantors to indemnify them, ma'am, in this
25  lawsuit?

Page 172

1      A.  In this KME lawsuit?
2      Q.  Yes, ma'am.
3      A.  Well, it's -- the lawsuit is myself, Alex Nguyen,
4  and Annie Hoang.
5      Q.  Correct.
6      A.  Correct.
7      Q.  Have you made any agreements with them to
8  indemnify you?
9      A.  No.
10     Q.  Have you made any agreements to indemnify them?
11     A.  (Nodding negatively.)
12     Q.  No?
13          You produced the lease guaranty.  You
14  produced...
15          Okay.  Did you make -- I didn't see any
16  payments.  How would you normally pay KME?
17     A.  I don't know.
18     Q.  So you don't know how 1960 Family Practice
19  normally paid KME?
20     A.  No.
21     Q.  Do you know if it was by wire or check?
22     A.  I don't know.
23     Q.  Who would know?
24     A.  Patricia.
25          MS. ZIEK:  Are we on 35?

TRUSTEE1960-051967
Huong Le Nguyen
Pagess 173..176

Page 173

1      MR. MATTHEWS:  Yeah.

2      Q.  (BY MS. ZIEK)  When did 1960 Family Practice file

3  for bankruptcy?

4      A.  It's on the record.  I think November 2021.  I

5  don't -- I don't remember exactly.

6      Q.  Could it be November of 2020?

7      A.  Oh, November 2020, yeah.

8      Q.  And I think earlier you said that you placed 1960

9  Family Practice, PA, into bankruptcy without any meeting

10  with either Drs. Nguyen or Annie Hoang?

11      A.  We had a meeting.  But since I was the majority

12  shareholder and the managing partner, so the decision was

13  made.

14      Q.  Okay.  So now you're saying there was a meeting?

15      A.  There was a meeting with me and my lawyer.

16      Q.  Okay.  That wasn't what I asked.  I asked was

17  there ever a meeting with doctors -- I'm sorry, Dr. Nguyen

18  and Dr. Hoang before 1960 Family Practice, PA, was placed

19  into bankruptcy?

20      A.  According to my lawyer, I don't have to.

21      Q.  That wasn't the question, ma'am.

22      A.  Okay.  No.  No.

23      Q.  It's yes or no.

24      A.  No.

25      Q.  Did you have a meeting with your other

Page 174

1  shareholders?

2      A.  No, there was no meeting.

3      Q.  And so in November of 2020, you put 1960 Family

4  Practice, PA, into bankruptcy, correct?

5      A.  Correct.

6      Q.  At the time you put it into bankruptcy, you filed

7  certain schedules and declared under penalties of perjury

8  these were the amounts due and owing, correct?

9      A.  Correct.

10      Q.  Okay.  Let me show you what's been marked as

11  Exhibit Number 35.

12          (Exhibit 35 marked.)

13      Q.  (BY MS. ZIEK)  This is an exhibit and it's called

14  A/B, up at the top, #11B.  Do you see that, ma'am?  And it

15  is a UMMC Receivable Detail.  Do you see that?

16      A.  Where is that, on what -- page 1?

17      Q.  It's on page 1.

18      A.  Yeah.

19      Q.  Up at the top it says "Exhibit A/B #11B,"

20  correct?

21      A.  Correct.

22      Q.  And it says "UMMC" under that, correct?

23      A.  Correct.

24      Q.  And then over to the side, starting on the

25  right-hand, it says, "UMMC Receivable Detail," correct?

Page 175

1      A.  Uh-huh, correct.

2      Q.  And this was part of what you filed in the

3  bankruptcy court.  Is that correct?

4      A.  Correct.

5      Q.  Okay.  And so what did this receivable represent?

6      A.  It represent the unpaid, the amount of money that

7  UMMC should have paid.

8      Q.  To whom, ma'am?

9      A.  To -- for example, to the Physicians Alliance of

10  Red Oak, on rent -- for rent in building -- in Spring

11  building.  It says right here, ultimately owed to

12  Physicians Alliance of Red Oak.  Ultimately -- you can see

13  all of that -- ultimately owed to Broadstone.

14      Q.  But whose receivable was this, ma'am?

15      A.  It was UMMC, 2019.

16      Q.  I understand that.  But who did UMMC owe pursuant

17  to your schedule and bankruptcy?

18      A.  This is rent money.

19      Q.  I understand that, ma'am.  But isn't this what

20  1960 was claiming was owed to them as a receivable from

21  UMMC?

22      A.  Yes.

23      Q.  Okay.  So let's go to page 2.  And I think if you

24  start down -- and it starts with 9 -- 11/15 of 2019.  It's

25  about halfway down the page.  And the number is $903.79,

Page 176

1  "5 percent late fee, November 2019 rent - 847 Cypress

2  Creek Parkway, Building 3."

3          Do you see this?

4          "Amount ultimately payable to KME Holdings,

5  LLC."

6      A.  992,000 -- I mean, $992.

7          MR. MATTHEWS:  You said the wrong date.

8      Q.  (BY MS. ZIEK)  903.79.

9      A.  Yes.

10          MR. MATTHEWS:  You said the wrong date, I

11  think.  12/15.

12      Q.  (BY MS. ZIEK)  12/15 of 2019?

13      A.  I see 12/17 of 2019.

14      Q.  Keep going down, ma'am.

15      A.  Okay.

16      Q.  Till you hit where --

17      A.  2 -- yes, yes.

18      Q.  Do you see it, 11/15 of 2019?

19      A.  Yes.

20      Q.  "903.79, 5 percent late fee, November 2019 rent."

21          Do you see that ultimately owed to KME?

22      A.  Yes.

23      Q.  Okay.  Where did you come up with all of these

24  numbers?

25      A.  Patricia pull it from her QuickBooks.

TRUSTEE1960-051968

Page 177

1    Q.  Okay.  So these are the amounts you acknowledged
2  are due KME, correct --
3         MS. FALCON:  Objection.  Form.
4    Q.  (BY MS. ZIEK) -- as of November of 2020 when you
5  filed bankruptcy?
6         MS. FALCON:  Objection.  Form.
7    Q.  (BY MS. ZIEK)  Well, you swore to the schedule,
8  correct?
9    **A.  Correct.  Whatever is on the schedule, that's**
10   **correct.**
11   Q.  Okay.  And so real estate taxes from September of
12  '19 to December of '19, amount ultimately owed to
13  Physicians Alliance of Red Oak, LLP.
14        Did Physicians Alliance of Red Oak, LP, pay
15  those taxes?
16   **A.  Yes.**
17   Q.  Why would Physicians Alliance of Red Oak, LP, pay
18  taxes owed by 1960 Family Practice, PA, on the buildings
19  owned by my clients?
20   **A.  No, no, no.  No.  What is it?  I'm confused.  The**
21   **Physician Red Oak -- Physicians Alliance Red Oak, we don't**
22   **pay taxes on building that owned by your client.  We pay**
23   **taxes on both buildings that's owned by Physicians**
24   **Alliance of Red Oak on Spring building.**
25   Q.  Okay.  Well, that's not that says, ma'am.

Page 178

1  $19,518.57, real estate property taxes from September of
2  2019 to December of 2019 for 847 Cypress Creek Parkway,
3  Building 3, Houston, Texas, which is one of my client's
4  buildings, correct?
5    **A.  Correct.**
6    Q.  And then it says, out to the side, "Amount
7  ultimately owed to Physicians Alliance of Red Oak, LP."
8         Is that incorrect?
9    **A.  I would have to ask Patricia.  But my suspect is**
10   **that Patricia took -- borrow money from our old building**
11   **and paid the taxes, but I don't know.  I would have to ask**
12   **her because she's a CPA and she pulled the schedule for**
13   **QuickBooks.**
14   Q.  Okay.  And so as we go down, there's certain
15  amounts paid.  It looks like the rent goes up on June 1st
16  of 2020, correct?  There's a rent increase?
17   **A.  Yes.**
18   Q.  And then it continues on.  And then we get down
19  to 11/6 of 2020, and it says, "One year of future rent
20  payments for Building 3."
21        Do you see that?
22   **A.  Yes.**
23   Q.  Why would she have been adding one year's worth
24  of rent payments that -- was she also under the assumption
25  that this was a ten-year lease?

Page 179

1    **A.  Correct.  I think she thought from November to**
2  **June 2021.**
3    Q.  Okay.  And the same thing, if you go to the
4  second page, although it is for building -- a different
5  building, Building 2, she also puts in a year's worth of
6  future rent payments on that building as well, correct?
7    **A.  What amount is it?**
8    Q.  $43,917.72?
9    **A.  Correct.  Right, because we all under the**
10   **assumption the lease -- that we obligate to --**
11   Q.  And the only amount that she actually has you
12  liable for in Building 3 appears to be the IT space,
13  correct -- I'm sorry, in Building 2?
14   **A.  Yes.**
15   Q.  Okay.  So it has no amounts for subtenants that
16  didn't pay, correct?
17   **A.  Correct.**
18   Q.  It has no amounts for tenants -- I'm sorry,
19  subtenants that didn't pay CAM, correct?
20   **A.  Correct.**
21   Q.  And it has no amounts for subtenants who moved
22  out of their spaces prior to their leases ending, correct?
23   **A.  Correct.**
24   Q.  And then at the bottom you say, "Plus
25  miscellaneous fees, including but not limited to late

Page 180

1  fees, interest, attorneys' fees for Brookstone Cypress MOB
2  and KME," correct --
3    **A.  Correct.**
4    Q.  -- "for which there are pending lawsuits"?
5    **A.  Not Broadstone.  Broadstone is a nonsuit now.**
6    Q.  Okay.  But you say "for which there are pending
7  lawsuits."
8         Do you see that ma'am?
9    **A.  Yes.**
10   Q.  Okay.  So at least in 2020, November of 2020, you
11  knew there was a lawsuit, correct, ma'am?
12   **A.  Of what?**
13        MS. FALCON:  Objection.  Form.
14   **A.  No, I don't know.  Like I said --**
15        MS. FALCON:  Which lawsuit?
16   **A.  Which lawsuit, on which company?**
17   Q.  (BY MS. ZIEK)  It says interest and attorneys'
18  fees for Broadstone Cypress MOB, LLC, and KME LLC for
19  which there are pending lawsuits?
20   **A.  Pending lawsuit from Cypress MOB and pending**
21   **lawsuit from KME.**
22   Q.  Okay.  So as -- when you filed in November of
23  2020, you knew there was a pending lawsuit, correct,
24  ma'am?
25   **A.  No.  Pending law -- okay.  Pending lawsuit of**

TRUSTEE1960-051968

LEXITAS

TRUSTEE1960-051969

Page 181

1 Cypress MOB, I don't think it was filed back there.  I

2 don't know.  I would have to go back and look at all that

3 number and what it is.  That's why we assigned zero.

4    Q.  Well, you assigned zero because it says "unknown

5 amount," correct?

6    A.  It's unknown amount.

7    Q.  OKAY.  But at least you knew there was a lawsuit

8 going on?

9    A.  I don't know about that.  I don't.  Seriously, I

10 don't know.

11    Q.  Well, somebody knew about it because somebody put

12 it on a schedule, correct?

13    A.  Patricia would be the one who filled out a

14 schedule and put on the schedule, correct, yes.

15        MS. ZIEK:  Can we take a five-minute break?

16 I might be pretty close to being finished.

17        MS. FALCON:  Sure.

18        (Recess taken from 3:51 p.m. to 4:02 p.m.)

19        MS. ZIEK:  I'm going to reserve the rest of

20 my questions until they finish, see if I have any more,

21 but I'm passing the witness.

22        MS. FALCON:  If y'all don't mind, it would

23 be really nice if we could just reschedule this for a

24 different day.  She's got a depo on Monday.  She's also,

25 you know, got her knee thing.  You've got stuff you need

Page 182

1 to do.  I think it would be very nice.  We can try to get

2 some dates.  You said before June 4th?

3        MS. POYSER:  4th.

4        MS. FALCON:  We'll try to work on that.

5        We'll look at your schedule tomorrow.

6        If that's okay with you.

7        MR. MATTHEWS:  Yeah, it's okay.  I mean, you

8 know, because either way, I don't think we are going to

9 finish today.

10        MS. FALCON:  That's the point.  Why start if

11 you're not going to finish.

12        MR. MATTHEWS:  Okay.

13        (Deposition Recessed at 4:03 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 183

1              CORRECTIONS AND SIGNATURE

2 WITNESS NAME:  HUONG LE NGUYEN      DATE:  05/19/2022

3 PAGE  LINE  CHANGE              REASON

4 _____

5 _____

6 _____

7 _____

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

Page 184

1    I, HUONG LE NGUYEN, have read the foregoing

2 deposition and hereby affix my signature that same is

3 true and correct, except as noted on the correction

4 page.

5

6        _____

              HUONG LE NGUYEN

7

8 THE STATE OF TEXAS        )

9 COUNTY OF _____ )

10

11    Before me _____ on this day

12 personally appeared HUONG LE NGUYEN, known to me or

13 proved to me on the oath of _____ or

14 through _____ (description of identity

15 card or other document) to be the person whose name is

16 subscribed to the foregoing instrument and acknowledged

17 to me that he/she executed the same for the purposes and

18 consideration therein expressed.

19    Given under my hand and seal of office this _____

20 day of _____, 2022.

