CAUSE NO. 2020-27436-A

| | | |
|---|---|---|
| **CYPRESS MOB, LLC** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| | § | |
| **vs.** | § | |
| | § | **HARRIS COUNTY, TEXAS** |
| **1960 FAMILY PRACTICE, P.A.,** | § | |
| **HUONG LE NGUYEN,** | § | |
| **ALEXANDER LU NGUYEN** | § | |
| **GUNTHER M. GRONING and** | § | |
| **THU ANH HOANG** | § | **295th JUDICIAL DISTRICT** |

<u>**PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT DOCTORS HOSPITAL 1997 LP D/B/A UNITED MEMORIAL MEDICAL CENTER**</u>

TO:    Doctors Hospital 1997 LP d/b/a United Memorial Medical Center, by and through its attorney of record, Sharlene A. Poyser, 1001 Texas Avenue, Suite 400, Houston, Texas 77002.

WFMC 2016-C34 Northwest Freeway, LLC, as successor in interest to Cypress MOB, LLC, ("Plaintiff") serves this First Set of Interrogatories to Defendant Doctors Hospital 1997 LP d/b/a United Memorial Medical Center ("Defendant"). Pursuant to Rule 197, Texas Rules of Civil Procedure, Plaintiff propounds the attached First Set of Interrogatories to be answered by Defendant, such answers to include all of the information called for by such Interrogatories.  To the extent possible, each Interrogatory should be answered in the space below following each Interrogatory.   These Interrogatories shall be answered separately, and under oath, within thirty (30) days from the date of service thereof.   Plaintiff also request that Defendant continue to supplement answers to these Interrogatories.

The responses should be sent within thirty (30) days of service of this request to Yonatan Z. Gerber, Gerber & Most, PLLC, 5555 West Loop South, Suite 400, Bellaire, Texas 77401.

Respectfully submitted,

**THE GERBER LAW FIRM, P.C.**

*/s/ Yonatan Z. Gerber*

Yonatan Z. Gerber
SBN: 24055544
Email: ygerber@thegerberlawfirm.com
5555 West Loop South, Suite 400
Bellaire, Texas 77401
Tel: 832-767-1065
Fax: 832-767-1686
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

This is to certify that a true and correct of the above and foregoing document has been served on all counsel of record below via email on, this the 3rd day of February, 2022:

Sharlene A. Poyser
G. Troy Pickett
The Poyser Law Firm
1001 Texas Ave., Suite 400
Houston, Texas 77002

James Q. Pope
The Pope Law Firm
6161 Savoy, Suite 1125
Houston, Texas 77036
jamesp@thepopelawfirm.com

Sanford Dow
Dow Golub Remels & Gilbreath, P.C.
2700 Post Oak Blvd., Suite 1750
Houston, Texas 77056
dow@dowgolub.com

Jeffrey R. Mathews
P.O. Box 982
Katy, Texas 77492
Jeff.superdocs@gmail.com

*/s/ Yonatan Z. Gerber*

Yonatan Z. Gerber

## I.  INSTRUCTIONS

1.     In the event Defendant claims that any materials responsive to discovery are confidential and should be protected from general public disclosure, Defendant's counsel is requested to contact Plaintiff's counsel in this regard to obtain an agreement as to the terms of a Protection Order substantially in advance of the discovery due date, so as not to delay discovery.

2.     In the event there are objections to any of these interrogatories, the objections are to conform to Tex. R. Civ. P. 193.  If the Defendant makes any objection, it is requested to specifically state the legal or factual basis for the objection and the extent to which it is refusing to comply with the request, and to respond to that portion of the discovery which is not subject to such limitations unless it is unreasonable for the Defendant to do so before obtaining a ruling on the objection.

3.     Some of the interrogatories within this set may ask the Defendant to identify documents. While a party typically may send no more than twenty-five interrogatories to another party as a matter of right, Tex. R. Civ. P. 190.3(b)(3) excludes from this limitation interrogatories asking a party to identify or authenticate documents.

4.     If applicable, the responding party may answer an interrogatory by specifying and, if applicable, producing the business or public records or compilation, abstract or summary of the records.  In this event, the records from which the answer may be derived or ascertained must be specified in detail to permit the party to locate and identify them as readily as can the responding party.  If the Defendant specifies business records, it must state a reasonable time and place for examination of the documents.  The Defendant must produce the documents at the time and place stated, unless otherwise agreed by the parties or ordered by the Court and must provide the requesting party a reasonable opportunity to inspect them.  Plaintiff is requesting than any such materials be produced within the above time period specified for responding to the interrogatories to Counsel for Plaintiff at 5555 West Loop South, Suite 400, Bellaire, Texas, 77401.

5.     For a document that no longer exists or that cannot be located, identify the document, state how and when it passed out of existence, or when it could no longer be located, and the reason for the disappearance.  Also, identify each person and/or entity having knowledge about the disposition or loss of the document, and identify any and all other document(s) evidencing the lost document's existence or any facts about the lost document.

6.     Where a claim of privilege is asserted in objecting to any interrogatory, or part thereof, and the requested information are not provided on the basis of such assertion:

    A.    in the objection, identify the nature of the privilege (including work product) which is being claimed and, if the privilege is being asserted in connection with a claim or defense governed by state law, indicate the state's privilege rule being invoked; and

    B.    provide the following information:

        (1)    for documents: (a) the type of document; (b) a description of the general subject matter of the document; (c) the date of the document; (d) such other information as is sufficient to identify the document for a subpoena duces tecum, including, where appropriate, the author of the document, the addressee of the document, and where not apparent, the relationship of the author and addressee to each other; (e) the name, address, and job title of the person to whom it was addressed or circulated or who saw it; and (f) the name, job title, and address of the person now in possession of the document.

        (2)    for oral communications: (a) the name of the person making the communication and the names of persons present while the communication was made, and where not apparent, the relationship of the persons present to the person making the communication; (b) the date and the place of the communication; and (c) the general subject matter of the communication.

Any document(s) withheld on a claim of privilege must be preserved. If any document(s) are so withheld, Plaintiff hereby requests, pursuant to Rule 193.3 of the Texas Rules of Civil Procedure, that you identify in a privilege list or log each such document and provide the information set forth in Rule 193.3(b).

7.    In producing documents and materials, you are requested to furnish all documents or things in your possession, custody, or control, regardless of whether such documents or materials are possessed directly by you or your directors, officers, partners, members, agents, employees, representatives, subsidiaries, managing agents, affiliates, investigators, or by your attorneys or their agents, employees, representatives, or investigators.

8.    This request requires the originals to be produced for inspection and copying, if they exist and are in your possession, custody, control, or access, including documents within the possession, custody, or control of your officers, directors, employees, attorneys, agents, representatives, and other persons or entities who have acted or purported to act on your behalf.