21

22        _____

              NOTARY PUBLIC IN AND FOR

              THE STATE OF T E X A S

23

24 My Commission Expires:

   _____

25

Page 185

```
 1                    CAUSE NO. 2020-01418
 2  KME HOLDINGS, LLC,        ) IN THE DISTRICT COURT OF
                              )
 3       Plaintiffs,          )
                              )
 4  VS.                       ) HARRIS COUNTY, TEXAS
                              )
 5  1960 FAMILY PRACTICE,     )
    P.A., PHYSICIANS ALLIANCE )
 6  OF RED OAK, L.P., UNITED  )
    MEMORIAL MEDICAL CENTER,  )
 7  LLC, HUONG LE NGUYEN,     )
    QUOC D. LE, AND ALEX L.   )
 8  NGUYEN,                   ) 189TH JUDICIAL DISTRICT
                              )
 9       Defendants.          )
10            REPORTER'S CERTIFICATION
          DEPOSITION OF HUONG LE NGUYEN
11             TAKEN MAY 19, 2022
12      I, SARA BIELAMOWICZ, Certified Shorthand Reporter
13  in and for the State of Texas, hereby certify to the
14  following:
15      That the witness, HUONG LE NGUYEN, was duly sworn
16  by the officer and that the transcript of the oral
17  deposition is a true record of the testimony given by
18  the witness;
19      That the deposition transcript was submitted on
20  June 02, 2022 to the witness or to the attorney for
21  the witness for examination, signature and return to me,
22  by June 22, 2022; (20 days);
23      That pursuant to information given to the
24  deposition officer at the time said testimony was taken,
25  the following includes all parties of record and the
```

Page 186

```
 1  amount of time used by each party at the time of the
 2  deposition:
 3  FOR THE PLAINTIFF:
    04:32
 4      Ms. Robin M. Ziek
        ROBIN M. ZIEK - ATTORNEY AT LAW
 5      24 Greenway Plaza, Suite 2050
        Houston, Texas  77046
 6      713.222.8030
        Rziek@sbcglobal.net
 7
 8  FOR THE DEFENDANT, HUONG LE NGUYEN:
    00:00
 9      Ms. Amy C. Falcon
        PORTER HEDGES, LLP
10      1000 Main Street, 36th Floor
        Houston, Texas  77002
11      713.226.6681
        Afalcon@porterhedges.com
12
13  FOR THE DEFENDANT, UNITED MEMORIAL MEDICAL CENTER:
    00:00
14      Ms. Sharlene A. Poyser
        THE POYSER LAW FIRM
15      1001 Texas Avenue, Suite 400
        Houston, Texas  77002
16      832.498.5434
        sharlene@thepoyserlawfirm.com
17
18  FOR THE DEFENDANT, ALEX L. NGUYEN:
    00:00
19      Mr. Jeff Matthews
        ATTORNEY AT LAW
20      P.O. Box 982
        Katy, Texas  77492
21      281.772.0772
        Jeff.superdocs@gmail.com
22
23
24
25
```

Page 187

```
 1      I further certify that I am neither counsel for,
 2  related to, nor employed by any of the parties in the
 3  action in which this proceeding was taken, and further
 4  that I am not financially or otherwise interested in the
 5  outcome of the action.
 6      Further certification requirements pursuant to Rule
 7  203 of Texas Code of Civil Procedure will be certified
 8  to after they have occurred.
 9
10      Certified to by me this 2nd day of
11  June, 2022.
12
13
14  SARA BIELAMOWICZ, CSR, RPR
    CSR NO. 4838; Expiration Date: 1-31-23
15  Lexitas - Firm Registration No. 95
    13101 Northwest Freeway, Suite 210
16  Houston, Texas 77040
    281-469-5580
17
18
19
20
21
22
23
24
25
```

Page 188

```
 1      FURTHER CERTIFICATION UNDER RULE 203 TRCP
 2      The original deposition was/was not returned to the
 3  deposition officer on _____;
 4      If returned, the attached Changes and Signature
 5  page contains any changes and the reasons therefor;
 6      If returned, the original deposition was delivered
 7  to Ms. Robin M. Ziek, Custodial Attorney;
 8      That $ _____ is the deposition officer's
 9  charges to Plaintiff for preparing the original
10  deposition transcript and any copies of exhibits;
11      That the deposition was delivered in accordance
12  with Rule 203.3 and that a copy of this certificate was
13  served on all parties shown herein and filed with the
14  Clerk.
15      Certified to by me this _____ day of
16  _____, 2022.
17
18
19  SARA BIELAMOWICZ, CSR, RPR
    CSR NO. 4838; Expiration Date: 10-31-22
20  Lexitas - Firm Registration No. 95
    13101 Northwest Freeway, Suite 210
21  Houston, Texas 77040
    281-469-5580
22
23
24
25
```

## Exhibits

**Nguyen 021** 3:13 8:10,12 50:9

**Nguyen 022** 3:15 54:23 112:5,12

**Nguyen 023** 3:17 51:21

**Nguyen 024** 3:19 60:21, 24 71:12 76:2 82:22 93:5

**Nguyen 025** 3:20 72:15, 20 75:6 97:23

**Nguyen 026** 3:21 72:13 73:10,12,14,15 74:13,14

**Nguyen 027** 3:22 74:16, 17

**Nguyen 028** 4:2 102:9,11

**Nguyen 029** 4:3 109:3,5

**Nguyen 030** 4:4 111:6,8 131:4

**Nguyen 031** 4:6 137:10, 12

**Nguyen 032** 4:7 144:8,10

**Nguyen 033** 4:9 156:22

**Nguyen 034** 4:11 160:7 163:9,11

**Nguyen 035** 4:12 174:11, 12

## #

**#11B** 174:14,19

## $

**$19,518.57** 178:1

**$2** 100:22 101:15

**$43,917.72** 179:8

**$500,000** 61:25 84:9 99:15

**$903.79** 175:25

**$992** 176:6

## (

**(d)** 68:21

**(g)** 103:20

## 0

**05/19/2022** 183:2

## 1

**1** 49:23 59:20,22,25 60:7, 11,15 61:8 64:25 68:21 77:13,19,22 78:4,6,20 91:23 96:7 99:7 104:19 107:16,17 108:1,5 129:3 174:16,17

**10** 45:8

**105** 27:16

**1099** 21:20

**11** 171:19

**11/15** 175:24 176:18

**11/6** 178:19

**11:50** 71:3

**12** 22:4 81:1,10,14

**12-year** 81:4,7

**12/15** 176:11,12

**12/17** 176:13

**12:54** 71:3

**13** 9:14

**13.5** 93:8

**14** 82:7 83:4,23

**15** 54:5,6 93:4,8

**15th** 72:21

**16** 31:8 102:13

**18** 169:2

**19** 10:17 11:20 128:23 129:13 162:1 177:12

**1906** 132:12

**1960** 13:1,4,11,19,24 14:10,22,25 15:4,7,11,20, 23 16:20,22,24 17:8,11 20:2,5 21:11 22:11 24:4, 7,12,15,17,19 25:9,11,20, 25 26:4,5 27:11 28:5 33:16 34:9,22,23 36:9,22 38:12 48:21 49:17,20 51:9 53:18 56:22 57:15, 25 59:11,23,25 60:2,10, 15 61:2,19 62:1,9 63:15 65:9,14,22 66:6,11,20 67:6,16,18 68:9,12 69:5, 20,21 70:12 71:17,25 72:22,25 73:3,7,17,23 74:9 75:2 76:15,25 77:13 78:16 79:8,22 81:18 83:5, 18 84:5,9,16,18,21 85:2, 3,4,12,19,25 86:9,19,21, 22,24,25 87:15,17 88:7, 11,19,25 89:4,9,21 90:12 91:6,8,20,21 92:13,24 93:2 94:6,10,11,14,19 95:5,7,8,9,12,18,20,22,24 96:12,14,18,22,24,25 97:2,4,5,8,9,10,12,18 99:3,16,19 100:16,21,23 101:5,15 102:16,17,20 103:6,9 105:6,8,15,20,21, 23,25 106:4,12,13,14,17, 23,24 107:7 109:23 117:2,12,14 119:22,24 121:10 123:8 126:7 127:7,15,25 128:9,19,24 129:11 130:1,11 131:11 134:21 135:14,21 137:24 139:9 140:4,24 141:21,22 142:7 143:10,23 146:20, 23 147:10,12,13,14,24,25 148:6,7 149:15,16,18 150:18 151:6,9,11,21 152:16 153:1,11,13,23

154:8,9,10,12,15,16,18,
19,20 155:9 156:7,12
157:1 159:18 162:9,18,19
168:20,24 169:8 170:7,8
172:18 173:2,8,18 174:3
175:20 177:18

**1960's** 64:13 69:15 70:20

**1975** 9:12,13

**1981** 9:18,19

**1985** 10:3,4,19

**1989** 10:20 11:20

**1992** 10:17,20 12:20

**1998** 11:5,11,12

**19th** 25:14 163:4

**1st** 66:14 74:8 91:24
121:11 139:11 150:24
151:2,10 154:16 158:18
160:13,18,24 163:1
169:2,5 178:15

---

### 2

**2** 32:23 33:15 34:2 37:18
40:1 48:22 49:1,18,24
50:20 52:7 56:17 63:20
64:14 66:22 67:7 68:21
72:3 74:10 77:9,14,18
80:8,9,12,13,18 91:10
96:7 99:7 101:12,13,18
103:18 109:1 112:17
139:12 145:23 158:21
159:2 175:23 176:17
179:5,13

**2.1(d)** 68:21

**2.6** 101:23

**20** 11:12 20:1,6 26:21 28:1
65:10 75:16 114:11
125:18 145:13

**20-plus** 88:21

**200** 32:17

**2000** 25:6

**2000s** 26:21,23

**2011** 39:20 45:23 60:16
67:3,8 72:22 120:13,15

**2016** 27:9 96:5 118:10
148:10

**2017** 101:7,10 126:14

**2018** 11:8,13 14:4 15:14
25:2 51:24 101:16 115:4
126:18 128:8,23 129:13
158:18 160:13 163:1

**2019** 11:7,8,13 15:14 22:9
24:4,19,20 25:10,14
26:11,12 28:2 48:24,25
49:18 60:5 61:8 63:18,22
64:3,25 65:22 66:15 74:8
76:6,16 86:1 91:23 95:25
101:16 102:13 110:13
121:11 128:8 129:3 132:1
134:20 139:11 145:13
146:3,12 150:24 151:2,10
154:7,9,11,16 158:17
160:18,21,24 161:7 162:1
164:23 165:10,19 169:5
175:15,24 176:1,12,13,
18,20 178:2

**2019-46875** 171:2,15

**2020** 11:7 22:9 161:5,9
162:3,6,10 173:6,7 174:3
177:4 178:16,19 180:10,
23

**2021** 27:2 60:16,17 63:25
65:12 67:3,9 80:4 81:6
120:23 121:12 132:1,10,
19 133:10,11 134:17,18,
20 135:7 149:2 156:16
173:4 179:2

**2023** 60:8

**20th** 146:11

**21** 8:10,12 35:16,21 50:5,
9,11 132:9

**22** 50:7,9,13,19,22 51:21,
22,23 54:23 82:1,2,3
112:5,12,15 113:6 115:2,
19

**22nd** 67:9 110:11,12
120:22 121:12

**23** 39:19 50:7,13,14,20,23
51:21,22,23 54:23 67:8
82:2 112:5,12,15 113:6
115:2,18

**2306** 21:3

**2320** 109:24

**23rd** 60:8

**24** 51:21 53:1 60:20,21,24
71:12 76:2 82:7,22 93:5

**2400** 103:17

**25** 60:19 72:14,15,20 75:6
97:23,25 121:17 141:14,
15

**26** 60:19 72:13 73:10,12,
15 74:14 97:23

**27** 51:24 74:16,17 98:1,2,3

**28** 102:9,11

**29** 109:3,5 129:24 130:19
131:6

**290** 59:15 77:15 79:16,22
99:7 110:5

**2920** 98:8,11,15 166:5,6,7

**2nd** 11:19

---

### 3

**3** 32:25 34:5 37:18 38:3
40:4 42:14 49:11,18,24
50:19 51:7 56:17 62:19,
21 63:20 64:14 66:22
67:7 68:24,25 72:3 74:11,
23 77:9,14,18 80:9,12
96:7 97:23 98:16 99:7
139:12 141:17 145:23
156:24 159:2 176:2

Case 20-35493   Document 112-40   Filed in TXSB on 01/08/23   Page 50 of 76
Huong Le Nguyen
TRUSTEE1960-051973                                                                s Index: 30..additional

178:3,20 179:12

**30** 100:2 111:6,8 119:7,8
130:21,22 131:4

**31** 114:11 118:9,10 119:5,
8 137:10,12,13

**31st** 161:9

**32** 144:8,10,12

**33** 156:19,20,22 160:7,8

**34** 34:11,15 160:7 163:9,
11

**341** 170:9,15

**35** 119:6 172:25 174:11,12

**3:02** 159:25

**3:22** 159:25

**3:51** 181:18

---

**4**

**4** 39:19,23 40:8,19 41:7,25
68:23 69:5 119:13,17,18
160:9

**4:02** 181:18

**4:03** 182:13

**4th** 182:2,3

---

**5**

**5** 40:3,8,20 41:10,12,13
42:1,2 51:4 69:6 112:4
113:20 114:24 162:23
176:1,20

**50** 8:6 13:22 14:25 15:4
30:17 83:13 109:16

**500** 87:11 99:23

**500,000** 84:22 87:9,10,12,
16,18,19,25 88:14

**500-** 100:3

**5037** 166:20

**5037-B** 166:7

**51** 82:13,15 83:15 84:1,2
85:17 129:17,20

---

**6**

**6** 40:4 53:8,10 57:16,18
114:6,8,9,10,13,15
168:21

**600,000** 100:3

---

**7**

**7** 54:23 108:21,22 109:5

**75** 65:25 66:4

**77381** 8:6

**77386** 21:3

**77388** 166:7

---

**8**

**8** 169:24

**845** 158:6 162:25 169:2

**847** 33:16 74:23 98:17
158:6,24 162:25 169:1
176:1 178:2

**88** 11:20

---

**9**

**9** 43:3 170:13 175:24

**900** 109:24

**903.79** 176:8,20

**92** 12:9

**992,000** 176:6

---

**A**

**a.m.** 71:3

**A/b** 174:14,19

**abandon** 150:10

**abandoned** 150:9

**ability** 106:17

**absolutely** 99:2

**accelerate** 120:9

**acceleration** 120:10

**accept** 91:25 92:2,4,20

**accepted** 126:4

**access** 102:12 103:1,3,4,
5,12,13 105:1 106:2
108:2

**accordance** 8:12 160:4

**account** 84:8 88:12 89:1,3
108:3

**accountant** 101:21
126:10 139:24,25 143:2
144:18

**accounting** 24:1

**ACH** 98:4 99:3

**acknowledged** 177:1

**acquire** 130:10 131:11

**acquired** 130:1

**act** 58:7 106:17

**action** 44:24 122:4,7
138:3

**active** 32:17

**actual** 98:10 106:8

**ad** 160:20 161:8,10,18,25
162:10

**added** 45:3

**addendum** 52:24 53:3
57:16 114:4,8,20,23
117:17,25 118:10

**adding** 178:23

**additional** 104:2

Case 20-35493   Document 112-40   Filed in TXSB on 01/08/23   Page 51 of 76
Huong Le Nguyen
s Index: address..asset

TRUSTEE1960-051974

**address** 109:19 110:16
160:15 166:6

**administration** 96:12

**administrative** 23:25
25:13 97:19

**administrator** 75:15

**admit** 88:5

**admonishments** 5:11,14

**adversary** 116:5

**advice** 35:5,6

**affect** 89:18,20

**Affiliate** 93:12

**afterward** 133:15

**agent** 122:18 170:7

**agree** 5:19 69:4,9,14,19
70:10 89:12 106:18
123:2,16 128:23 142:9
153:8

**agreed** 169:4

**agreement** 5:23,25 6:5,7,
12 35:24 42:7,11 44:7
46:20 47:19,24 53:22
59:5,6,20 60:25 61:4,9,
12,15,17 62:24 64:17
70:7,14,15,17,18 71:8,9
72:21 74:3,4,22 75:1,5
82:11,22 83:25 84:5
86:10 90:7 91:24 92:3,15
95:16 97:23 98:4 99:3
102:12 103:2 105:22,24
106:3 107:22 108:17
117:12,18 118:13 121:12
126:25 130:25 133:10
137:1 145:17 152:6
158:9,10,14,22 160:4
169:25 171:21