9.    Documents not otherwise responsive to the discovery requests shall be produced if such documents mention, discuss, refer to, or explain the documents that are called for by the discovery request, or if such documents are attached to documents called for by the discovery request.

10.     If any document was, but is no longer, in your possession or subject to your control, state whether it: (a) is missing or is lost; (b) has been destroyed; (c) has been transferred, voluntarily or involuntarily, to others; or (d) is otherwise disposed of. In each instance explain the circumstances of such disposition, state the approximate date thereof, and identify all persons having knowledge of the document's contents.

11.     Please produce all electronic or magnetic data or media in electronic or magnetic form on compact discs (CDs) or DVDs pursuant to Rule 196.4.

12.     Any request or response to any request involving a corporation or other business entity or any other entity shall also refer to and include any and all parents, subsidiaries, affiliates, partners, joint venturers, agents, employees, representatives, accountants, investment bankers, or attorneys acting on behalf of the corporation or other entity.

13.     If you cannot answer any interrogatory fully and completely after exercising due diligence to secure the information necessary to do so, you must so state and answer each such interrogatory to the full extent you deem possible, specify the portion of each interrogatory that you claim to be unable to answer fully and completely, state the facts upon which you rely to support your contention that you are unable to answer the interrogatory fully and completely, and state what knowledge, information, or belief you have concerning the unanswered portion of each such interrogatory.


## II.    DEFINITIONS

The following definitions will apply throughout these requests, regardless of whether upper or lower-case letters are used:

1.     Plaintiff" and/or Landlord refers to and/or means WFMC 2016-C34 Northwest Freeway, LLC, as successor in interest to Cypress MOB, LLC which is the Plaintiff in this cause.

2.     "You," "your" and/or Defendant refers to and/or means Doctors Hospital 1997 LP d/b/a United Memorial Medical Center which is a Defendant in this cause.

3.     "All" means "any and all" and "each and every."

4.     "Communications" means and includes any manner, method, or means of disclosure, transfer, or exchange of information including, through a third party, whether made by oral or written utterance, notation, or statement of any nature whatsoever, including but not limited to documents, correspondence, correspondence, conversations, dialogues, discussions, interviews, consultations, agreements, and other understandings between or among two or more persons, whether made face-to-face, or by telephone (including text messages), telecopier, mail, e-mail, personal delivery, or otherwise.

5.  "Document" and "Documents" are used herein in the broad sense means and includes, but
    are not limited to, the following items within the possession, custody or control of the
    Plaintiff, and/or any agent, representative or other person acting or purporting to act on behalf
    of the Plaintiff, including but not limited to any attorney(s) acting or purporting to act on
    Plaintiff's behalf, whether such items are typed, printed, recorded, reproduced by any
    mechanical process, copied or written by hand, or otherwise recorded matter of whatever
    character, including but not limited to; contracts; communications; correspondence;
    telegrams; memoranda; statements; records; reports; books; summaries and/or records of
    telephone conversations; summaries and/or records of personal conversations; diaries;
    forecasts; orders; bills; invoices; checks; statistical statements; books of account; studies;
    graphs; charts; accounts; work papers; indexes; date sheets; data processing cards; analytical
    records; minutes and/or records of meetings and conferences; reports and/or summaries of
    interviews; reports and/or opinions of consultants; appraisals; records, reports, and
    summaries of negotiations; brochures; lists; periodicals; pamphlets; circulars; electronically
    stored information (ESI); trade letters; newspaper clippings; press releases; notes;
    projections; drafts of documents; working papers; copies; marginal notations; photographs;
    drawings; tape recordings; catalogues, calendars, inter- or intra-office communications,
    depositions, answers to interrogatories, pleadings, judgments, newspaper articles; motion
    pictures; receipts; any carbon or photographic copies of any such material if you do not have
    custody or control of the original; and all other written, printed, recorded or graphic matter
    or sound reproductions, however produced or reproduced.  The term "document" and
    "documents" also means and includes computer-stored or computer-generated data or
    computer-readable media of any type or nature whatsoever, including that stored on disks,
    hard drives, networks, backup tapes, and printers, and including backup or temporary copies
    of any such data.  If any document requested to be identified and/or produced was, but is
    no longer in existence, state whether it is:

    a.  Missing or lost;

    b.  Destroyed;

    c.  Transferred, voluntarily or involuntarily, to others and, if so, to whom; or

    d.  Otherwise disposed of; and in each instance explain the circumstances surrounding
        an authorization of such disposition hereof, state the approximate date thereof, and
        describe its contents.

6.  "Electronically stored information" and "ESI" means any Information on operational systems including accounting, financial, distribution, or manufacturing systems; E-mail; Instant Messages (IM); Web pages; text messages; cell phone data; Excel spreadsheets and underlying formulae; metadata; computer databases (i.e., Access); erased, fragmented or damaged data; Blackberry data; and anything stored on computer or other electronic means located on or in, but not limited to cache memory; optical disks; magnetic tapes/back-up tapes; magnetic disks (hard drive, floppy disks, etc.); PDAs, Blackberries and Palm Pilots; cell phones; IM tools; or USB drives.

7.  "Person" means and includes a natural person or persons, a group of persons acting as individuals, a group of natural persons acting in collegial capacity, an association, corporation, partnership, joint venture, firm, proprietorship, governmental body and any other incorporated or unincorporated business, enterprise, or entity, including all predecessors or successors in interest, unless otherwise limited herein.

8.  The singular shall, as used herein, shall include the plural, and the masculine shall include the feminine gender and neutral.

9.  "File" means any collection or group of documents maintained, held, stored, or used together, including, without limitation, all collections of documents maintained, held, or stored in folders, notebooks, or other devices for separating or organizing documents.

10.  "Relating to" and "relates to" means, without limitation, embodying, mentioning, or concerning, directly or indirectly, the subject matter identified in the request.

11.  "Concerning" means, in whole or in part, directly or indirectly, referring to, relating to, commenting on, responding to, showing, describing, analyzing, reflecting, and constituting, or being in any way logically connected with the matter discussed.

12.  "Date" means the exact date, month, and year, if ascertainable, or, if not, the best available approximation.

13.  "Describe" and "identify," when referring to a person or individual, are defined to require that you state the following:

    a.  The full name.

    b.  The present or last known residential address.

    c.  The present or last known business address.

    d.  The present or last known residential telephone number.

    e.  The present or last known business telephone number.

    f.  The present occupation, job title, employer, and employer's address at the time of the event or period referred to in each particular request.

    g.  In the case of any person other than an individual, identify the officer, employee, or agent most closely connected with the subject matter of the

request and identify the officer who is responsible for supervising that officer or employee.