**agreements** 34:18,25
39:6 46:13 47:9,14 52:17
59:11,14 67:13,20 71:16
89:9 90:2 157:6,8,10
158:5,11,13 168:21

171:19,23 172:7,10

**agrees** 68:18

**ahead** 35:21 72:5 80:7

**ail** 90:24

**Alex** 14:14,15,16,22,25
15:3,10,24 16:5 17:3 42:2
48:10 51:14 57:1 65:17,
18 66:10 78:24 96:16
172:3

**allegation** 115:2

**alleged** 131:13,15,24

**allergies** 49:14

**allergists** 24:17,22 25:5

**allergy** 23:6,15,17,22
24:2,3,6,16,17,21,22,24
25:5,7,12 88:16,18,20
102:15 108:16 137:23,24,
25 138:2,12,18 139:3

**Alliance** 78:24 79:5,13
98:7,13,23 175:9,12
177:13,14,17,21,24 178:7

**allowed** 113:18 153:9,20,
21

**ALT** 88:15

**amazingly** 128:25

**Amended** 111:10 131:4

**amendment** 113:24

**amendments** 52:13 54:11
112:24 113:13 117:19

**America** 72:25

**amount** 16:14 79:25
101:11 131:13,14,15,21,
24 132:4,5 175:6 176:4
177:12 178:6 179:7,11
181:5,6

**amounts** 67:13,21 89:8
90:1 120:23 121:15 174:8
177:1 178:15 179:15,18,
21

**Amy** 38:7 80:15

**and/or** 28:20

**Ann** 51:16

**Annie** 16:7,9,21 17:5
51:17 53:20 57:1,5,19
58:12 65:16 66:10 116:22
172:4 173:10

**anniversary** 11:20

**answering** 41:4

**answers** 19:7,20

**antibiotics** 41:6

**anymore** 76:12 150:7
156:6

**AOT** 88:15

**APA** 71:7 84:25 131:18

**apologies** 119:1

**appears** 64:9 72:24 74:22
144:15 179:12

**apply** 32:13 133:18

**appraisal** 99:12

**approximately** 11:7 52:4
89:5 161:4

**April** 11:19 63:18

**AR** 84:8,21

**area** 140:21

**ARS** 86:8 87:6,7

**Article** 62:21

**Arts** 9:21

**Askdrle@**
**1960familypractice**
157:21

**Askdrle@1960fp.net**
165:1

**asks** 55:13

**assessments** 140:22,25

**asset** 25:9 60:25 61:19

TRUSTEE1960-051975
Case 20-35493   Document 112-40   Filed in TXSB on 01/08/23   Page 52 of 76
Huong Le Nguyen
s Index: assets..bill

62:9 64:17 69:22 71:8,9
82:22 83:5,7,13,14,19,22
84:4,24 85:17 86:10
99:19 105:25 121:12
129:20 130:25 145:16
153:15,24 154:22

**assets** 22:10,20 24:7
48:25 61:24 62:20 63:15
64:6,9,10,13,14 65:2,21
66:1,14 69:15 73:7 74:9
79:23 81:18,21 82:12
84:1,4,6 86:7 99:13,16
103:6 107:19 129:8,11,
16,17 130:1,11 131:12
153:12,21 156:9 170:8

**assign** 35:24 36:12,23,25
37:4 38:12 69:16 93:10,
23,25

**assignable** 93:17

**assigned** 87:6 90:22 91:4
123:10 181:3,4

**assigning** 64:18

**assignment** 38:3 63:10
65:3,6 89:14 91:16 93:6,8
94:1 149:18 152:8

**assignments** 52:14 54:11
112:24 113:14

**assistant** 94:7

**Associates** 29:18 60:2
84:16,17 85:2,4 86:23
94:11,14,19 95:4,7,9,13,
20,22 96:12,19,22,25
97:1,2,5 102:17 105:16,
20,21 106:4,13,15,17
107:7 147:13,25 148:7
154:3

**Associates'** 106:23

**association** 97:10 154:12

**assume** 90:7,9,10 92:14
133:5,9

**assumed** 90:24

**assumption** 62:21 178:24
179:10

**attached** 8:23

**attaching** 98:25

**attachment** 98:25

**attempt** 143:19

**attempts** 125:20

**attend** 9:24

**attention** 164:11

**attorney** 5:8 61:9 111:15,
17 113:7 118:2 171:9

**attorney's** 137:19

**attorneys'** 180:1,17

**August** 76:6,16,22 88:3,4

**authority** 85:25

**authorized** 170:6

**aware** 17:10 35:10,11
48:12 56:23 81:7,20
107:8 111:12,13,22
115:10,16 123:21 128:16
146:5 152:21 157:14
169:18,20

**B**

**B1** 33:8

**B2** 32:23 33:8,9,10 34:13,
19 35:19,21,24 41:19,22
60:4 63:21 67:14,20 68:9,
15 69:4 80:3,7,10,15,18
81:11,25

**B3** 32:25 33:9,10,17,18
34:5,15,20 35:19,25
41:19,23 60:4 63:21
67:14,20 68:9,15 69:4
80:3,7,11,15,20 81:25

**B4** 39:21

**Bachelor** 9:21

**back** 8:23 9:4,5 10:17

11:5,9 12:13 14:6 16:11,
12 62:4,10 97:19 99:20
101:17 102:6 140:11
164:22 166:15,24 181:1,2

**back-end** 135:13

**background** 9:4 75:14,18

**bank** 47:2,3 58:19,21,23
59:5 100:14

**bankruptcy** 15:22,24
16:19,21,25 17:8,11 20:7,
8 59:23 60:1,12,15 85:21
88:8,9 119:25 135:16
139:10 160:25 161:2,3,4,
12 162:9 173:3,9,19
174:4,6 175:3,17 177:5

**banks** 100:10

**base** 121:22 142:11,20,22

**based** 35:4 65:25 82:21
145:20

**basically** 52:7 54:14,16
55:4 56:12 62:23 71:15
100:5 104:1 106:5 145:16
156:25 157:3 163:24

**basis** 101:10 149:20
169:25

**Baylor** 9:25 10:1,12,20

**bear** 135:17

**beds** 31:7

**begin** 6:8

**beginning** 50:5 67:8

**behalf** 34:9 106:17

**belong** 65:9

**belonged** 88:19 105:6,7

**belongs** 84:15 85:19,24
107:6

**benefit** 93:5,8,25 147:8

**bickering** 96:20

**bill** 138:6,7,22 139:1

**billing** 23:25 25:10,13
76:12 154:13

**billing/collection** 88:21
89:1

**bills** 139:5 143:18

**bind** 136:13

**binding** 52:9 112:20

**bit** 9:4 25:7

**boarded** 11:2 12:1

**books** 88:6

**born** 9:9

**borrow** 178:10

**boss** 145:2,8

**bottle** 40:17

**bottom** 179:24

**bought** 16:4,5,12 24:19
25:9 28:2 56:16 83:5,7
84:9 115:3 117:15
126:15,18,22 140:18
153:14 154:22

**breach** 54:21

**breached** 118:10

**break** 6:1,2,5 70:24 71:4,6
159:22 160:1 181:15

**briefly** 27:24 29:7

**bring** 160:3

**Broadstone** 34:19,20
59:18,19 73:16 74:2
77:21 114:18,20,21,25
115:6,9,12,13,22 127:3,
25 128:6 175:13 180:5,18

**broke** 71:12 169:22

**broken** 125:24

**Brookstone** 180:1

**brown** 109:12,13 154:7

**building** 33:15 34:2,5
37:18 40:1,4 48:22 49:1,

8,11,18,23,24 50:19,20
59:15,18,20,22,25 60:3,7,
11,15 64:4 74:23 77:13,
14,15,18,19,22 78:4,6,20,
22,23 79:3,12,17 80:13
91:9,10 96:7 97:23 98:8,
9,11,15,16,24 99:7,8
104:19 107:16,17,21
108:1,5 109:1 110:5,16
115:4,12 122:13 123:7,17
124:2,5,11,17,18 126:15,
22 134:13 135:20,21,22
140:12,18 141:17 145:23
148:6,8 154:1,2,5,7,10,
21,22,25 155:10,13,15,
17,21 156:10 159:2
162:22 166:4,13,19,25
167:8,9 175:10,11 176:2
177:22,24 178:3,10,20
179:4,5,6,12,13

**buildings** 34:22 49:21,22
56:17 59:12 63:3,20
64:14 66:22 67:7 72:3
73:1,21 74:10 77:9,10,12,
16 98:18 99:8 123:15
139:12 145:23 154:14
155:4,6 159:4 162:16,18
165:21 177:18,23 178:4

**built** 105:3,5

**bulk** 94:5

**burden** 135:17

**business** 29:19,21 86:20
108:16 122:25 157:22

**businesses** 23:3

**buy** 12:14,17 13:2 14:6,16
15:16 16:10 61:19 62:9
83:13,15,22 84:2,12 85:1,
2,17 99:19 115:12 126:17
153:15

**buyer** 56:15 64:24 65:1
68:18 116:11

**buyers** 64:23

**buying** 56:19 61:24 83:12

**C**

**call** 6:20 29:7 32:12
101:24

**called** 136:19 143:2
174:13

**calling** 143:3

**Calls** 83:2

**CAM** 142:1,2,9,15,16,17
143:1 160:18 179:19

**cap** 112:3 114:23

**capable** 126:3

**capacity** 38:11 156:25
157:1 170:6

**capped** 113:19

**car** 125:10,11

**card** 125:8,9

**care** 72:24 76:4 90:15
150:1 169:15

**Cartwright** 157:20

**case** 36:15 38:16 80:3
111:11,14

**cash** 92:9 99:23

**cashed** 92:6

**cease** 26:10 27:25 96:6
104:7

**ceased** 73:4

**Center** 22:11 158:23

**central** 108:4,5

**CEO** 31:11,12

**certificate** 50:24,25 54:10,
17 56:8 57:1,6,11 115:18
126:25

**certificates** 115:3 157:9

**chair** 84:25 85:15 95:10

**chairs** 154:23

TRUSTEE1960-051977

**chance** 71:5 111:16

**change** 13:7,9 24:18
69:24 82:14 83:17 118:23
183:3

**changed** 21:25 22:2 24:20
164:12 168:13

**charge** 28:10,11

**charges** 104:2 142:13
143:11

**charging** 97:12

**check** 81:11 92:6 149:15,
16 151:15,19,23,24
152:3,4 172:21

**checked** 165:15

**checks** 91:22 92:10
139:19 152:24

**children** 6:25 7:7 23:3

**Chinese** 44:9 54:24

**choose** 26:7 134:12

**Chundru** 168:3,8

**circle** 156:3

**circles** 156:5

**cited** 160:15

**claim** 118:2

**claiming** 175:20

**clarification** 119:4

**clear** 6:9 35:20 73:23
131:19

**client** 49:25 63:3 89:8
90:1 91:22,25 92:4,6
111:22 112:1,5 113:18
115:3,10 116:10,14
117:18,24 122:9 124:21,
22 126:15,18,22 137:22
138:13 148:13,16,17,21
153:8 160:12 177:22

**client's** 92:9 98:18 116:4
152:13 178:3

**clients** 63:7 89:20,21
138:16 177:19

**clinic** 74:5

**clips** 33:24

**close** 11:22 181:16

**closed** 26:12,13

**closing** 87:8

**clue** 47:18

**collect** 87:8 142:20
143:20

**collected** 89:5 142:22

**collection** 24:1 88:25

**collections** 25:10

**college** 9:15,25 10:1,12

**commitments** 52:18

**common** 125:1,3,7,11
136:2,3 140:21

**communication** 140:10
149:9 159:11 167:21
168:2,12,18,19

**communications** 140:7
157:19 159:9 163:3
167:20 168:1,10,15

**community** 124:4

**company** 16:10,12 17:21,
22,25 19:23 24:22 31:18
45:24 58:20,24 77:5 85:7
99:25 108:13 125:9 145:4
153:15 180:16

**company/staffing** 23:23

**Complete** 103:3,5

**completed** 10:11

**comply** 121:19

**comprised** 77:12

**compromise** 171:20

**computer** 83:21 84:7 86:8
87:14 104:17 106:9 107:4

**computers** 84:21 103:9
107:15 157:18

**concerned** 144:1

**conclusion** 83:2

**conclusions** 122:1

**concurrently** 44:7

**condition** 45:11 56:19
72:7

**conditioned** 36:17

**conditions** 35:1 55:7

**conference** 49:6

**confused** 113:15 177:20

**Conroe** 10:15

**consent** 35:25 36:16,23
37:9,11,14,17 38:6,14
66:16 69:14 71:18 72:4,8
73:16,24 90:10 114:21
156:9

**consents** 152:18

**considered** 141:2

**constitutes** 52:9 112:20

**Consultant** 72:23

**Consultants** 72:25

**contact** 66:15 72:4 74:2

**contained** 142:13

**continue** 49:17 70:12,19
76:13 83:18 85:25 88:22
90:13,15 96:13

**continued** 68:12 69:23

**continues** 36:18 43:22
44:5 52:13 178:18

**continuing** 43:2

**continuously** 30:5

**contract** 86:12,13,17,19
87:3 93:16 94:12 95:8,17,
19,21 96:4 108:6 119:20

**contractor** 17:17,19,20
20:22 21:19,23,24,25
32:12

**contractors** 19:2 32:10

**contracts** 85:6,8 86:15
94:9 95:5

**controlled** 160:14 168:24

**conversation** 136:10
162:12,14 165:18

**conversations** 127:24
128:8

**conveyed** 82:17

**COO** 31:11,12

**Coo@
medicalcareoftexas.com.**
157:24

**copied** 74:14

**copies** 8:14 33:5

**copy** 8:13 34:11 75:5
108:20 109:6 111:4
163:13

**corporate** 32:8

**correct** 5:17 11:17 14:11
15:7 17:1,3,4,5,6 23:14
24:23 25:16 28:21 29:11,
12,25 30:23 34:12,13,14,
16,17,20,21 36:18,23
37:9,14 46:1,2 47:9,12
49:19 52:4,15,16 55:15,
22 56:17 57:24 60:18
64:6,7,12,14,15 65:1,4,13
66:2,4,11,23 70:4,5 71:13
72:13 73:1,25 74:6 75:7
76:24 77:1,2 79:14,15
80:6 81:4,8,14 82:4,23
85:13,22 88:17 89:13,16,
18,22,24 90:11,17,22,23
91:5,6,15,17,19 92:16,17,
21 93:3 94:18 95:14
96:17,24 97:21 98:10,18,
19 99:5 100:6,7 102:18,
19,20,21,22 103:10,24,25

104:3 107:16,20 108:7,
14,15 109:16,17 110:3,8,
16,17 113:22 115:4,11,
18,20,23 116:3,8,9,12,15,
21,22,24 117:3,4,6,9,10,
20,21,23,25 118:4,17
119:22 120:5,11,16,19
121:15 123:10 125:13
128:17,25 129:2,8 130:4,
7,11 131:23 132:11,13
133:16,24 134:1,10,11,14
137:17,18,20,21 138:4,9
140:18 141:3,10,19,23,24
142:23 143:22 144:16,17,
21,22 145:8,9,14,15,17,
18 146:3,8,9,18,21,25
147:11,17,18,20,21,23
149:16 150:9 151:4,7,8,
21,22 152:6,7,9,10 153:2,
9,12,25 154:1 155:6,22
156:15 157:2 159:5,8,17
161:5,6 164:12 165:7,8,
10,22 167:18,22 168:17
171:5,6 172:5,6 174:4,5,
8,9,20,21,22,23,25 175:1,
3,4 177:2,8,9,10 178:4,5,
16 179:1,6,9,13,16,17,19,
20,22,23 180:2,3,11,23
181:5,12,14