14. "Describe" and "identify," when referring to a document, are defined to require that you state the following:

    a.     The nature (e.g., letter, handwritten note) of the document.

    b.     The title or heading that appears on the document.

    c.     The date of the document and the date of each addendum, supplement, or other or addition or change.

    d.     The identity of the author and of the signer of the document, and of the person on whose behalf or at whose request or direction the document was prepared or delivered.

    e.     The present location of the document, and the name, address, position, or title, and telephone number of the person or person having custody of the document.

    f.     A general description of the document.

15. "Describe" or "Identify" when used in reference to a communication, are defined to require you to state the following:

    a.     A description of each communication, including a statement of the date, place, time and person or persons involved.

    b.     The identity of the source(s) of the communication, including the date upon which such communication was made.

16. The word "and" means "and/or."

21. The word "or" means "or/and."

22. "Demised Premises No. 1" means 20320 Northwest Freeway, Suites 500 and 550, Houston, Texas 77065.

23. "Demised Premises No. 2" means 20320 Northwest Freeway, Suites 800 and 900, Houston, Texas 77065.

24. "Asset Purchase Agreement means the Asset Purchase Agreement dated effective September 1, 2019 and attached hereto as Exhibit "A."

## II.  RELEVANT TIME PERIOD

    The relevant period, unless otherwise indicated, shall be from January 1, 2018, through the present, and shall include all documents and information which relate in whole or in part to such period, or to events or circumstances during such period, even though dated, prepared, generated or received prior or subsequent to that period.

## PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT DOCTORS HOSPITAL 1997 LP D/B/A UNITED MEMORIAL MEDICAL CENTER

### INTERROGATORY REQUEST NO. 1:

Identify the name, address and telephone number of the general partner(s) of Doctors Hospital 1997 LP.

**RESPONSE:**

### INTERROGATORY REQUEST NO. 2:

Identify the name, address and telephone number of the limited partners of Doctors Hospital 1997 LP.

**RESPONSE:**

### INTERROGATORY REQUEST NO. 3:

Identify the name, address and telephone number of those persons involved in the negotiations of the Asset Purchase Agreement.

**RESPONSE:**

### INTERROGATORY REQUEST NO. 4:

Identify the name, address and telephone number of those persons and/or entities who provided you, your agents and/or representatives with due diligence documents relating to the Asset Purchase Agreement.

**RESPONSE:**

### INTERROGATORY REQUEST NO. 5:

Identify the name, address and telephone number of the persons and/or entities who reviewed any due diligence documents relating to the Asset Purchase Agreement.

**RESPONSE:**

# EXHIBIT A

LE003463

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "*Agreement*") is made and entered into as of September 1st, 2019, by and among Doctors Hospital 1997 LP d/b/a United Memorial Medical Center, a Texas limited partnership ("*Purchaser*") 1960 Family Practice, PA, a Texas professional association ("*Seller*").

WHEREAS, Seller owns and operates a professional medical practice which provides professional medical and related services (the "*Practice*") at 837 Cypress Creek Parkway Suite 105, Houston Texas 77090;  20320 Northwest Freeway, Houston Texas 77065; 3550 Rayford. Spring, Texas 77386 and 5039 FM 2920, Spring Texas 77388 (the "*Practice Locations*");

WHEREAS, Purchaser desires to purchase from Seller the assets of Seller utilized in the Practice, and Seller wishes to sell such assets to Purchaser (the "*Transaction*").

NOW, THEREFORE, for and in consideration of the premises, and the agreements, covenants, representations and warranties hereinafter set forth, and other good and valuable consideration, the receipt and adequacy of all of which are forever acknowledged and confessed, the parties agree as follows:

## ARTICLE 1.    DEFINITIONS

**1.1 Definitions**. In addition to the other definitions contained in this Agreement, the following terms will, when used in this Agreement, have the following respective meanings:

"*Affiliates*" means, with respect to any Person, any Persons directly or indirectly controlling, controlled by, or under common control with, such other Person at any time during the period for which the determination of affiliation is being made. For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of management policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"*Closing*" means the consummation of the transactions contemplated by and described in Article 2.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Confidential Information*" means information, to the extent not considered a Trade Secret under applicable law, that: (a) relates to the business of the Practice, (b) possesses  an element of value to the Practice, (c) is not generally known to the Practice's competitors, and (d) would damage the Practice if disclosed. Confidential Information shall also include information of any third party provided to the New Practice which the New

LE003464

Practice is obligated to treat as confidential, including, but not limited to, information provided to the New Practice by its referral sources or patients. Confidential Information includes, but is not limited to, (e) future business plans, (f) financial statements, (g) information pertaining to agreements with third-party payers, (h) contracts with any payer or payee of medical services, preferred provider organizations, health maintenance organizations, or any other managed care entities or arrangements, (i) information regarding independent contractors, referral sources, and patients of the Practice, including, but not limited to, patient names, patient charts, lists or records, test results and reports, nurses' notes, operative notes, diagnoses or treatment plans, case histories, x-rays, and patients' financial information, and (j) information concerning the Practice's or a third party's financial structure and methods and procedures of operation. Confidential Information shall not include any information that: (k) is or becomes generally available to the public other than as a result of an unauthorized disclosure, (l) has been independently developed and disclosed by others without violating this Agreement or the legal rights of any party, or (m) otherwise enters the public domain through lawful means.

"*Encumbrances*" means liens (including deed of trust liens, mechanic's or materialmen's liens and judgment liens), charges, encumbrances, security interests, options, judgments or any other restrictions or third party rights.

"*Knowledge of Seller*" (or words of like effect) shall mean the actual knowledge, after due inquiry (unless otherwise indicated herein), of Seller. "Knowledge" as it relates to a party other than Seller, shall mean the actual knowledge of such party, after due inquiry (unless otherwise indicated herein). In the absence of due inquiry, a person shall be deemed to have knowledge of information that would have been discovered by a reasonable inquiry.

"*Law*" means any applicable law, statute, ordinance, rule, regulation, directive, requirement, code, order, judgment, injunction, decree or judicial or administrative doctrine that is legally promulgated or issued by any Governmental Entity.

"*Liability*" shall mean any liability or obligation whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated and whether due or to become due.

"*Losses*" means damages, claims, losses, charges, actions, suits, Proceedings, deficiencies, interest, penalties and reasonable costs and expenses associated therewith (including reasonable attorneys' fees, Proceeding costs, fines, penalties and expenses of investigation), whether asserted by a party to this Agreement or by a third party.