**CORRECTIONS** 183:1

**correctly** 36:20 127:17
164:13

**correspondence** 157:6,13
158:3,4,22 159:9 162:23
167:17

**cost** 97:19 103:23

**counsel** 8:24 160:5
163:12

**counterclaim** 111:22
118:18,20,22 131:5

**Counterclaims** 111:10

**County** 10:15

**court** 5:16 6:9 13:14 45:3

**125:23 135:8 148:21**
161:1,2,12 175:3

**courtesy** 32:17 164:9

**covenants** 56:20

**cover** 18:25

**COVID** 11:6,9,10 22:9,17
25:3

**CPA** 127:11,12 145:4
161:20 178:12

**create** 25:12

**created** 24:16 25:5

**credit** 125:8,9 132:6,11,15
133:15,18 134:13,14
135:3,11,23 148:23 149:1

**credited** 131:14,23 134:3
135:4

**crediting** 134:15

**Creek** 74:23 98:17 158:6
162:25 169:2 176:2 178:2

**Crest** 8:6 109:16

**crisis** 100:8

**Cross-action** 131:5

**Cross-claim** 111:11

**crossover** 171:7,12

**current** 70:15 79:2,4 80:9
124:20 129:25 131:10

**CVS** 26:2

**Cypress** 74:23 77:15
79:16,22 98:16,17 158:6
162:25 169:2 176:1 178:2
180:1,18,20 181:1

---

**D**

**damages** 48:17

**data** 106:25

**database** 106:10

TRUSTEE1960-051978

LEXITAS

Case 20-35493   Document 112-40   Filed in TXSB on 01/08/23   Page 56 of 76
TRUSTEE1960-051979
Huong Le Nguyen
s Index: date..double-dipping

**date** 8:14 15:13,15 18:25 26:22 46:5,8 50:2 51:20 61:4 110:13 114:9,16 121:5,7,9 154:18 176:7, 10 183:2

**dated** 39:19 118:7 145:13 163:4

**dates** 10:18 182:2

**daughter** 27:24 28:4,7 29:3,4,5,11

**daughter's** 7:13

**David** 62:7,8,11,13,16 93:19 99:17,22 129:5,6, 14 168:14

**day** 18:25 20:6 70:1 72:21 82:15 181:24

**day-to-day** 28:22

**days** 100:2

**deal** 89:17 170:24

**dealing** 129:4 170:7

**debate** 99:20

**debt** 58:25 87:21,22,23 89:22

**December** 26:11 132:19 133:10 145:13 146:3,11, 19 161:5 165:9,19 177:12 178:2

**decide** 63:14

**deciding** 99:15

**decision** 65:24 173:12

**declaration** 118:23 119:19

**declarations** 119:14 148:11

**declared** 174:7

**decreased** 76:12

**defamation** 96:20

**default** 42:16 54:21 55:17

**58:22 68:9,13 76:20,21, 23 77:4 81:20,23 82:3,10, 23 108:18 125:9**

**defaulted** 48:5 58:19,20 76:19

**defaulting** 76:15

**defaults** 47:4

**defendant** 7:1 158:23

**defendants** 6:23

**defenses** 42:17

**degree** 9:19

**delayed** 36:17

**delivered** 110:23

**demand** 42:15

**demands** 42:16

**depo** 181:24

**deposition** 5:12 9:6 40:23 134:10 182:13

**describes** 56:12

**describing** 85:8 132:24

**desk** 94:7

**Detail** 174:15,25

**difference** 33:25

**difficult** 67:25 106:12 167:11

**difficulty** 76:14

**Digital** 102:20

**diligence** 115:13

**diligent** 123:14

**dime** 136:15

**dire** 100:16

**direct** 82:13,16 98:21 140:7,10 150:5 151:19 152:3,15

**directed** 75:10

**directing** 98:12

**directly** 90:4 139:17 142:15,16 150:1 151:20

**director** 20:23,25 21:4,6, 14 22:13,18

**disable** 104:1

**discover** 146:10

**discuss** 42:20,21 43:12, 18 48:14 55:7

**discussed** 45:21 55:14 57:15

**discussing** 57:10 64:17 71:12,15,21

**discussion** 7:17 57:4 73:13 74:15 129:21 145:21

**distribution** 101:2

**dive** 108:4

**dividend** 101:3

**doctor** 7:22 8:1,3 10:22 12:24 122:24 124:19 139:15 168:3,9 169:12,17

**doctors** 10:24 12:5,12 27:10 32:3,6,7,10,13,15 61:2 94:10 97:14 148:7 173:17

**document** 8:16 41:8 53:14 70:17 72:16 75:3 130:17 132:24

**documents** 8:24 9:1 33:11 34:9 40:10 41:1,16 52:1 55:8 71:5,10 76:7 160:3 168:23 171:1

**dollars** 89:7,25

**door** 49:9,15

**doors** 145:22 165:20

**double-dipping** 132:6 134:16

Case 20-35493   Document 112-40   Filed in TXSB on 01/08/23   Page 57 of 76
Huong Le Nguyen
s Index: doxycycline..existing
TRUSTEE1960-051980

**doxycycline** 41:6

**draft** 93:20 141:17

**drafted** 75:3,9,10

**draw** 121:25

**drive** 8:6 109:16 125:10

**Drs** 173:10

**duces** 8:23 9:1 74:20
160:2

**due** 67:13 77:22 79:12
89:8 115:13 120:23
121:18 131:15,24 132:3,4
161:8,9,21 174:8 177:2

**DULY** 5:2

**duration** 129:13

**E**

**earlier** 8:14 29:10,24
65:14 130:6 173:8

**early** 8:25 160:5

**educational** 75:14,17

**effect** 52:9 59:22 112:20
169:4

**effective** 104:9

**election** 66:14

**Ellent** 62:8,11,13,16 93:19
99:18,22 129:5,6,14
168:14

**else's** 107:11

**email** 18:22,23 145:10
157:22 162:7 163:8,21,
22,24 164:8,25 165:15
167:16

**emailed** 163:21

**emails** 164:10,21

**emergency** 17:21,22
18:21 20:22,23,25 21:1,5,
15 22:14

**employ** 24:25

**employed** 17:16 20:2
31:15 95:8 107:7 108:13

**employee** 21:20 25:8
76:14 88:21 146:16

**employees** 31:13 94:5
146:7,12

**employer** 18:17

**employment** 95:16,17,19,
21 96:4

**empty** 124:2,5 125:10,12

**end** 10:16 26:11 94:6
120:13 134:14

**ended** 46:8 96:15 120:15

**ending** 179:22

**ends** 45:22 46:1,5 120:13

**enforce** 59:6,19 143:8

**enforcement** 45:11

**engagement** 136:25

**ensure** 149:7,19 151:14

**enter** 82:11 83:24 94:9

**entered** 35:9,23 57:23
63:7 72:5 74:5 120:14
123:3 171:21

**entering** 82:21

**entirety** 118:21

**entitled** 132:10 133:15

**entity** 31:14 83:8,10,16,18
85:4 102:15 160:10,14
162:24 168:23

**equipment** 104:18 153:14
155:3

**equity** 82:13

**error** 98:19 99:1,10

**essence** 103:8

**estate** 177:11 178:1

**estoppel** 50:24,25 51:1
54:10,13,14,17 56:7,10,
14,25 57:6,10 115:2,18
126:24 157:9

**event** 54:21 76:9 82:10

**events** 81:20 82:3

**everybody's** 42:4

**evidence** 40:9 132:23
158:11

**exact** 15:15 26:22 50:2
79:25

**EXAMINATION** 5:3

**excess** 97:12

**exchange** 163:14

**excuse** 31:12

**execute** 114:20

**executed** 52:8 112:19

**execution** 118:9

**exhausting** 43:24

**exhibit** 8:10,12 35:17
39:23 40:3,4 41:7,13,19,
25 50:9 51:21 53:10
54:23 57:16,18 60:21,24
71:12 72:13,15,20 73:10,
12,14 74:13,16,17 75:6
76:2 80:8,9,12,13,18
82:22 93:5 97:23 98:4,6
102:9,11 109:3,5 111:6,8
112:5,12 113:25 114:8,
10,13,15 130:20,24 131:4
137:10,12 141:13 144:8,
10,11 156:22 160:6,7
163:9,11 174:11,12,13,19

**exhibits** 40:8,19 50:7,17,
22 60:4 80:15 108:19

**exist** 26:10

**existence** 24:6 26:8 82:15
95:24

**existing** 54:22

Case 20-35493   Document 112-40   Filed in TXSB on 01/08/23   Page 58 of 76
Huong Le Nguyen
s Index: expenses..firm

**expenses** 76:13 77:5
100:3,6 160:11,17

**expire** 60:7 63:25

**expired** 60:17

**explain** 116:4,6

**expound** 126:2

**Express** 25:23 26:25 27:3,
6,12,15,21 28:5,20
158:16

**extent** 58:9

**extra** 111:4 163:13

**eye** 73:17,19 74:1,5
139:15 168:2,9 169:12

---

**F**

**face** 39:12

**facility** 49:20 95:10

**fact** 117:8

**facts** 68:6 121:21

**failed** 67:18

**failure** 121:19

**fair** 55:2 78:18 97:20

**FALCON** 7:16 8:18,20
19:4,13 20:10,13,16,20
24:9 29:14 31:20 32:20,
23,25 33:4,9,21 35:2,12,
17,20 36:2 37:3,15,19
38:20 39:17,19,22,25
40:3,6,14 42:5 43:10,14,
19 44:25 45:6,18,20
46:10 49:2,4 50:6,12,14,
19,21 51:22 52:25 53:3,6,
8,24 55:10,12,18,23
58:13 59:8 60:20,22
63:16 66:17,24 67:1,4,10,
15,22,24 70:24 72:14
80:8,12,16,19,21 82:24
83:2 86:16 89:19 91:1
97:25 108:22,25 114:6,
10,12,15 118:15,22

119:1,8,11 120:20 121:1,
3,23,25 122:5,10 124:24
125:17 129:10 130:5,8,
12,16,24 131:2 132:20,23
133:4 136:25 138:9,16
139:21 141:4,11,20 142:4
144:11 149:3 153:10
159:22 163:17 170:17
177:3,6 180:13,15
181:17,22 182:4,10

**family** 10:8 11:1,2 12:10,
11,15,18,23,25 13:1,4,11,
19,24 14:10,22,25 15:4,7,
11,23 16:20,22,24 17:8,
11 20:2,5 21:11 22:11
24:4,7,12,15,17,19 25:9,
12,20,25 26:4,5 27:11,15,
17,20 28:3 34:9,23 36:9
49:20 51:9 53:18 56:22
57:15,25 59:11,23 60:1,
10,15 61:2,19 63:15 65:9,
15,22 66:6,11,20 67:6,16,
18 68:12 69:5,21 70:13
71:17,25 72:22 73:1,4,7,
17,23 74:9 75:2 76:15,25
77:13 78:16,17 79:1,8,22
81:18 83:5,18 84:5,9,21
85:4,12,14,19 86:1,9,19,
21,24,25 87:15,17 88:7,
11,19,25 89:4,21 90:13
91:6,21 92:24 93:2 94:6,
10 95:5,9,25 96:14,24
97:2,5,8,9,11,12,18 99:4,
16,19 100:16,21,23 101:5
102:16,17 103:6,9 105:7,
8,24 106:12,24 109:23
117:2,12,14 121:10 123:8
127:7,15,25 128:9,24
130:1,11 131:11 132:13
134:21 135:21 139:9
140:4 141:21,22 142:17
143:23 146:20,23 147:10,
12,14,24 148:6 149:18
150:6,8,15,18,20 151:6,9,
11 152:16,24 153:1,11,
13,23 154:3,8,9,12,22
155:9 156:7,12 157:1

159:19 162:18,19 168:20,
24 169:9 170:7,8 172:18
173:2,9,18 174:3 177:18

**fault** 152:13

**fee** 176:1,20

**fees** 137:20,25 138:5
179:25 180:1,18

**fellowships** 10:9

**felt** 96:21 122:21

**figure** 171:10

**file** 17:10 58:10 79:7,9
84:15 85:1 94:23 107:6
119:5 161:2 173:2

**filed** 16:25 20:7,8 59:23
60:1,12,15 78:5 111:11,
14,21 120:8 161:4 174:6
175:2 177:5 180:22 181:1

**files** 84:12,14

**filing** 88:8,9 111:21

**filled** 26:6 27:12 181:13

**fills** 26:1

**financial** 48:2 59:5
126:11,12,16,21 127:2,4,
7,15,16,25 128:9,15,20,
22,24

**financials** 127:5,6,9,14,
18,22 128:6,7,22

**find** 18:20 122:11 124:3,5
133:22,24 134:12

**finding** 167:10

**fine** 35:14 47:22 53:13
113:8 134:8 136:17

**finish** 6:8 126:1 134:5
181:20 182:9,11

**finished** 10:20,21 11:22
30:4 66:25 181:16

**firewall** 108:3

**firm** 138:17

TRUSTEE1960-051981

**five-minute** 181:15

**fixture** 84:11 87:14

**fixtures** 85:15

**flash** 125:11

**flowed** 154:18

**flowing** 100:2

**FM** 33:16 98:11 166:7

**FMFP** 34:19,20

**follow** 67:25 77:25

**force** 52:8 112:20

**forceable** 52:9 112:21

**form** 19:4,13 20:10,13,20
24:9 29:14 31:20 35:2,12
36:2 37:3,15,19 42:5
43:10 44:25 45:6,18
46:10 49:2,4 53:24 58:13
59:8 63:16 66:24 67:4,10,
15,22 82:24 89:19 91:1
120:20 121:1,23 122:10
124:24 125:17 129:10
130:5,8,12,15 132:20
133:1,4 139:21 141:4,11,
20 142:4 149:3,12 153:10
177:3,6 180:13

**format** 170:21

**forward** 146:8

**forwarded** 145:20 170:22

**Foundation** 10:15

**Foxhall** 12:17

**FP** 132:12,13

**frame** 101:14 121:8,14
133:3,20,21 135:5

**Freeman** 28:13

**Freeway** 109:24

**front** 33:3 39:11 94:7
99:23 132:25 141:6

**fulfilled** 153:5

**full** 6:14 52:8 112:20

**furniture** 83:7,14,20
84:10,25 85:5,9 87:13
154:23 155:3

**future** 178:19 179:6


**G**

**gas** 125:11,12

**gave** 5:15 11:15 35:5
132:22 141:6 156:24

**gee** 165:19

**general** 156:24

**generally** 42:17

**generate** 97:4

**generating** 97:2

**Genesis** 62:8,16 93:20
99:18,22 169:14,15,18,21

**give** 5:15,22 33:5 38:7
81:16 99:22 106:24
108:20 109:6 113:8 114:1
122:20 124:10 163:13

**giving** 116:13,15

**glad** 122:23

**glanced** 39:10

**God** 72:11 123:25

**good** 40:16 86:2 101:11
108:7 122:17

**governs** 130:18

**graduate** 9:17 10:3,19

**graduated** 10:4

**grandkids** 29:16

**Great** 164:8

**greed** 122:21,22 124:25

**greedy** 122:21 133:25

**group** 10:24 12:5,7,12
24:5 95:3 169:15

**guarantee** 41:17,22 47:25
120:21 145:24

**guaranteed** 41:18 58:25
121:14

**guaranties** 39:16 41:21
43:25 46:25 57:19 69:5

**guarantor** 43:23 44:6,23
50:24 51:10 53:20 54:10,
17 56:13,21 57:5,10,19
67:18 68:10 77:17,19
78:17 79:17 89:22 91:21
112:3 114:22,23 120:6,
13,19,25 121:14,18
123:13,19 124:13,14,16
127:1,19,22 134:15
135:18,24 143:21 144:2
146:24 147:3 156:14
159:14 162:19