"*Permitted Encumbrance*" means (a) any liens evidenced by an Assumed Contract, and (b) any liens which are not material, which do not interfere with the use of any of the Practice Assets and which do not secure the obligation to pay amounts; including, those liens or encumbrances arising out of any capital debt, capital lease or other long-term liabilities of Seller or the Practice ARE Permitted Encumbrances, except to the extent expressly excluded in this Agreement.

"*Person*" means an individual, a corporation, a partnership, a joint venture, a limited liability company, an association, a foundation, a trust or any other entity or organization.

LE003464

LE003465

"***Proceeding***" means any claim, action, arbitration, audit, hearing, investigation, litigation or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private).

"***Required Consents***" means all consents and waivers, if any.

"***Taxes***" means any tax, fee, assessment, levy, tariff, charge or duty of any kind whatsoever and any interest, penalty, addition or additional amount thereon imposed, assessed or collected, whether disputed or not, by or under the authority of any Governmental Entity or payable under any tax-sharing agreement or any other agreement or contract.

"***Trade Secrets***" shall have the meaning set forth in Tex. Civ. Prac. & Rem. Code § 134A.002(6).

## ARTICLE 2.    PURCHASE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1    **Purchase of Assets**. Subject to the terms and conditions contained in this Agreement, at Closing Seller will sell, convey, assign, transfer and deliver to Purchaser all of its the Seller's property and assets, wherever located and utilized in the Practice, in each case as the same exists on the Closing Date, including, but not limited to the following (collectively, the "***Assets***"):

(a)    all equipment and furnishings (including all medical equipment, computers, and other data processing equipment) used or usable by Seller in the operation of the Practice and which is either owned by Seller or leased by Seller under a capital lease, and any warranties related thereto;

(b)    all commitments, contracts, agreements, operating leases, lease purchase arrangements and license agreements in respect of the Practice (collectively, the "***Assumed Contracts***");

(c)    all inventories, supplies, other current assets and other assets located at or used in connection with the operation of the Practice;

(d)    Purchaser shall sign a lease/sublease agreement for each of the Practice Locations.

2.2    **Excluded Assets**. Notwithstanding the provisions of Section 2.1, the Assets shall not include any of the following items, all of which are specifically excluded from the Assets (collectively, the "***Excluded Assets***"):

(a)    all cash, cash equivalents, short term investments and marketable securities;

(b)    all of the Seller's accounts receivable (whether receivable from patients or from third party payors) (the "***Practice Receivables***"); and

(c)    The name "1960 Family Practice", and its assumed names.

3

LE003466

(d)      its tax id number.

(e)      the following Excluded Assets will be leased to Purchaser at a fair market value monthly rate:

- Current telephone and fax numbers. Purchaser agrees to use the current numbers for the Practice for a period of 24 months following the Closing Date.

- Phone and Efax system

- EHR, RIS, PACS and practice management system

- IT support for these services and the maintenance of patient records through legacy EHR.

### 2.3    Assumption of Certain Liabilities of Seller.

(a)      Purchaser agrees to pay and satisfy all Liabilities of Practices incurred after the Closing Date.  Purchaser is not responsible for Sellers Liabilities prior to the Closing Date.

(b)      Notwithstanding the foregoing, at Closing, Purchaser will assume and agree to satisfy the liabilities, including (collectively, the "*Assumed Liabilities*"):

(i)      the obligations arising under and related to the Assumed Contracts to the extent first arising after the Effective Time;

(ii)      buyer agrees to sign a lease or sublease for all Practice Locations. Purchaser agrees to comply with the terms of the Master/Prime Lease for each Location and shall execute a personal guaranty for payment of said leases, and

(iii)      any existing contractual or non-contractual liabilities used in the operation of the Practice

(iv)      Buyer will remain responsible for all obligations and liabilities incurred from the Closing Date to the termination date.

### 2.4    Purchase Price.

(a)      In consideration of the transfer of Assets to Purchaser, Purchaser agrees to pay to Seller Five Hundred Thousand and No/100 Dollars ($500,000.00) for the purchase of the Assets (the "*Purchase Price*"). subject to following adjustments and prorations:

(i)      Seller shall retain an option period extending 24 (twenty-four) months from the closing date ("Option Period"). During the Option Period the Seller has the right to offer for sale, commit to purchase, or otherwise engage any other party to purchase the Practice Locations and the associated Assets. Seller shall

4

LE003467

offer Purchaser first right of refusal during the Option Period. Upon refusal by Purchaser to purchase and after the closing of another Purchaser. Seller shall return to Purchaser (1) the original Purchase Price, and (2) pay an additional 8%. Upon return of Purchase price this agreement shall be terminated.

(ii)    Seller will maintain an option, exercisable during the Option Period, to terminate the Sale with or without cause.  This option must be exercised in writing and within at least (30) thirty days'notice. If the sale is terminated, the sublease of the locations will also be terminated. Buyer will remain responsible for all obligations incurred from the Closing Date to the termination date. Additionally, Buyer acknowledges that by the end of the last day of the notice period, it (a) no longer has any possessory right to control or use the Practice, assets or any part of the premises at the leased/subleased locations; and (b) will return to Seller all keys, security codes, passwords and badges related to the operation of the Seller. The Seller shall return to Purchaser the original Purchase Price.

(iii)    At any time during the Option Period and for an indefinite period beyond the Option Period, if Purchaser sells Practice business and/or the hospital business, currently located at 16750 Red Oak Dr., Houston, TX 77090, 837 Cypress Creek Parkway Suite 105, Houston Texas 77090;  20320 Northwest Freeway, Houston Texas 77065; 3550 Rayford, Spring, Texas 77386. 5039 FM 2920. Spring Texas 77388 or a relocated or additional address of businesses, the Purchaser is obligated to immediately turn over the first $90,000,000.00 (ninety million dollars) to Providence Hospital of North Houston, LLC.  Purchaser shall retain 50% of any remaining amount of the purchased amount over the $90,000,000.00 and immediately turn over the remaining 50% to Providence Hospital of North Houston, LLC. Purchaser acknowledges the Practice and hospital business refers to the current locations and to any relocation or additional location of said businesses. Purchaser acknowledges and agrees that the terms stated herein are binding and shall survive, regardless of what entity is then operating the businesses or where the businesses are located.

(b)    Purchaser shall pay the Purchase Price on the earlier of,  the date this Agreement is signed or on the date of Closing, by cashier's check or by wire transfer to an account designated in writing by Seller; provided, however, that if the Closing Date falls on a banking holiday. Purchaser shall pay the Purchase Price on the next business day which is not a banking holiday.

(c)    The Purchase Price shall be allocated among the acquired Assets. The parties shall use such allocation for purpose of complying with Section 1060(b) of the Code and for filing Form 8954 with the Internal Revenue Service, and the parties agree that they will not take or cause to be taken any action that would be inconsistent with such allocation.