**Guarantor's** 43:3

**guarantors** 6:23 41:25
42:15 43:5 44:6 45:3 48:6
51:12 52:8,10,19 67:21
79:9 92:5 112:19,21
171:24

**guaranty** 41:9,20 42:4
43:24 44:14,20 45:12
46:13,20 47:18,23 52:8,
14,19 53:3 54:12 59:4,6,
10,14,19 78:19 112:9,19,
25 113:14,19 114:5,9,21
118:10,11,12,23 123:16
124:17 136:14 162:6
169:25 171:20 172:13

**guarantying** 48:2

**guess** 58:18 106:11

**guys** 121:10


**H**

**H-U-O-N-G** 6:16

**halfway** 175:25

**hand** 34:1

TRUSTEE1960-051983

**handle**  19:19

**handwriting**  34:2

**happen**  70:11

**happened**  15:19 94:1
105:7 108:10

**hardship**  127:3

**heard**  138:25

**hearsay**  136:19

**heart**  122:24

**Hedges**  136:23 137:16
138:2 139:1

**held**  57:9,10 94:13 95:5

**Hemant**  144:25 145:20,21
163:25 164:3,5

**hereunder**  93:11

**Hermann**  94:24

**hey**  122:19 124:1,2,11
162:8

**high**  102:4

**HIPAA**  107:3

**hire**  20:9,21 24:16 25:5
32:8 88:22 122:18 148:7

**hired**  20:12,21 21:4 22:15
28:15 32:7 47:10,11

**hiring**  24:22

**hit**  22:9 176:16

**hits**  11:9

**HLEMD@HOTMAIL**  165:1

**Hlemd@hotmail.com.**
158:1

**Hoang**  16:7,9,21 17:5
51:16,17 53:20 54:4 57:2,
5,19 58:12 65:16 66:10
78:19 112:3 114:23
116:22 148:18 172:4
173:10,18

**Hoang's**  54:1 113:19

114:23

**hold**  21:16 34:17 50:15
72:10 93:9 98:6 114:7
135:8 144:23 145:3

**holding**  135:6,7

**Holdings**  5:6 49:25 56:14,
16 66:15 70:19 71:18
81:16 129:15 138:10,13,
19 140:17 142:10 145:12
176:4

**Holdings'**  147:17

**home**  110:16,23 166:2

**honestly**  48:23 123:23

**hook**  97:8

**hospital**  10:23 30:8,14,22,
25 31:3,5,7,9,13,16 32:4,
7,8,16 61:2 102:22
107:23,24,25 108:1

**hours**  70:25 159:23

**housed**  107:21,23,25

**Houston**  21:1,15 30:8,15,
22 31:1,10,13,16 32:4,16
73:18,19 74:1 102:22
107:24 108:1 178:3

**HR**  94:8 99:25

**hub**  108:4,5

**huge**  50:9

**Huh-uh**  125:22

**human**  21:6 106:15
124:25

**hundred**  14:10 30:22
39:12 83:22

**Huong**  5:1 6:16 42:2
93:13 183:2

**husband**  8:3 11:18 12:1,4
18:7,10 19:6,9 20:8 22:22
27:5 29:20,25 30:2,6,20,
21 32:2 93:17

**hypothecated**  82:17

---

**I**

**ice**  40:14

**idea**  47:20,23 123:7,18
169:21

**identified**  50:1

**identify**  50:22 72:16 73:14

**Igo**  21:8,9,11 25:11,15,17

**II**  62:21

**iii**  38:3

**Imaging**  102:20

**inability**  76:18

**inactive**  11:15 85:4,7

**include**  62:1 63:3

**including**  29:3 93:12
160:13 168:24 170:9
179:25

**incorrect**  178:8

**increase**  178:16

**incurred**  97:18

**indemnification**  171:20

**indemnify**  171:24 172:8,
10

**independent**  17:17,18,19
19:2 20:21 21:19,23,24,
25 32:10,12

**indicating**  168:23

**indication**  165:9

**indirect**  82:13,16

**individual**  68:9 156:25
170:6

**individually**  79:14 93:17
137:22 157:7

**inform**  129:7,15

**information**  103:14

105:23 137:7

**initial**  80:25 81:9,14
 134:14

**Initially**  49:12

**initiating**  43:24

**inside**  27:16 108:2

**instance**  55:11

**institution**  59:6

**instruction**  125:23

**insurance**  86:15,17,18
 87:3 100:1 101:23,25
 102:1,6 160:23 161:7
 162:17

**intent**  120:9

**interest**  31:17 66:11
 82:14,16 102:4 160:11
 180:1,17

**interested**  99:19

**interests**  30:12

**interpret**  54:25

**interview**  29:1,4

**interviewed**  28:19

**introduced**  50:3 140:16
 158:10

**involuntarily**  36:13 37:5

**involved**  19:12,17 28:22

**issue**  15:22 128:22 170:7

**issues**  122:2 127:15
 128:24

**items**  77:3 105:6,7

**J**

**January**  158:18 160:13
 161:9 163:1 169:2

**Jerry**  45:23 50:1 63:24
 128:11,18 129:7 139:16
 140:8,10,19 145:11,20,22

149:9 150:3 152:2,14
157:20 163:22

**Jersey**  110:1

**joint**  43:4,8 48:16 113:21

**judge**  47:17

**Julia**  28:16

**July**  63:17,18,21 64:16
 72:22

**June**  39:19 45:22,23 60:8
 63:17,18,21,25 64:16
 67:3,8,9 80:4 81:6 120:22
 121:12 132:1,8,19
 133:10,11 135:7 149:2
 156:16 178:15 179:2
 182:2

**jury**  47:18

**K**

**Kevin**  168:12 169:16

**Khemka**  144:25 163:25
 164:3,5

**kill**  118:25

**Kim**  109:12

**kind**  34:2 52:14 54:12
 76:4,17 78:9 93:19,20
 97:13 100:7 101:2 104:2
 108:4 112:25 113:14
 118:5 147:12 148:5
 152:25 162:22 171:20

**KME**  5:6 49:25 56:14,16
 66:15 69:9,14 70:6,8,10,
 18 71:18,24 81:16 90:20,
 21 91:7 114:19 119:21
 120:8 121:18 126:4
 128:9,19 129:7,15,24
 131:10,23 132:4 136:13
 138:10,13,19 139:7,16,20
 140:4,17 142:10 145:11
 146:11 147:17 148:22,24
 150:1,3 157:6,13,20
 159:15 172:1,16,19

176:4,21 177:2 180:2,18,
21

**KME's**  121:19

**knee**  181:25

**knew**  64:25 72:7 73:24
 91:8 100:14 116:10 117:5
 127:2 143:10 162:6
 180:11,23 181:7,11

**Kroger**  29:9

**L**

**L-E**  6:16 13:16

**lack**  64:11

**lame**  46:22

**landlord**  36:1,16,24 37:9
 43:23 44:22 45:9 48:5,9,
 18 50:2,4 52:18 54:22
 56:4,14 59:15 70:7 71:18
 72:4 73:24 74:2 78:5,22
 79:13 85:9 90:4,14
 120:24 122:12,17 124:15
 133:23 140:16,19 141:2,
 7,9,18,23,25 143:24
 147:7,15,16 150:4
 151:16,19 152:23 156:8
 160:12

**landlord's**  37:14,17 38:5,
 13 72:8 90:10

**landlords**  64:18 133:25

**late**  126:4,7 146:2,18
 147:5 176:1,20 179:25

**law**  36:14 37:6 120:1,11
 180:25

**lawsuit**  45:4,17 77:24
 78:1,3,5,9 79:8 119:24
 120:8 138:11,19 148:16,
 20 171:8,13,22,25 172:1,
 3 180:11,15,16,20,21,23,
 25 181:7

**lawsuits**  171:8 180:4,7,19

Case 20-35493   Document 112-40   Filed in TXSB on 01/08/23   Page 62 of 76
Huong Le Nguyen
s Index: lawyer..located

TRUSTEE1960-051985

**lawyer** 6:2 35:3,5,13 36:3 37:22,24,25 38:16,17,18, 21 39:1,2,3,7,13,14 40:24,25 41:15 42:9,20, 22 43:13,17,18 44:10,11, 12,16 47:5,21 54:25 55:5, 8,13,16,21,25 56:1,2 61:15,16 62:14,17,18 74:19 75:12 95:3 126:3 137:8 138:15 143:2 173:15,20

**lawyer's** 35:6

**lawyers** 46:23 47:6,7,13

**layman's** 41:15 70:2

**layperson** 44:13

**Le** 5:1,5,10 6:16,18,20,22 7:18 8:11,15,22 11:4 13:13,16,20,24 14:2,9,21, 24 15:3 16:3,4,8,10,15,25 19:11 32:18 40:22 42:2 48:10,19 53:9,19 57:20 58:12 71:4 79:1 93:13 109:5 111:7 112:2 113:17 114:22 115:4 117:5,13 121:17 135:17 145:24 156:23 160:1 164:15 165:12 183:2

**Le's** 116:17 118:11

**lease** 32:19 33:15 34:18 35:3,13,25 36:13,23,25 37:8 38:4,5 39:16 41:9, 17,18,20 42:4 43:5,25 44:7 45:24 46:24 48:1,3 52:24 54:22 55:17 57:18, 22,23 59:22 60:7,14 62:24 63:21,24 64:1 65:8, 10 67:8,13,19,20 68:17 69:17,21,22 70:17,18,19, 20 71:16 79:21 80:1,25 81:2,4,7 82:21,23 85:5 89:9 90:2,8,9,11,22 91:5, 6 95:10 110:3,5,7,15 113:24 114:5,9 117:18 119:21 120:10,13,14,21

121:19 122:13 123:19 124:13,21,22 125:6 128:13,14 131:13,16 132:5,8,17,18 133:9,19, 20 135:25 136:4,12 142:14 144:2 147:24 148:2,4 151:12 152:8 153:8,13 157:8 159:13 168:19,22 172:13 178:25 179:10

**leased** 36:14 59:11 147:19 153:13

**leases** 34:22 38:13,17 41:22 47:1 60:3 64:19 80:2,5 85:9 88:1 89:14 90:25 117:22 159:15 169:4 179:22

**leasing** 59:12 123:23

**leave** 13:24 15:10 93:24 152:24

**leaving** 76:10 96:16

**left** 12:22 14:2,9 15:20 60:14 80:1 96:19,22,23 117:5 118:18 151:22

**legal** 75:20 83:2 122:1

**lessee** 129:25 131:11 134:13

**letter** 56:14 124:15 126:25

**letters** 109:8,14,19 110:13,18

**Lewis** 12:16

**liabilities** 62:21 69:4 90:6 121:18 130:2,11

**liability** 42:4 43:3,9 45:16, 22,25 46:5 48:16 90:4,12, 13,14 92:14 99:24 113:20 114:24 118:12 122:8,9 131:12,18 159:18

**liable** 46:8 110:3,7 113:21 115:14 117:13 123:16 135:5,6,7,8 179:12

**license** 11:15 17:13

**lieu** 61:15

**life** 46:14 101:23,24 102:1,6

**lights** 84:10

**limit** 163:3

**limited** 93:12 179:25

**lines** 55:16 72:12

**list** 84:24

**listed** 84:25 116:10 138:13 141:6,18,23

**listen** 38:18 55:25

**listened** 152:4

**listing** 9:5

**live** 8:7 165:23

**lives** 29:13

**LLC** 5:6 18:1,3,5,8,12,15 19:3,24 20:11,19 21:16, 17 22:8 23:6,7,8,12,16, 17,22 24:3,6,21,24 26:25 27:4,7,13,21 28:21 30:9, 11,12,23 31:1,10,14,24 32:1,3 34:19,20 49:25 56:16 57:25 66:15 70:19 78:25 79:6,7,13 81:17 95:4,13,22 129:15 137:5 138:23,25 176:5 180:18

**LLCS** 19:9,12 22:23 139:4

**LLLC** 30:10

**LLP** 177:13

**loaded** 135:13

**loan** 47:4 100:13 101:25 102:2,4

**loaned** 100:21 101:15

**loans** 47:2,3 100:10

**locate** 166:12 170:2

**located** 18:19 21:2 27:16, 18,19 31:5 49:21 98:11

TRUSTEE1960-051985
Lexitas

TRUSTEE1960-051986

Case 20-35493   Document 112-40   Filed in TXSB on 01/08/23   Page 63 of 76
Huong Le Nguyen
s Index: location..meeting

104:19 158:6,23 162:25
168:25 169:1

**location** 18:24 27:19
77:15 98:20 109:24
147:11 153:12 165:25
166:8

**locations** 62:1,25 64:9
96:7 161:11

**lock** 145:22 165:20

**locks** 164:12

**long** 12:18,21 19:25 20:5
21:9 22:7,13 24:2 26:15
40:21 52:3 54:4 67:24
75:19 80:2 126:12

**longer** 16:20 77:1 86:19
87:4 96:9 119:25 121:10
147:10 150:14,18 151:4,
5,18 169:8,9

**looked** 118:5 162:8

**loop** 152:25

**losing** 26:14,15

**lot** 62:13 76:10,13,14 86:2
87:23 89:1 96:19,20
105:17 143:1

**LP** 79:1 177:14,17 178:7

**Lymphedema** 72:22,24
141:6,12,13 142:1,25
143:6,7,8,11 155:14
168:10 169:13

**Lymphedema's** 155:14

---

**M**

**M-C-C-O-N-N-E-L-L**
101:22

**M-E-D** 18:3

**M-I-C-H-A-E-L** 7:12

**M-I-C-H-E-L-L-E** 7:14

**M-I-N-H** 7:6

**made** 35:10 56:3,4,21
66:14 72:21 90:21 92:21
107:22 115:10,21 125:21
127:9 137:16 149:1,20
161:18,21 169:24,25
170:1,5,9 171:23 172:7,
10 173:13

**mail** 151:23

**maintenance** 140:21

**majority** 15:6 65:19,23,25
173:11

**make** 38:21 58:25 65:24
67:18 68:10,12 69:24
70:12,19 74:20 82:1
90:20 100:11 103:9
109:19 124:19 128:25
142:2 146:15 149:19
157:19 159:20 161:10,16
167:19 172:15

**maker** 47:4

**making** 96:13 97:7 115:22

**malpractice** 100:1

**manage** 46:23

**managed** 23:12 28:9 60:2
102:12 103:1,12 106:2

**management** 23:23 49:13
102:25

**manager** 23:9,11 24:3,11,
20 28:16 65:24 106:20,23

**managers** 23:12

**managing** 23:10,11 24:14
28:15 173:12

**manner** 6:10

**manufacturing** 77:5

**March** 51:24 126:18

**Marcia** 28:12 29:4

**marked** 8:10 33:8 40:8
41:22 50:7,8 53:10 60:21
67:20 72:13,15 73:10,11
74:13,16 102:9,10 109:3,

5 111:6 137:10,11 144:8,
9 156:22 163:9 174:10,12

**married** 7:3,5,18,22,24
29:11,22,25 30:3,5,6

**marry** 11:18

**Matt** 157:20

**matter** 79:16 91:15 92:19
109:13 133:2 138:10,11,
14 167:13

**MATTHEWS** 53:4 80:17,
20 114:3 129:23 137:13
141:14 156:1 173:1
176:7,10 182:7,12

**Mcconnell** 101:22 140:1,
2,9 143:15,17 144:15
145:4 161:22,24 162:6
165:18,23 166:13,21

**Mcdonnell** 101:22

**MD** 93:13

**meaning** 48:17 121:10

**means** 36:4 43:9 44:3
69:25 80:18 120:12
135:20

**meant** 96:23

**Med** 18:1,3,4,8,15 19:3,24
20:19 21:16 22:16

**medical** 9:22,24 11:24,25
17:13 20:11,23,24 21:1,4,
14,15 22:8,11,13,17
29:25 30:6 49:16,20 59:4
77:6 94:7 102:25 105:15,
18 107:5 158:23