**Assignment of Contracts**. Notwithstanding any provision of this Agreement to the contrary, to the extent that any contract to be assigned to Purchaser hereunder requires the waiver or consent of any other party, and such waiver or consent has not been obtained but whose benefits are being enjoyed by Purchaser. the contract shall be considered an Assumed Liability of Purchaser . In the

5

LE003467

LE003468

event that the Closing occurs without obtaining such waiver or consent, Seller and Purchaser agree to use their reasonable best efforts to obtain the necessary waiver or consent to the assignment of any such contract.

## ARTICLE 3.        CLOSING

**3.1     Closing.** Closing will take place at the offices of the Seller on September 1, 2019 or such other date as the parties may agree upon (the "***Closing Date***").. Closing will be deemed to have become effective at 12:01 a.m., local time, on the Closing Date (the "***Effective Time***").

**3.2     Actions by Seller at Closing.** At Closing and unless otherwise waived by Purchaser. Seller will deliver or shall cause to be delivered to Purchaser the following:

    **(a)**     such other instruments and documents as are reasonably requested by Purchaser in connection with the consummation of the Transaction or to satisfy the conditions precedent to Purchaser's obligations hereunder.

**3.3     Actions by Purchaser at Closing.** At Closing and unless otherwise waived by Seller, Purchaser will deliver, or cause to be delivered, to Seller the following:

    **(a)**     such other instruments and documents as are reasonably requested by Seller in connection with the consummation of the Transaction or to satisfy the conditions precedent to Seller's obligations hereunder.

## ARTICLE 4.        REPRESENTATIONS AND WARRANTIES OF SELLER

As of the date hereof and (except as otherwise expressly stated herein) as of the Closing Date, Seller hereby makes the representations and warranties to Purchaser set forth below.

**4.1     Capacity and Authority.** Seller is a professional association, duly organized and validly existing under the laws of the State of Texas. Seller has the requisite corporate power and authority to enter into this Agreement and the other documents contemplated hereby, to perform its obligations hereunder and thereunder, and to conduct its business as now being conducted. Seller's execution, delivery and performance of this Agreement and the other documents contemplated hereby, and the consummation by Seller of the transactions contemplated hereby and thereby, are within Seller's powers and have been duly authorized by all appropriate action. This Agreement and the other documents to be executed and delivered by Seller have been or will be duly executed and delivered by Seller, as the case may be.

**4.2     Consents; Absence of Conflicts with Other Agreements, Etc.** The execution, delivery and performance by Seller of the Agreement hereby: (a) will not conflict with any provision of Seller's organizational documents; (b) will not violate, conflict with or constitute on the part of Seller a breach of or a default under, or require approval or consent of any Person under, any Law, Governmental Authorization, material contract, agreement, indenture, mortgage or lease to which Seller, the Practice, or any of the Assets may be subject; and (c) will not create any Encumbrance on any of the Assets.

**4.3     Binding Effect.** This Agreement is and will constitute the valid and legally binding obligation of Seller, and is and will be enforceable

**4.4     Financial Statements and Contracts.** Seller will deliver to Purchaser a sample

6

LE003468

LE003469

schedule of Practices' monthly expenses <u>Exhibit B</u>. Seller will make available to Purchaser true and complete copies of Assumed Contracts.

    **45**    **Regulatory Compliance**. Seller is in compliance with all Laws of all Governmental Entities having jurisdiction over the Practice and its operations.

    **46**    **Equipment and Other Assets.**

    **(a)**    The Assets constitute all assets, properties and leasehold estates in the operation of the Practice, except for the Excluded Assets. All of the personal property owned or leased by Seller under an Assigned Contract is in good operating condition and repair, free from any defects (except such minor defects as do not interfere with the use thereof in the conduct of the normal operations), ordinary wear and tear excepted, have been maintained consistent with the standards generally followed in the industry.

    **(b)**    All inventories are usable and saleable in a manner consistent with past practices and industry standards and are at levels sufficient to operate the Seller's Business in the ordinary course.

    **47**    **Employee Relations.**

    (a) As used herein, the term "***Employee***" means, collectively, each Person, who on the Effective Date of this APA, is an employee of Seller and any other person listed on <u>Exhibit A</u> attached hereto who provides services for Seller.

    (b) On the Effective Date of this APA, or other date mutually agreed upon to allow for a smooth transition, Seller will terminate the employment of each of the Employees. Purchaser will offer employment to each Employee. As used herein, "***Hired Employee***" means each Employee who accepts Purchaser's offer of employment described above. Notwithstanding the foregoing, nothing in this Agreement will be deemed to require Purchaser to retain any Hired Employee for a certain period of time but Purchaser must be compliant with the WARN ACT and provide a 60 day notice to those employees being terminated.

    (c) The Hired Employees will be offered employment at a salary comparable to their current salary with Seller. The Hired Employees will be eligible to participate in Purchaser's employee benefit plans in accordance with the terms of such plans as amended from time to time. Hired Employees will be given credit for their existing earned but unused PTO and given credit for their full-time period of employment with Seller for purposes of determining the amount of paid time off under Purchaser's PTO plan and other benefits determined by tenure.

    (d) During the Option Period, if the Purchaser intends to end the employment of a Hired Employee that would make $60,000.00 or more annually, Purchaser will notify Seller's administrator of the intent to terminate for administrators' mutual consent. The administrator for Seller shall be Stacy Williams. Seller shall notify Purchaser of any change of administrator.

LE003469

LE003470

## ARTICLE 5.    REPRESENTATIONS AND WARRANTIES OF PURCHASER

As of the date hereof and (except as otherwise expressly stated herein) as of the Closing Date, Purchaser represents and warrants to Seller as follows:

**5.1    Capacity and Authority**. Purchaser is a limited partnership, duly organized and validly existing in good standing under the laws of the State of Texas. Purchaser has the requisite corporate power and authority to enter into this Agreement and the other documents contemplated hereby, to perform its obligations hereunder and thereunder, and to conduct its business as now being conducted. Purchaser's execution, delivery and performance of this Agreement and the other documents contemplated hereby, and the consummation by Purchaser of the transactions contemplated hereby and thereby, are within Purchaser's powers and, subject to the receipt of approvals contemplated under Section 8.7, have been duly authorized by all appropriate action. Purchaser, its representatives, and agents shall owe a fiduciary duty to Seller and its members to operate the Practice and to use and manage Sellers Assets in good faith with the utmost business judgement. Purchaser shall not encumber, mortgage, cause a lien to attach to, commit waste, transfer, or convey any of the Sellers Assets during the Option Period.