**medication** 41:4

**medicine** 9:25 10:2,12
27:8 32:9 62:2

**meet** 76:11,18 77:6 96:14
100:9 128:11

**meeting** 57:9,13 76:14
170:9,15 173:9,11,14,15,
17,25 174:2

**meetings** 57:8,14 58:1,7, 11

**Melissa** 21:8,9,11 25:11, 17,18

**member** 23:10,15,17 27:20

**members** 18:12 23:13 27:3 30:19

**membership** 30:12

**Memorial** 22:11 24:5 94:24

**mentioned** 142:25

**messages** 164:22 167:17

**messenger** 118:25

**met** 50:1 99:18 159:12

**Michael** 7:12,18 78:25

**Michelle** 7:14,24 25:15 78:25

**mid** 25:6 26:21,23

**million** 89:7,25 100:22 101:12,13,15,18,23

**million-something** 89:6

**mind** 81:5 181:22

**mine** 163:13

**Minh** 7:6 93:12

**minute** 9:3 68:23 89:11 91:14 92:10 115:25 133:8 136:9 155:2

**minutes** 57:13,14,21 58:1, 3,11,14,16 170:16

**miscellaneous** 179:25

**mistake** 118:16,17,19 119:2

**misunderstood** 80:15

**mitigate** 133:22

**mixed** 10:18

**MOB** 180:1,18,20 181:1

**modification** 40:5,6 112:8 113:19

**modifications** 52:14 54:12 112:6,25 113:14 117:19

**modified** 118:11

**Monday** 164:11 181:24

**money** 26:14,15 61:16 83:8 88:18 97:2,4,8 100:18,20,23 101:5 132:4,5,7,14,15,16 133:14,18,21 134:3 135:2,3,10,22 138:23 139:1 148:23 154:15,17 161:22 168:11 175:6,18 178:10

**monies** 46:7 154:13

**Montgomery** 10:15

**month** 91:22 99:25 100:4 149:15,17 159:21

**month's** 100:6

**month-to-month** 60:10,11

**monthly** 149:20

**months** 22:4 79:25 104:9, 12,13 105:2,15 108:7,8,9

**Moran** 168:13 169:16

**morning** 111:11,14 118:16 163:22 164:11

**mortgage** 36:12 37:4 38:3

**move** 25:11 38:20 49:8 136:22 154:25 155:2 169:19

**moved** 123:5 169:18,21 179:21

**moving** 123:6

**multiple** 167:1

**N**

**N-G-U-Y-E-N** 6:17 7:6,14

**named** 28:13

**names** 7:11 14:16

**native** 170:21

**nature** 60:4

**nay** 39:14

**necessitated** 76:6

**needed** 35:11,25 37:17 72:8

**negatively** 107:12 172:11

**network** 103:4,5,8,14,23 104:5,7,20,24 105:3,4,6, 13,14,16,17 107:4,9,10, 14,21,25 108:3

**Nguyen** 5:1 6:16 7:6,12, 14,18,24 8:5 14:14,15,16, 22,25 15:4,10,24 16:6 17:3 42:2 48:10,18 51:14 57:1,4 58:11 65:17,18 66:10 76:11 78:19,25 79:1 93:13 96:16 171:1, 14 172:3 173:10,17 183:2

**Nguyen's** 15:16,19

**nice** 8:24 122:17 133:23 150:4 164:9 181:23 182:1

**night** 145:19

**nodding** 107:12 172:11

**non-suit** 78:11,12

**nonpayment** 42:16

**nonprofit** 84:18 94:13,15, 17,20,21,22,23 95:1 106:19 148:4

**Nonprofits** 106:19

**Nonresponsive** 28:24 63:12 69:13

**nonsuit** 180:5

**North** 30:8,14,22,25
31:10,13,16 32:4,16
73:17,19 74:1 102:22
107:24 108:1

**Northwest** 109:24

**note** 58:19,20,22 59:1

**notes** 57:8 58:4,10

**notice** 9:5 42:15 78:10,12
119:21 120:9,10 121:19
122:20 124:1

**notices** 42:16 108:18
143:1

**notification** 81:16 125:15
140:17 142:6 146:2

**notify** 142:5

**November** 26:11 161:5
173:4,6,7 174:3 176:1,20
177:4 179:1 180:10,22

**null** 38:6

**number** 32:21,23,25 41:7
43:3 45:8 52:24 53:8,10
73:12,15 74:14 82:22
93:5 98:3 100:7 114:5,9
118:9 119:5 121:17
130:20 144:10 156:18
158:20,21 160:6,7,9
162:23 163:11 166:9,11
168:21 169:24 170:12,13
171:2,15,19 174:11
175:25 181:3

**numbered** 103:18

**numbers** 39:18 51:7
176:24

**numeral** 82:8

_____

**O**

**Oak** 12:10,11,14,18,22,25
31:6 78:24 79:6,7,13
98:7,13,23 175:10,12
177:13,14,17,21,24 178:7

**OB-GYN** 49:12

**object** 94:4 122:6

**objected** 163:2 169:3
171:5

**objection** 19:4,13 20:10,
13,20 24:9 28:24 29:14
31:20 35:2,12 36:2 37:3,
15,19 39:15 42:5,10
43:10,14 44:25 45:6,18
46:10 49:2,4 53:24 55:10
58:13 59:8 63:12 66:17,
24 67:4,10,15,22,23 68:2
69:13 82:24 83:1 89:19
91:1 92:7 120:20 121:1,2,
23,24 122:10 124:24
125:17 129:10 130:5,8,
12,14 132:20 133:1,4
136:16,21 139:21 141:11,
20 142:4 149:3,12 153:10
156:24 177:3,6 180:13

**obligate** 90:15 133:11
179:10

**obligated** 67:12 68:10
91:25 92:4,13,20 123:9
125:5 133:21 146:20,24
147:4 150:21 151:12
162:20

**obligation** 76:17 77:7
96:14 112:21 120:18
124:22,23 129:1 150:19,
20 153:7 159:15 162:16,
22

**obligations** 44:14,19 46:7
48:2 52:10 67:19 76:16,
19 77:8 79:12 88:1 90:25
93:11 117:14 118:11
120:15,17 121:4,13,15,18
123:3,20 124:12,14
149:19 151:14 153:4
159:16 162:17

**obtain** 69:1,2 71:17 72:4
73:24 106:13

**occasion** 53:18 59:3

139:18 140:20 143:25

**occupied** 49:11 64:14
66:22 67:7 123:7 124:18
162:24

**occupy** 48:21 49:18 98:14
123:25 124:20 135:20,21,
22 148:8 155:13 168:25

**occupying** 59:25 64:4,10,
11 69:22 123:17

**occur** 131:17 151:17

**occurred** 139:10 162:13

**October** 110:11,12 114:11
118:10

**offer** 168:22

**office** 96:11 154:5 166:13,
18 167:11,14,15

**officer** 108:16

**offices** 18:15 49:16
144:21

**oncology** 169:15

**ongoing** 27:1

**online** 18:18

**open** 26:24 93:25 167:14

**opened** 26:18,20

**opening** 20:19

**operate** 69:23 83:18
88:23,24

**operates** 31:10

**operation** 28:22 36:13
37:5

**opinion** 108:6 135:12

**order** 85:14 148:21

**organization** 84:19 94:13,
16

**original** 41:25 57:18
114:4,9,20

**originally** 9:7 12:8 13:6

TRUSTEE1960-051988

TRUSTEE1960-051988

TRUSTEE1960-051989

Huong Le Nguyen

s Index: orthopedic..PDFS

20:2 21:25 28:4 34:19
62:8

**orthopedic** 169:17

**outstanding** 131:15,24

**overhead** 97:19

**owe** 77:11 135:14 175:16

**owed** 46:7 89:9 90:1
131:13,15,24 136:15
168:11 175:11,13,20
176:21 177:12,18 178:7

**owing** 67:13 120:24 174:8

**owned** 12:11,13 14:22
27:15 28:5,8 58:20 65:15
67:6 83:17 103:9 105:23
155:18 160:14 168:23
177:19,22,23

**owner** 13:11 14:10,13
78:25 98:10,24

**owners** 13:5

**ownership** 13:7 18:4,7
82:14 106:14

**owns** 29:18 30:8,10 32:1
84:17,18 94:14,15 105:18
106:15 165:7

---

**P**

**p.m.** 71:3 159:25 181:18
182:13

**PA** 17:8 24:12,15 34:9
36:9 58:1 60:11 61:2 67:6
69:21 73:1,4,7 75:2 86:9,
19,21,22,24,25 87:15
89:4 91:21 94:6,10 95:6,
25 96:24 97:3,11,12,18
99:4,16 102:17 106:13,24
109:23 117:3,12,14 123:9
150:16 151:9 154:13,15,
19,20 169:9 173:9,18
174:4 177:18

**PA's** 66:21 88:12

**pages** 51:6

**paid** 77:11 87:12,13
100:18,19 102:3,5,6
120:17 132:4,5 135:22,23
139:5 140:4 142:3,10,15,
16,17,25 143:11 146:15,
23 147:2,4,8 148:24
149:5 151:14 153:4
159:16,18 160:20,23
165:10,20 172:19 175:7
178:11,15

**pain** 49:12

**Palmer** 8:6 109:16

**paper** 33:24 78:15

**papers** 78:14

**paragraph** 34:6 36:6 38:2
42:14 43:2 52:7 54:23
61:5,7 83:4,23 112:17
116:11 130:19 131:6,16
157:2

**Parkway** 74:23 98:17
158:6 176:2 178:2

**part** 64:8,13 93:11 103:6
105:22,24 107:18 142:9
175:2

**parties** 8:7 45:11 72:3
165:6

**partner** 65:24 173:12

**partnership** 30:10

**party** 119:24

**passed** 97:19 139:19

**passing** 146:7 181:21

**past** 72:2 75:16 77:22
79:12

**patient** 26:7 83:20,21
84:12,14,15 85:1 106:9
107:5 150:16 154:8,21

**patients** 26:4,6 27:6,8,9,
11 87:4 96:5,6,10 148:1

**Patricia** 101:21 140:1,2,9
142:24 143:15 144:15
145:4 161:1,20 165:17,23
170:4 172:24 176:25
178:9,10 181:13

**Patricia's** 145:2

**pause** 67:1

**pay** 21:18 61:16 87:11,19,
21,25 89:8,10,22 90:1,4,
12 92:13 97:3,5 98:13,21,
22 102:6 103:13,22 104:8
122:13,14,16,19 134:17,
18,20,22,23 136:12,14
138:8,18,23 139:14,16
140:21,24 142:7 143:6,7,
10,20 144:1,3,5 146:20,
24 147:5 149:4,10 150:1,
6 152:15,16 159:13,14,15
161:25 162:9,18,19,20,22
167:25 172:16 177:14,17,
22 179:16,19

**payable** 176:4

**paying** 91:9 92:18 97:10,
12 105:13 136:23 137:3
142:1 143:18 147:1 149:7
153:1

**payment** 48:6 68:12 69:24
70:12 88:3 90:20,21
91:15 97:7 101:17
131:13,14,21 170:3

**payments** 58:25 67:19
68:10,15 70:20 91:25
92:4,20,21 126:4 137:16
139:12 140:3 149:1,19,20
160:10,14,16 161:10,16,
19 169:24 170:1,2 172:16
178:20,24 179:6

**payroll** 21:18 25:13 76:12,
14,19,20,21,23 77:1
87:23 100:1,9,11

**pays** 139:2

**PDFS** 170:23

TRUSTEE1960-051989

LEXITAS

Case 20-35493   Document 112-40   Filed in TXSB on 01/08/23   Page 67 of 76
TRUSTEE1960-051990
Huong Le Nguyen
s Index: penalties..practice

**penalties** 174:7

**pending** 180:4,6,19,20,23, 25

**people** 24:24 47:7 49:7,8 94:8 151:22 153:7,9 154:10 164:11

**percent** 13:22 14:10,25 15:4 30:17,22 65:25 66:4 82:13,15 83:13,15,22 84:1,2 85:17 112:4 113:20 114:24 129:17,20 176:1,20

**percentage** 148:19

**perform** 96:13

**period** 25:1,6 85:17,20

**perjury** 174:7

**permission** 63:6 106:24 107:11 114:21 168:25

**person** 13:17 28:18 36:15 117:1 132:10 140:3 143:14 144:24 147:22 160:10 162:24 171:22

**personal** 100:18,19 138:19 145:24

**personally** 101:14 123:15 128:3,5 136:23 137:3,25 157:15 171:11

**pharmaceutical** 25:25

**pharmacist** 27:24 28:10, 11,15,19 29:7

**pharmacists** 29:1

**pharmacy** 25:20,22,23,24 26:1,8,10,13,14,15,18,20, 23 27:1,14,16,18,21 28:3, 5,8,9,20 29:9 158:15,16 159:3,6

**phone** 83:21

**physical** 107:14

**physically** 150:23

**physician** 12:16 18:24 30:2 32:8 60:2 83:6 84:15,16,17 85:2,3,11 86:22 94:11,12,14,19 95:4,7,9,12,20,22 96:12, 18,21,22,25 97:1,2,4,5,10 100:1 102:16 105:16,20, 21 106:4,13,14,17,23 107:6,7 147:13,25 148:7 154:3,21 177:21

**physicians** 13:2 73:17,19 74:1 76:10 78:24 79:5,7, 12 84:18 95:5 98:7,13,23 147:14 154:12,17,20 175:9,12 177:13,14,17, 21,23 178:7

**place** 93:21 153:7,12,25

**plays** 152:12

**pleading** 122:1,3

**pledge** 36:12 37:5 38:3

**pledged** 82:17

**PLLC** 137:23 138:1,2,13, 18

**point** 6:1 15:3 49:6,7 54:14,15 58:12 91:25 93:1,18,24 97:11 116:24 129:4 133:12 148:25 150:5 151:25 152:22 153:6 155:12 156:15 170:24 182:10