**5.2    Consents; Absence of Conflicts with Other Agreements, Etc**. Purchaser's execution, delivery and performance of this Agreement and the other documents contemplated hereby, and the consummation by Purchaser of the transactions contemplated hereby and thereby: (a) except as otherwise expressly provided herein, do not require any approval or consent of, or any declaration or filing with, any Governmental Entity which is required by Law; and (b) will not violate, contravene, conflict with or constitute on the part of Purchaser a breach of or a default under the respective articles of organization and operating agreement of Purchaser, any existing Law, or any material agreement, indenture, mortgage or lease to which Purchaser is subject.

**5.3    Binding Effect**. This Agreement and any other agreements to which Purchaser will become a party hereunder are and will constitute the valid and legally binding obligations of Purchaser and are and will be enforceable against Purchaser in accordance with the respective terms hereof and thereof.

## ARTICLE 6.    PRE-CLOSING COVENANTS OF SELLER

**6.1    Operations**. Between the date of this Agreement and the Closing Date, Seller shall:

(a)    carry on the business of the Practice in substantially the same manner as has heretofore been conducted and not make any material change in any operations, finance, accounting policies or real or personal property relating to the Practice, except as otherwise expressly required by this Agreement;

(b)    at Seller's expense, maintain the Assets in as good working order and condition as at present, ordinary wear and tear excepted;

(c)    maintain and preserve the business organization of the Practice intact, retain employees at the Practice (except for employment terminations in accordance with past practices

8

LE003471

and in the ordinary course of business), maintain relationships with suppliers, patients and others having business relations with the Practice, and take such actions as are necessary to cause the smooth, efficient and successful transition of such business operations and employee and other relations to Purchaser as of Closing;

(d)     notify Purchaser of any known event or circumstance or combination of events or circumstances that is reasonably likely to have a material adverse effect on the Seller or the Practice or would cause or constitute a breach of any of the Seller's representations, warrants, or covenants contained herein; and

(e)     continue to cooperate with Purchaser's ongoing diligence investigation of the Practice and Assets.

6.2     **Closing Conditions**. Between the date of this Agreement and the Closing Date, Seller will cause the conditions specified in Articles 8 and 9 over which Seller has control to be satisfied as soon as reasonably practicable, but in all events before Closing.

## ARTICLE 7.     PRE-CLOSING COVENANTS OF PURCHASER

7.1     **Closing Conditions**. Between the date of this Agreement and the Closing Date, Purchaser will cause the conditions specified in Articles 8 and 9 over which Purchaser or any of its Affiliates has control to be satisfied as soon as reasonably practicable, but in all events before the Closing Date.

## ARTICLE 8.     CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

The obligations of Purchaser hereunder are, subject to the satisfaction, on or prior to the Closing Date, of the following conditions, unless waived by Purchaser:

8.1     **Representations, Warranties and Covenants**. The representations and warranties of Seller contained in this Agreement will be true in all material respects when made and on and as of the Closing Date (or the date otherwise specified herein) as though such representations and warranties had been made on and as of such date, except for those representations and warranties qualified by materiality, which shall be true in all respects.

8.2     **Actions or Proceedings**. No Proceeding will have been instituted and remain in effect seeking to restrain or prohibit the transactions contemplated hereby; and no Governmental Entity will have taken any other action or made any request of Purchaser or Seller, or their respective agents, as a result of which Purchaser reasonably and in good faith deems it inadvisable to proceed with the transactions contemplated hereby.

8.3     **Diligence; No Material Adverse Change**. Purchaser shall be satisfied with the results of its diligence investigation of Seller, the Practice and the Assets, and between the date hereof and the Closing Date, there shall not have been any event, circumstance, change or effect that, individually or in the aggregate, had or likely will have a material adverse change or affect on the Assets, business, prospects, financial condition or results of operations of Seller or the Practice.

9

LE003471

LE003472

## ARTICLE 9.   CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

The obligations of Seller are, at the option of Seller, subject to the satisfaction, on or prior to the Closing Date, of the following conditions unless waived by Seller:

**Representations, Warranties and Covenants**. The representations and warranties of Purchaser contained in this Agreement will be true in all material respects when made and on and as of the Closing Date (or the date otherwise specified herein) as though such representations and warranties had been made on and as of such date, except for those representations and warranties qualified by materiality, which shall be true in all respects; and each and all of the terms, covenants and conditions of this Agreement to be complied with or performed by Purchaser on or before the Closing Date pursuant to the terms hereof will have been duly complied with and performed in all respects.

**9.1    Actions or Proceedings**. No Proceeding before any Governmental Entity will have been instituted or threatened to restrain or prohibit the transactions contemplated hereby; and no Governmental Entity will have taken any other action or made any request of Seller or Purchaser as a result of which Seller reasonably and in good faith deems it inadvisable to proceed with the transactions contemplated hereby.

## ARTICLE 10.   OTHER COVENANTS AND AGREEMENTS

### 10.1    Trade Secrets and Confidential Information.

(a)    Purchaser agrees that it/he will not use, disclose, or reverse engineer the Trade Secrets or the Confidential Information for any purpose other than in connection with the medical practice formerly operated by Seller which shall be operated by Purchaser (such continued operations to be referred to as the *"New Practice"*), except as authorized in writing by Seller or its Affiliate. The obligations under this Section 10.1 shall remain in effect as long as the information constitutes Confidential Information or a Trade Secret. The confidentiality, property, and proprietary rights protections available in this Agreement are in addition to, and not exclusive of, any and all other rights to which Purchaser is entitled under any other contracts or federal and state law, including, but not limited to, rights provided under copyright laws, trade secret and confidential information laws, and laws concerning fiduciary duties.

(b)    In the event Purchaser breaches any portion of Section 10.1 Above during the Option Period, nothing contained in this Agreement shall limit Sellers's right to any remedies at law or in equity. If Purchaser breaches any portion of Section 10.1 above, Purchaser agrees that: (i) Seller would suffer irreparable harm; (ii) money damages alone would be an inadequate remedy for the injuries suffered by Seller; and (iii) if Seller seeks injunctive relief to enforce Section 10.1 above, Purchaser shall waive and shall not: (A) assert any defense that Seller has an adequate remedy at law with respect to the breach, (B) require that Seller submit proof of the economic value of any Trade Secret or Confidential Information, or (C) require Seller to post a bond or any other security.

10

LE003473

(c)     The covenants set forth in Section 10.1 of this Agreement shall be construed as an agreement independent of (i) any other agreements, or (ii) any other provision in this Agreement, and the existence of any claim or cause of action by Purchaser against Seller, whether predicated on this Agreement or otherwise, regardless of who was at fault and regardless of any claims that either Seller or Purchaser may have against the other, shall not constitute a defense to the enforcement by Seller of any of the covenants set forth in Section 10.1 of this Agreement. Seller shall not be barred from enforcing any of the covenants set forth in Section 10.1 of this Agreement by reason of any breach of (i) any other part of this Agreement, or (ii) any other agreement with Purchaser.