**pointed** 81:8 113:20

**points** 15:6 66:21 67:6

**policy** 101:23,25 102:1,2, 7

**Porter** 136:23 137:16 138:2 139:1

**portion** 12:23 14:6 15:16 16:21 37:18 38:4

**portions** 38:13 91:9

**position** 21:18 23:20 66:21 120:11 121:6 145:3

**positions** 21:16 29:1

**POYSER** 68:2 98:1 108:21 119:3,9 130:21,23 182:3

**practice** 10:8,25 11:1,2 12:10,11,15,19,23,25 13:1,4,12,19,25 14:6,10, 17,22 15:1,4,7,11,17,24 16:20,22,24 17:8,11 20:3, 5 21:12 22:11 23:1 24:4, 12,15,17,19 25:9,12,20, 25 26:4,5 27:11,15,17 28:3 32:9 34:9,23 36:9 49:12,13,14 51:10 53:19 54:6 56:22 57:15,25 59:12,23 60:1,11,15 61:2, 20 62:25 63:15 65:9,15, 22 66:6,11,21 67:6,16,18 68:12 69:5,21 70:13 71:17,25 72:22 73:1,4,7, 17,23 74:10 75:2,15 76:11,12,15,25 77:13 78:16,17 79:8,22 81:18 83:6,18 84:5,9,22 85:3,4, 13,14,19 86:1,9,11,19,21, 24,25 87:15,18 88:7,11, 19,25 89:4,21 90:13 91:6, 21 92:24 93:2 94:6,10 95:6,9,25 96:14,24 97:3, 5,8,9,11,12,18 99:4,16,19 100:2,16,21,22,24 101:6 102:16,17 103:6,10 105:7,8,24 106:13,24 109:23 117:2,12,14 121:10 123:9 127:7,15 128:1,9,24 131:11 132:13 134:22 135:21 139:9 140:4 141:21,22 142:17 143:23 146:20,23 147:10, 12,15,24 148:6 150:7,8, 16,21 151:9,11 152:16,24 153:1,11,13,23 154:3,8,9, 12,22 155:10 156:7,12 157:1 159:19 162:18,19 168:20 169:9 172:18 173:2,9,18 174:4 177:18

Case 20-35493   Document 112-40   Filed in TXSB on 01/08/23   Page 68 of 76
TRUSTEE1960-051991
Huong Le Nguyen
s Index: Practice's..quote

**Practice's** 24:7 49:20 130:1,11 149:18 150:18 151:6 168:24 170:7,8

**practices** 12:6 124:19

**practicing** 27:8 30:2,3 62:2

**precipitating** 76:9

**premise** 151:5

**premises** 36:14 37:8,18 38:5 121:11 147:20,23 150:9,10,11,12,22,23 151:1,4,10,22 158:5,23 159:1,2 160:12,21,24 162:1,24 167:22,23 168:25 169:9

**prepare** 40:22 61:9,14 62:14,17

**prepared** 61:12 62:5,7,18 74:10 75:22 76:7

**prescription** 26:2

**prescriptions** 26:6 27:12

**present** 58:4,10 158:19 160:13 163:1 169:2

**presented** 74:11,19

**presentment** 42:15

**president** 38:12 51:9 149:21 157:2

**pretty** 11:22 181:16

**previous** 75:5 107:22

**price** 61:23

**primarily** 149:16

**primary** 10:25 43:4 169:15

**prior** 8:15 24:7 33:12 36:16 38:5 41:1 99:12 168:7 179:22

**privilege** 43:16

**privileged** 38:22,23 45:21 55:14,19,23 137:7

**privileges** 32:11,13,14,16

**problem** 126:11 153:17

**problems** 126:13,16 127:4,25 128:10,15,20

**proceed** 43:23 44:5 45:4,5

**proceeding** 16:19

**produce** 163:12,16,17 168:4,6,19 169:4 170:15, 17

**produced** 137:16 160:5 163:6,15 171:1 172:13,14

**producer** 96:18

**promises** 52:17

**pronounced** 164:2

**proper** 120:9

**property** 178:1

**prospective** 56:5

**protest** 42:15,16

**provide** 8:24 32:3 95:5 103:3 119:21 127:6 128:7

**provided** 36:17

**Providence** 30:8,14,22,25 31:9,13,16 32:4,15 102:22 107:23,25 108:1

**providing** 8:25 97:13 120:9

**provision** 37:1 42:20,22, 24 43:12 82:1,2,3 149:1

**pull** 176:25

**pulled** 163:18 178:12

**purchase** 60:25 61:23 62:9,20 63:9 64:17 69:22 71:8,9 82:22 83:19 84:5, 24 86:10 106:1 117:12 130:25 145:17 158:9

**purchased** 84:24 117:8

**purchaser** 56:5 62:23 68:22,25 69:7

**purport** 61:17

**purpose** 24:18,21

**pursuant** 9:1 71:16 90:7 97:22 175:16

**pursue** 45:9,10 48:11

**put** 11:15 17:8 33:24 58:4 68:13 107:8,10 108:23, 24,25 109:2 132:24 135:16 136:13 154:4 174:3,6 181:11,14

**puts** 179:5

**Q**

**Q-U-O-C** 13:15

**question** 5:20,22 6:3,4 20:14 23:4 28:23,25 31:2 35:7 39:8,9 41:3 43:15, 16,19 44:18 47:13 55:18, 24 56:6 63:11,13 64:2,3 66:13 68:3,6 71:23 88:10 89:25 92:3,12 93:4 94:2,3 106:11 113:11 116:2 126:1 127:8,21 128:18 131:20 137:2 148:15 162:3 173:21

**questioning** 6:3 71:19

**questions** 5:16 6:8 19:7, 21 55:12 67:24 86:3 181:20

**quick** 93:4 159:22

**Quickbooks** 176:25 178:13

**quicker** 86:2

**quit** 97:10

**Quoc** 13:13,24 14:2,9,21, 24 15:3 16:3,4,8,10,15 42:2 48:10,19 53:19 57:20 58:12 112:2 114:22 115:4 116:17 117:5,13

**quote** 83:19

Case 20-35493   Document 112-40   Filed in TXSB on 01/08/23   Page 69 of 76
Huong Le Nguyen
s Index: radiologist..reply

TRUSTEE1960-051992

## R

**radiologist** 12:3 30:3

**radiology** 22:25 29:18

**rate** 102:4

**Ravi** 164:16 165:2,3

**Rayford** 21:3

**reach** 131:10

**reached** 129:25 131:22

**read** 36:5,20 38:17,19 39:5,9 42:7,9,11 50:17 93:22 113:13 118:7 148:19 164:12

**reading** 39:11 68:24 114:17

**reads** 39:7 47:5,21

**ready** 40:12,18

**real** 177:11 178:1

**realize** 66:3

**reason** 17:14 63:8 81:5 92:19 99:21 109:18 145:7 164:21 165:13,14 168:6 183:3

**reasons** 96:15

**recall** 5:14 8:25 14:2,19 15:13 49:10,24 51:25 53:18 60:14 71:19,20 78:4 108:19 112:6 140:14 160:16 161:24 162:12,14, 17 169:7

**receipt** 88:11

**receivable** 84:8 174:15,25 175:5,14,20

**receivables** 89:2,3

**receive** 78:10 88:18 101:17 131:12 132:14 134:15 135:2 138:6,7 139:1 154:11,13

**received** 78:12 131:14,21 132:16 135:10 139:19 140:4 145:10,19 146:11 160:12,14 163:21,23 165:14

**receiving** 135:13 139:12 160:16

**recess** 71:3 159:25 181:18

**Recessed** 182:13

**recommending** 27:10

**record** 6:15 7:17 22:5 33:2 71:2 73:13 74:15 106:7 107:5 129:21 173:4

**records** 88:7 105:15,18

**recover** 48:17,18

**Red** 12:10,11,14,18,22,25 31:6 78:24 79:6,7,13 98:7,13,23 175:10,12 177:13,14,17,21,24 178:7

**reference** 80:18

**reflects** 53:23

**regard** 41:7 42:4 46:25 123:15 160:11

**reinstate** 11:5,10

**reissue** 16:11,12

**reissued** 16:14

**relate** 171:16

**related** 6:22,24 82:18

**relating** 118:22 171:22

**relation** 171:17

**relationship** 13:17

**relative** 27:20

**release** 148:18

**relied** 115:10

**relief** 29:7 148:12,19

**relying** 116:14

**remain** 88:11 117:13 120:18

**remained** 67:12 84:4,6 123:9,14

**remaining** 79:22 120:23 121:3 156:11

**remedies** 45:9

**remedy** 43:24

**remember** 11:8,13,19 12:20 13:10,21 14:3,20 15:14,15 22:3,6,16 24:13, 14 26:21,22 28:1,6,7 30:16 40:21 42:13 46:15, 19 48:23 49:1,6,9,15 50:1,2 52:2 53:15 57:3,7, 12,21 59:2,9 62:4 74:12 78:2,7,13,15 79:24,25 88:4 127:23 128:5,21 139:13 140:15 162:2,4, 15,21 173:5

**remove** 114:22 119:5,8,10

**removed** 112:2 118:1,2,8, 18,20,23,24

**renew** 45:23 63:25 108:8

**renewing** 128:13,14

**rent** 70:12 77:6,7,8,10,11, 22 96:14 97:3,6 128:25 132:3 133:15,17,18 142:12,20,22 145:24 146:2,11,15,18,19 147:2, 4 149:5,7,10,11 150:1 160:10,17 165:20 167:19, 25 170:8 175:10,18 176:1,20 178:15,16,19,24 179:6

**repeat** 39:12 68:4

**rephrase** 5:21 23:16

**replace** 16:8

**replaced** 16:9

**reply** 164:10

TRUSTEE1960-051992

LEXITAS

TRUSTEE1960-051993

**report** 143:17

**reporter** 5:16 6:9 13:14 50:11 125:23 156:18,20

**represent** 5:5,7 132:16 175:5,6

**representation** 74:20 115:10

**representations** 56:4,21

**representative** 63:20 71:17 128:19 145:11

**represented** 117:18 132:21

**representing** 54:20 138:2

**represents** 132:17

**request** 103:23 127:6

**requested** 53:19 56:20 148:11,12

**requesting** 148:17

**required** 45:9 58:14 106:24 119:21 120:10 142:10

**requirements** 121:20

**reschedule** 181:23

**research** 49:13

**reserve** 181:19

**reside** 8:5 109:16

**residence** 8:8

**residency** 10:5,7,11,12, 14,16,20,21 11:23 12:9 30:4

**resigned** 28:13

**resources** 21:6

**respiratory** 169:12

**responding** 156:25

**response** 8:25 74:19 94:4 136:16,21 163:3

**responses** 160:2

**responsibilities** 124:12

**responsible** 56:3 67:21 68:15 91:15 120:24 142:11,14 143:11 149:16 156:11,13

**responsive** 163:3

**Responsiveness** 39:15 42:10

**rest** 181:19

**restroom** 6:2

**retail** 26:1

**retained** 103:6

**retire** 11:3,4,9,11 96:3

**retired** 11:14 12:16

**revenue** 154:11

**revenues** 96:23

**review** 35:3,13 41:1 46:24 55:5 111:16,19 113:7

**revolves** 49:8

**revolving** 49:9,14

**rheumatology** 169:13

**Rice** 9:16,19 10:19

**right-hand** 174:25

**rights** 93:11

**Road** 21:3

**Robin** 5:5

**robust** 105:17

**Roman** 82:7

**room** 17:21 20:22,23,25 21:1,5,15 22:14 49:6 105:10 166:15,24 167:1

**rooms** 17:22 18:21

**route** 108:2

**rows** 116:23

**rug** 84:10

**rules** 125:25

**rumor** 96:20

**run** 85:10,12 100:3 106:19

**running** 104:20

**runs** 23:8 31:9

**rush** 76:5,6

**Ryan** 145:21 146:16 164:16 165:4,5

---

## S

**salary** 101:1

**sale** 69:15 93:1 121:12 156:9 158:16 159:6 170:8

**satisfy** 90:3,5 99:25

**schedule** 175:17 177:7,9 178:12 181:12,14 182:5

**schedules** 174:7

**school** 9:22,24 11:24,25 29:25 30:6 44:10 59:4

**search** 157:18,21,24 158:1 163:7

**secretary** 58:7

**security** 45:10

**seek** 100:10,13

**seeking** 59:19

**segregated** 138:5

**select** 48:11

**sell** 12:23 63:14 64:6 66:1, 14 81:17 82:11 83:24,25 104:24 153:23

**Seller** 93:10,12

**selling** 24:7 64:8 65:1,20, 21 96:16 99:12 129:8,11, 15,17

**send** 26:5 27:11 109:20

TRUSTEE1960-051993

124:15 125:9 127:16,18,
21 151:15,16,18,19
152:3,4,23,24

**sending**  27:6,14

**sense**  125:1,3,7,11 136:2,
3

**sentence**  93:10

**separate**  12:6

**separately**  44:7

**September**  25:10,14
48:25 49:18 61:8 64:25
65:22 66:14 74:8 76:6,16,
22 86:1 91:23,24 95:25
102:13 121:11 129:3
139:11 150:24 151:2,10
154:16 160:18,24 163:4
169:5 177:11 178:1

**series**  5:11 82:18

**serve**  125:21

**served**  78:13,15

**server**  105:9,11,23 106:8

**servers**  107:15

**Service**  102:12 103:2
106:3

**services**  97:13 102:25
136:24 138:6,19

**set**  52:19

**setting**  15:22 16:19

**settlement**  129:25 131:10,
12,14,22 171:19

**severally**  113:21

**share**  65:19

**shareholder**  15:7 24:12
65:24 173:12

**shareholders**  16:24 17:7
58:2 174:1

**shares**  15:19,25 117:8

**shift**  18:25 19:1

**short**  25:6

**show**  8:13 32:18 33:1,7
40:7 50:8 53:9 72:12
73:11 74:13 81:9 102:10
109:4 124:21,22 127:14
137:11,16 144:9 163:6
164:11 174:10

**shown**  34:10

**side**  174:24 178:6

**sign**  44:16,17 47:21,22
51:9 55:6 62:24 63:5 65:8
68:16,19,22,25 69:8,11,
25 70:1,8,9 109:22
110:22 113:9 115:4
141:18

**signatory**  106:6

**signature**  41:10,12 51:2
52:2 54:1,7 74:11 75:23
116:8,17 183:1

**signatures**  34:8 51:12

**signed**  34:25 35:11 37:2
39:6 42:8,12 44:15,20
45:13 46:14,25 54:10
55:3 57:1 62:10 63:9
64:20,21 68:17 70:3,5
76:2,7 86:9 91:3 93:22
108:16 113:3,5,6 115:15
116:22,24,25 117:2,18

**significant**  29:13

**signing**  51:25 54:17 57:5
116:22

**similar**  60:3 168:22

**simultaneous**  92:8
123:12 133:7 136:7
155:25

**single**  82:17 136:15

**sit**  42:24 48:24 79:11
83:20 113:10 148:25

**sitting**  105:9,18,23

**situation**  146:5

**six-month**  132:17

**small**  38:3 167:8

**Smith**  28:12

**sold**  22:10,19 24:4 27:2
48:25 73:7 79:23 81:21
95:24 100:5 129:20
150:12,17 151:6 153:11

**solution**  147:7

**somebody's**  107:9

**son**  7:19

**sort**  96:19

**sought**  59:6

**sound**  46:22

**space**  47:25 59:11 64:10
67:7 98:14 145:22 147:9,
14 179:12

**spaces**  179:22

**speak**  7:16

**speakers**  92:8 123:12
133:7 136:7 155:25

**specialty**  10:5 25:23
26:25 27:3,7,13,15,21
28:5,20,21 158:16

**specific**  25:24 118:7

**specifically**  90:6

**spell**  18:2

**spelled**  13:14

**Spring**  21:3 27:19 77:14
78:22,23 79:3,12 98:9,11,
15,24 99:8 166:4,7
175:10 177:24

**Stacy**  19:22,23 23:20
25:11,15 58:4,6,9 61:13
62:7,10,15 75:11,24
93:20 99:18 108:12,13
140:8 144:20 163:18
164:5 165:17

**staff**  17:21 18:21 19:18,21
20:22 23:24,25 25:11,13

LEXITAS

Case 20-35493   Document 112-40   Filed in TXSB on 01/08/23   Page 72 of 76
Huong Le Nguyen
s Index: staffing..Syed