(d)     If any covenant in Section 10.1 is held to be unreasonable, arbitrary, or against public policy, such covenant will be considered to be divisible with respect to scope, time, and geographic area, and such lesser scope, time, or geographic area, or all of them, as a court of competent jurisdiction may determine to be reasonable, not arbitrary, and not against public policy, will be effective, binding, and enforceable against Purchaser.

10.2    **Confidentiality**. This "*Confidentiality Agreement*", shall remain in full force and effect. In addition to the covenants in the Confidentiality Agreement, except as expressly contemplated hereunder, neither party will disclose to any Person any of the terms, conditions or other facts with respect to the Transaction, including the status thereof; provided, however, that each party may disclose such information (i) to its officers and advisors who need to know the same for the sole purpose of evaluating the Transaction and also have been informed of the confidential nature of the Confidential Information and have been directed to hold such information in strict confidence and to use such information solely for the purposes permitted hereunder, (ii) to third parties in connection with obtaining Required Consents, and (iii) to the extent required under applicable Law. Notwithstanding any provision to the contrary in the Confidentiality Agreement, Seller authorizes Purchaser and its representatives to disclose information regarding the Transaction with Seller's employees in a manner mutually acceptable to Seller and Purchaser that will not be disruptive to current operations.

10.3    **Access**. Purchaser may continue its due diligence review and investigation of Seller including its business, assets and liabilities. Seller shall provide Purchaser and its representatives with copies of, and/or reasonable access to, all information requested by Purchaser relating to the operations, assets and financial condition of Seller, together with reasonable access to the management and employees of Seller, for the purpose of conducting such due diligence. Purchaser and its representatives will use good faith efforts to conduct due diligence in such manner as to minimize any disruption to Seller's business. The parties shall cooperate with one another in the due diligence process.

10.4    **Books and Records**.

(a)     After the Closing Date, Purchaser will maintain in the ordinary course of business all books and records of the Practice which relate to the post-Closing business, operations and affairs of the Practice, and Seller will maintain in the ordinary course of business all such books and records which relate to the pre-Closing business.

10.5    **Further Assurances**. After Closing, and without further consideration, each party shall, at the request of the other party, execute and deliver such further documents and instruments of conveyance, assignment, and transfer and shall take such further reasonable actions as may be

11

LE003473

LE003474

necessary or desirable, in the reasonable opinion of the requesting party, to consummate the transactions contemplated hereunder or to carry out the intent of this Agreement.

10.6    **Risk of Loss**. Seller will bear all risk of loss, destruction or damage to any of the Assets occurring prior to Closing, whether due to fire, accident or other casualty, willful act, condemnation, riot, act of God or otherwise, and Purchaser will have no responsibility with respect thereto. Purchaser will bear all risk of loss, destruction or damage to any of the Assets occurring post Closing, whether due to fire, accident or other casualty, willful act, condemnation, riot, act of God or otherwise, and Seller will have no responsibility with respect thereto.

10.7    **Publicity**. From and after the date hereof, neither party shall publish any press release or make any other public communications with respect to the transactions contemplated hereby and the method of release thereof unless mutually agreed upon by Seller and Purchaser.

## ARTICLE 11.    INDEMNIFICATION

11.1    **Indemnification by Seller**. Seller hereby indemnifies and holds harmless Purchaser against any Losses suffered by Purchaser arising out of or resulting from:

(a)    the breach or failure of any representation or warranty of Seller contained in this Agreement or any of the Transaction Documents;

(b)    the breach or nonfulfillment of any agreement or covenant of Seller contained in this Agreement or any of the Transaction Documents; or

(c)    any liability, Encumbrance (other than Permitted Encumbrances), obligation, claim against or contract of Seller, its Affiliates, Shareholders or the Practice, of any kind or nature whatsoever, and at any time existing or asserted, whether or not accrued, whether fixed, contingent or otherwise, whether known or unknown, and whether or not recorded on the books and records of Seller or otherwise disclosed to Purchaser, due to or arising by reason of any transaction or event occurring prior to Closing, which is not an Assumed Liability; or

(d)    any Retained Liability; or

(e)    any Excluded Asset; or

(f)    any act of commission or omission of Seller, its Affiliates, any Shareholder or the Practice, or their respective employees, officers, agents or independent contractors, prior to Closing; or

(g)    the use, operation or maintenance of the Assets or the Practice prior to Closing; or

(h)    any claim for brokerage commission or finder's fee asserted by any person, firm or corporation claiming to have been engaged by Seller.

11.2    **Indemnification by Purchaser**. Purchaser will indemnify and hold harmless Seller against any Losses suffered by Seller arising out of or resulting from:

(a)    the breach or failure of any representation or warranty of Purchaser

12

LE003475

contained in this Agreement or in any of the Transaction Documents; or

**(b)** the breach or nonfulfillment of any agreement or covenant of Purchaser contained in this Agreement or in any of the Transaction Documents; or

**(c)** any Assumed Liability; or

**(d)** any act of commission or omission of Purchaser, or its employees, officers, agents or independent contractors, subsequent to Closing; or

**(e)** the use, operation or maintenance of the Assets or the Practice by Purchaser after the Closing; or

**(f)** any claim for brokerage commission or finder's fee asserted by any person, firm or corporation claiming to have been engaged by Purchaser.

### 11.3 Survival.

**(a)** Each of the covenants set forth in this Agreement will survive the Closing in accordance with its terms.

**(b)** Notwithstanding anything herein to the contrary, the rights and remedies under this Article 11 with respect to any Proceeding (including, without limitation, recovery of Losses in respect thereof) for which notice has been given prior to the applicable Representation Survival Date will survive until such Proceeding has been resolved.

### 11.4 Limitations.

**(a)** As used in this Article 11, the term "*Losses*" include only losses actually paid or incurred and does not include any amounts recovered from any surety, insurance carrier, or third party obligor.

**(b)** Notwithstanding anything contained herein to the contrary, (i) Seller not be required to make any indemnification payment pursuant to Section 11.1(a) of this Agreement with respect to Losses.