TRUSTEE1960-051995

31:15 32:11,13,16 46:2
58:3 128:4 142:5,7 151:1,
13

**staffing** 24:21 31:15,17
88:20 94:10

**staffs** 17:22

**stand** 102:24 145:7

**staple** 33:22

**stapled** 72:11

**stapler** 33:21

**start** 19:11 25:2 63:14
94:19 134:7 139:8,10
175:24 182:10

**started** 29:21 94:21,22
95:1

**starting** 126:14 174:24

**starts** 36:8 175:24

**state** 6:14 103:16

**statement** 15:8,23 16:2
28:21 30:23 49:3 62:4
97:20 110:19 113:10
115:21 124:9 126:16,22
130:6 140:5 159:20
166:22

**statements** 55:21 56:3
115:23 116:13,14 170:5,9

**states** 9:7,11 43:3 131:16

**status** 11:16 22:1,2 54:15

**stay** 49:7 154:19

**Stein** 128:11,18 129:7
140:8,11 145:11 152:2,14
157:20 163:22

**step** 140:24 142:7 143:10
152:22

**stepping** 147:1

**steps** 71:23 142:2 146:14
147:3 149:6,13

**stipulate** 80:17

**stock** 15:19,25 16:10,11,
12,14 101:3 117:9,14

**stop** 25:8 123:17

**stopped** 27:8 96:4,6 97:7
101:7,10 105:13 123:18

**straight** 97:16

**straits** 100:16,17

**strike** 48:14 73:5

**stuck** 81:5

**stuff** 104:2 107:16 150:12,
14,18 170:23 181:25

**sublease** 37:10,13 62:24
63:7,9 65:3,6 66:16,18,19
68:17 70:4,7 71:18,25
72:3,5,7,21 73:16,25
74:2,4,10,22 75:1,5,22
89:11 91:3,18 97:22,23
98:12 99:6 122:12 141:5
143:8 149:17 168:13
169:16,22

**subleased** 123:10

**subleases** 99:9 141:3,9,
23 152:17

**subleasing** 64:18 66:18

**sublet** 36:14 37:8,17
38:12 168:22

**subletting** 38:4

**subpoena** 8:23 9:1 74:19
160:2

**subsequently** 9:22 10:9
12:14 13:7,24 15:10
119:5

**substantially** 66:1 81:17
82:12 83:25

**substitute** 112:3 114:22

**subtenant** 69:18,20 72:25
73:3,6,20 120:18 139:12,
15 140:3 142:20 150:3
151:18 152:6,15 167:24
168:18,20 169:4

**subtenants** 139:19
140:21 142:21 143:17
144:5 160:15,17 168:1
169:8 179:15,19,21

**sudden** 78:9

**suddenly** 66:3

**sue** 78:16 79:13 125:14
132:7 136:13 137:24
143:8

**sued** 47:8,14 77:18,21
78:13 79:5,19 125:13,18,
19 138:1 159:13

**suing** 112:1 113:18
117:24 120:4,6 133:13
134:18,19,25 171:14

**suit** 6:23 169:25

**suite** 27:16 109:24
166:13,16,17,21,23,25
167:1,3,4,6,8,11,13

**suites** 167:2

**super** 65:25

**supplier** 97:6

**supplies** 85:10

**supply** 25:24 77:5,6 83:7,
14 85:5 87:24

**supposed** 18:20 69:2
89:10 98:22 103:13
123:14 135:16 139:14
147:22 152:10

**surcharge** 97:13

**surety** 42:17

**surprised** 123:24

**suspect** 178:9

**suspended** 17:14

**swearing** 115:15

**swore** 177:7

**SWORN** 5:2

**Syed** 136:10,14 152:2

TRUSTEE1960-051995

LEXITAS

154:4 159:12 164:15
165:7

**system** 84:7,8 86:8 87:14
104:14 105:19

---

**T**

**table** 40:11 85:15 95:10

**tacked** 97:20

**takes** 6:9 166:23

**talk** 6:1 38:21 124:20
145:21 163:10

**talked** 40:24 146:16
162:15

**talking** 40:25 41:19 51:17
85:16 86:14,24 106:2
114:12 125:25 126:5,6
128:5 129:14 130:16

**talks** 93:5

**tax** 161:18

**taxes** 160:10,17,21 161:7,
9,10,25 162:10,15
177:11,15,18,22,23
178:1,11

**team** 163:18

**tecum** 8:23 9:1 74:20
160:3

**telephone** 84:7,21 86:8
87:14 166:9,10

**telling** 39:2 66:19 130:3
153:6 155:8 156:7 167:24
168:11

**tells** 38:21 39:14

**ten** 19:15 46:18 79:25
120:15,21

**ten-year** 80:5 81:2 178:25

**tenant** 36:8,9 43:4 44:6
45:10 46:7 48:5 50:24
54:10,17,22 56:13,22,25
57:5,10 73:4 81:21 82:10,

14,16 83:24 92:5 119:21,
22 120:5 122:11,13,16,19
123:5,11,19 124:3 127:1,
2 132:11 133:24 135:21
139:15 147:6,8,17 149:21
152:15

**tenant's** 121:15

**tenants** 126:5 179:18

**term** 47:20 70:2 79:21
81:9,14 104:10 131:12
134:14

**terminated** 96:2

**terms** 35:1 41:15 71:16
80:25 98:19 118:11

**testified** 5:2 29:24

**testimony** 29:10 39:5
47:17 48:15 58:6 67:5
68:8 135:17 138:24 139:2
157:12 167:16

**testing** 24:17,22 25:6,7

**Texas** 10:15 21:3 23:6,16,
17,22 24:2,3,6,16,21,24
25:5,12 29:18 34:19,20
88:17,18,20 102:15,25
108:16 120:11 137:23,24
138:1,2,13,18 139:3
166:7 178:3

**text** 145:20 163:14,23
164:22 167:17

**the's** 168:25

**thereof** 82:15

**thick** 33:24

**thing** 55:5 93:20 116:1
119:9 142:21 170:22
179:3 181:25

**things** 37:21,25 55:1
113:17 128:15 146:7
165:10 169:1

**thought** 35:10 45:22 53:7
56:9 80:5,10,14 90:17,18,
19 118:1 123:22,23

139:14 142:11,15,16,17,
19,21,23 143:5 149:5
168:19 170:17 179:1

**threaten** 78:9

**threatening** 77:23 78:1
145:22

**throwing** 40:10 50:10
53:11

**Thu** 51:16 114:23

**Till** 176:16

**time** 6:1 11:6 14:21 15:3,6
16:25 22:17 25:6 30:3
36:15 37:8 39:2 46:1,7,23
48:19 54:14,15 57:2 59:3,
23,25 60:12 63:9 64:3
66:21 67:7 68:4 73:3,6
74:8 76:2 77:23 93:1
97:11 101:14 104:8
121:8,14 128:19 129:2,4,
13 132:18 133:3,8,20,21
135:5 140:11 141:25
144:5 146:10 150:15
157:17 174:6

**times** 14:24 39:12

**timing** 76:3

**TMMS** 31:15,21,24 32:1,3
88:20 102:24

**today** 6:20 8:12 26:8
33:12 40:20,23 41:1,5
42:25 45:14 48:24 76:25
78:2 79:11 104:15 107:19
109:9,14 113:11 118:6,7
145:11 148:19,25 155:10
160:4 168:7 182:9

**told** 45:23 55:16 56:9
63:24 65:14 68:13 112:5
126:10 128:12 133:22
136:5,6 139:15,16 143:5
149:9 150:3,19 151:18
152:2,14

**Tomball** 165:24

Case 20-35493   Document 112-40   Filed in TXSB on 01/08/23   Page 74 of 76
TRUSTEE1960-051997
Huong Le Nguyen
s Index: tomorrow..Village

**tomorrow** 182:5

**top** 34:3 103:20 163:20 174:14,19

**toss** 53:11

**total** 77:10,16

**training** 75:20

**transaction** 82:18

**transactions** 82:18

**transfer** 82:11,12 83:24, 25 105:15 106:25

**transferred** 49:25 82:17

**trouble** 126:21

**true** 16:2 55:22 97:17 113:3,10 115:16 130:3 165:13

**trustee** 85:24 87:6 137:24 138:1 170:10,18

**truthful** 5:22

**truthfully** 41:5

**turn** 35:15,21 38:16 39:13 55:5 62:19 80:22 82:6,7 98:3,22 116:6 156:23

**type** 41:4

### U

**Uh-huh** 39:22 40:2 82:9 104:11 110:4 114:14 130:23 132:2 137:14 156:21 157:23,25 158:2 164:1,25 175:1

**ultimately** 104:24 175:11, 12,13 176:4,21 177:12 178:7

**UMMC** 22:20 24:8,19 25:9,16 27:2 28:2 48:25 60:2 61:3,22 63:7 68:11, 14 69:15 71:19,24 73:8 74:9,11 75:2,22 76:3 79:23 83:5 84:5 86:10

87:12 88:22 89:10,12,17 90:3,6,16 91:9 92:13,16, 18,23 93:1,21 94:6 97:24 98:13,21 99:13 102:15 103:22,24 104:5,23,24 105:1 106:25 107:19 120:18 126:6 129:7,14,25 130:10 131:11,13,23 132:4,7,8 134:18,19,21 135:3,22,23 136:5,6,14 141:18 144:1,3 146:17 148:23 149:7,25 150:13, 17 151:15 152:2,3,5 153:9,12,14,20,24 154:22 155:9,10,18 156:10 158:5,14 159:7,10 165:3, 5,6,7 167:19 168:18 169:10 174:15,22,25 175:7,15,16,21

**UMMC's** 155:17

**unaware** 142:13

**uncured** 54:21

**understand** 5:6,20,22 23:4 30:11 31:2 35:1,5,7, 23 37:1,4,16 38:11 39:10, 13 40:10 42:6,24 43:8 44:3,8,10,12,19,22 45:2, 13,14,16 46:6,11 47:11 48:3,7,9,16 54:9,19 56:6, 7 64:5 68:3 83:10 85:16 94:25 105:5 106:16 112:10 115:1 120:22 135:19 147:16 148:14 151:24 152:17,18 153:18 154:24 155:16 161:4 175:16,19

**understanding** 8:11 41:8, 16 42:3 46:3 68:1,11 70:2,6 83:4

**understandings** 52:18

**understood** 36:22 37:12 44:14 46:6 56:16 69:9 70:3 116:21 152:5

**undertake** 71:24 142:2 149:7 151:14

**undertaken** 72:4

**undertook** 146:14

**uneasy** 96:21

**United** 9:7,11 22:11 24:5 158:22

**University** 9:16,20

**unknown** 181:4,6

**unpaid** 23:20 121:13 175:6

**unreasonably** 36:17

**unstable** 96:21

**users** 104:1

**utilize** 87:19 155:8

**utilized** 89:8 104:14 155:6

**utilizing** 34:23 49:1 97:3 104:5,7 107:19

### V

**V-I-V-E-N-T-I** 18:3

**vacated** 48:24

**vacating** 63:20

**vaccine** 87:24

**Valdez** 28:17

**valid** 52:9 112:20

**valorem** 160:20 161:8,10, 18,25 162:10

**variable** 101:24

**vendor** 85:6,8 87:23 97:6 100:2

**verbal** 5:15

**versus** 24:22 48:18

**Vietnam** 9:10

**Village** 110:1

**Viventi** 18:1,3,4,7,15 19:2, 24 20:11,19 21:16 22:8, 16

**voicemails** 164:10

**void** 38:6

**voluntarily** 36:13 37:5

**vote** 17:8 65:19,25

---

### W

**W-2** 21:20,21,22 22:1

**wait** 68:23 89:11 91:14 115:25 133:8 136:9 155:2

**waive** 42:15

**Walgreens** 26:2

**walk** 155:9 167:14,15

**wanted** 95:13 168:8

**warranting** 54:19

**water** 40:14,17

**website** 86:12

**week** 103:17

**whatsoever** 92:19

**Whoever's** 167:14

**Williams** 19:22,23,25 20:9,12,18 23:20 25:11, 15 58:4,6,9 61:13,14 62:7,15 75:11,12 99:18 101:20 108:12,13 140:9 144:20 164:5 165:17

**Williams'** 75:14

**wire** 151:23 172:21

**withheld** 36:17

**wonderful** 116:5

**Woodlands** 8:6

**word** 64:11 124:4

**words** 111:25

**work** 10:22,24 19:23

25:16 28:4 29:5,9 47:10, 11 54:4 62:13 75:15 89:2 95:13 145:4,6 147:7 154:14,17 164:11 165:5 166:3,4 167:15 182:4

**worked** 12:4,8 21:11 22:7, 22 27:10 28:2,7,19 89:4 145:8

**working** 17:19 21:14,15 24:15 27:21,23,25 94:6 108:15 166:1

**works** 19:24 144:20 165:18,25 166:22

**worries** 80:16

**worth** 84:10,22 99:16,17 100:6 178:23 179:5

**Wound** 72:23,24

**wow** 53:1

**write** 127:3 149:15,16

**writing** 91:21

**written** 36:16 37:6 38:5 118:12 119:20 123:3 159:11

**wrong** 47:8 98:25 176:7, 10

**wrote** 127:1

---

### X

**xiv** 82:7,8

---

### Y

**y'all** 122:19 124:5 181:22

**yea** 39:14

**year** 9:17 22:15 26:17 102:3 125:18 161:19 162:1 164:23 178:19

**year's** 178:23 179:5

**yearly** 101:9

**years** 10:1 11:21 20:1,6 21:10 52:4 54:5,6 75:16 81:10,14 117:17 120:15, 21 160:21

**yes-or-no** 113:11

**you-all** 31:17 58:7 156:1

---

### Z

**Ziek** 5:4,5 7:18 8:11,22 19:6,15 20:11,14,18,24 24:11 28:24,25 29:16 31:22 32:18,19,21,24 33:1,5,7,10,11,22 34:1 35:4,15,18,21 36:5 37:7, 16,20 38:7,9,23 39:15,18, 21,24 40:2,5,7,19 42:7, 10,11 43:12,17,22 45:2,8, 25 46:13 49:3,10,17 50:5, 8,13,15,20,22 51:23 52:23 53:1,5,7,9 54:1 55:11,15,20 56:2 57:17, 18 58:16 59:10 60:19,23, 24 63:12,13,19 66:20,25 67:2,5,12,17,23 68:3 69:13,14 71:1,4 72:16,17, 20 73:11,14 74:17 80:10, 14,22 83:1,3 86:18 89:20 91:2 92:7,9 94:3,5 98:2,3 102:10 108:18,24 109:2, 4,6,8 111:4,7 114:1,4,7, 14,16 115:1 118:20 119:7,12,13 120:22 121:2,7,9,24 122:3,7,15 123:13 125:3,20,24 129:11,22,24 130:6,10, 14,19,22 131:1,3,6 132:21 133:2,5,8 136:9, 16,18,21,22 137:2,11,14, 15 138:12,18 139:23 141:5,15,22 142:6 144:9, 12,13 149:6,12,13 153:11 156:4,21,23 159:24 160:1 163:10,20 170:19,25 172:25 173:2 174:13 176:8,12 177:4,7 180:17

888-893-3767
www.lexitaslegal.com

LEXITAS

TRUSTEE1960-051998

TRUSTEE1960-051999
Huong Le Nguyen

181:15,19

TRUSTEE1960-051999
LEXITAS