**(c)** During the Option Period, Purchaser, its representatives, and agents shall owe a fiduciary duty to Seller and its members to operate the Practices and to use and manage the Sellers Assets in good faith and with the utmost business judgment. Purchaser shall not encumber, mortgage, cause a lien to attach to, commit waste, transfer, or convey any of the Sellers Assets during the Option Period

## ARTICLE 12.    TERMINATION

**12.1 Termination.** This Agreement may be terminated at any time during the Option Period as follows:

**(a)** by the mutual consent of Purchaser and Seller;

**(b)** by Seller if a material breach of this Agreement has been committed by Purchaser and such breach has not been cured (to the extent curable) to the reasonable satisfaction

13

LE003475

LE003476

breach then Seller can give a 15 (fifteen) day termination notice to Purchaser;

(c)     Seller can terminate this agreement without cause with a 30 (thirty) day written notice to Purchaser

(d)     by Seller, upon notice to Purchaser, if between the date hereof and the Closing Date there has occurred (or been discovered) any event, condition or change in the operations of the Purchaser, or in the financial condition, assets, liabilities (contingent or otherwise) or income of Purchaser, which, individually or in the aggregate, results in or is reasonably likely to result in a material adverse effect on the assets, operations, results of operations, or financial condition of Purchaser taken as a whole; or

**12.2     Effect of Termination**. In the event of any termination of this Agreement, as provided by Section 12.1 or Section 2.4 , this Agreement will thereupon become void and of no effect, no party will have any further rights or obligations hereunder, and no party will have any liability to any other party arising out of such termination except those obligations and rights as stated herein. Upon termination, Seller shall return the Purchase Price to Purchaser. Purchaser acknowledge that termination of this Agreement for a breach in no way limits the causes of actions or remedies available to Seller under the applicable law.

### ARTICLE 13.     IN GENERAL

**13.1     Costs**. Whether or not the transactions contemplated hereby are consummated and except as otherwise expressly provided herein, each party will be responsible to pay its own costs and expenses incurred in connection with proceeding with the Transaction, including, but not limited to, any legal fees incurred by such party. Purchaser or its Affiliate will pay the costs and expenses of consultants and advisers jointly engaged by Purchaser or its Affiliate, on the one hand, and Seller, on the other hand. Seller shall timely pay all sales, transfer or similar taxes required to be paid by reason of the sale by Seller to Purchaser of the Assets pursuant to this Agreement.

**13.2     Notices**. Any notice, demand or communication required, permitted or desired to be given hereunder will be in writing and will be deemed effectively given when personally delivered, when received by telegraphic or other electronic means (including telecopy and telex) or overnight courier, or five (5) days after being deposited in the United States mail, with postage prepaid thereon, by certified or registered mail, return receipt requested, addressed as follows:

if to Seller:

        1960 Family Practice

        Attn: Huong T Le, President

        20320 Northwest Freeway Ste 900

        Houston, Texas 77065

with copies to:

        huonglemd@yahoo.com

        hlemd1@yahoo.com

LE003476

LE003477

imaging50@live.com

stacy.williams@tmmsonline.net

hkhemka1@tmmsonline.net


if to Purchaser:


with copies to:


or to such other address, and to the attention of such other Person or officer as any party may designate by notice given in like manner.

**13.3     Schedules and Other Instruments**. Each Schedule, each certificate provided hereunder and each written disclosure required hereby is incorporated by reference into this Agreement and will be considered a part hereof as if set forth herein in full; provided, however, that information set forth on any Schedule, certification or written disclosure constitutes a representation and warranty of the party providing the same, and not the mutual agreement of the parties as to the facts therein stated. Any Schedule may be amended after the date hereof only on the mutual written consent of the parties.

**13.4     Choice of Law**. This Agreement will be governed by and construed in accordance with the laws of the State of Texas without regard to its principles of conflicts of laws.

**13.5     Benefit; Assignment**. Subject to express provisions herein to the contrary, this Agreement will inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, successors and permitted assigns, and the rights and obligations of the parties hereunder will survive the sale or other transfer of substantially all of the assets of any party or a change in control of any party. Purchaser may not assign any of its rights or obligations under this Agreement without the express written consent of Seller. Seller may assign all or part of its rights and obligations hereunder to an Affiliate of Seller, including but not limited to Minh C Nguyen, MD or Huong T Le, MD.

**13.6     No Rights in Third Parties**. Nothing contained in this Agreement will be construed as giving rise to any right to enforce its provisions to any Person not a party to this Agreement under any legal theory.

**13.7     Waivers and Consents**. Any waiver of any provision of this Agreement and any consent given hereunder must be in writing signed by the party sought to be bound. The waiver by any party of breach or violation of any provision of this Agreement will not operate as, or be construed to constitute, a waiver of any subsequent breach or violation of the same or any other provision hereof.

**13.8     Interpretation**. In the event any provision of this Agreement is held to be invalid,

15

LE003477

LE003478

illegal, or unenforceable for any reason and in any respect, such invalidity, illegality, or unenforceability will in no event affect, prejudice, or disturb the validity of the remainder of this Agreement, which will be and remain in full force and effect, enforceable in accordance with its terms. Inasmuch as this Agreement is the result of negotiations among sophisticated parties of equal bargaining power represented by counsel, no inference in favor of, or against, any party will be drawn from the fact that any portion of this Agreement has been drafted by or on behalf of such party. The Article and Section headings of this Agreement are for convenience of reference only and do not form a part hereof and do not in any way modify, interpret or construe the intention of the parties.

13.9    **Entire Agreement; Amendment**. This Agreement together with any other agreements expressly contemplated hereby supersede all previous agreements (except for the Confidentiality Agreement, which shall continue to be in effect) and constitute the entire agreement of whatsoever kind or nature existing among the parties representing the within subject matter, between Seller and Purchaser, and no party will be entitled to benefits other than those specified herein and therein. The parties specifically acknowledge that in entering into and executing this Agreement and any other agreements specifically referenced herein or therein, the parties rely solely upon the representations and agreements contained herein and therein and no others. All prior representations or agreements, whether written or oral, not expressly referenced herein are superseded unless and until made in writing and signed by the party sought to be charged therewith. This Agreement may be amended, and the terms hereof may be modified, only by a writing executed by each party hereto, and any matter referred to herein as mutually agreed to or designated by the parties must be evidenced by such a writing.

13.10    **Counterparts**. This Agreement, and any document or instrument required or permitted hereunder, may be executed in counterparts, each of which will be deemed an original and all of which together will constitute but one and the same instrument.

LE003478

LE003479

   IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized officers, all as of the date and year first above written.

**SELLER:**                                      **PURCHASER:**

1960 Family Practice, PA                  Doctors Hosital 1997 LP d/b/a United Memorial Medical Center

---

Huong P Le, M.D.                            ~~Syed Rizwan Mohiuddin~~  RAVI MALLAPURAM
President                                        Its MANAGING DIRECTOR

---                                             08 / 16 / 2019
Date                                            Date

17

LE003479

LE003480

**Exhibit A**

Employees

[See attached]

18

LE003480

LE003481

## Exhibit B

Sample Schedule of Monthly Expenses

[See attached]

19

LE003481